IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CHRISTOPHER LANGDON,                            :
                                               :
                  Plaintiff,                   :
                                               :
            v.                                 :        C.A. No. 06-319 (JJF)
                                               :
GOOGLE INC., d/b/a DELAWARE GOOGLE,            :
INC., YAHOO! INC., and MICROSOFT              :
CORPORATION,                                   :
                                               :
                  Defendants.                  :

**OPENING BRIEF IN SUPPORT OF GOOGLE INC.'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

PROCTOR HEYMAN LLP
Kurt M. Heyman (# 3054)
Email:  kheyman@proctorheyman.com
Patricia L. Enerio (# 3728)
Email:  penerio@proctorheyman.com
1116 West Street
Wilmington, DE 19801
(302) 472-7300
Attorneys for Defendant Google Inc.

OF COUNSEL:

WILSON SONSINI GOODRICH & ROSATI PC
David H. Kramer
Colleen Bal
Bart E. Volkmer
650 Page Mill Road
Palo Alto, CA  94304
(650) 493-9300

Tonia Ouellette Klausner
Emily Shepard Smith
12 East 49th Street, 30th Floor
New York, NY 10017
(212) 999-5800

Dated: October 16, 2006

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

I.     PROCEDURAL HISTORY...............................................................................2

     A.    Plaintiff's Initial Complaint .................................................................2

     B.    Plaintiff's Amended Complaint ............................................................3

II.    FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT ............................3

III.   PLAINTIFF'S CLAIMS...................................................................................6

SUMMARY OF THE ARGUMENT .........................................................................7

ARGUMENT.........................................................................................................8

I.     THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
COMPLY WITH RULE 8 .................................................................................8

II.    PLAINTIFF'S CLAIMS ARE BARRED AS A MATTER OF LAW ........................10

     A.    The Relief Sought By The Amended Complaint Is Precluded By Google's
First Amendment Rights.....................................................................11

     B.    Google Is Immune From All Claims Grounded Upon Google's Exercising
Editorial Discretion Over Internet Content.........................................12

III.   THE AMENDED COMPLAINT SHOULD BE DISMISSED UNDER RULE
12(B)(6) FOR FAILURE TO STATE A CLAIM ...................................................14

     A.    The Complaint Fails to State a Claim Against Google for Violation of
Plaintiff's Right to Free Speech..........................................................15

          1.    Internet Search Engine Results Pages Are Not Public Forums Subject to
First Amendment Protections ................................................16

          2.    Neither Google's AdWords Program Nor Its Search Engine Is Entwined
with the Government.............................................................20

          3.    The Delaware Constitution Does Not Expand First Amendment
Protection beyond the U.S. Constitution................................21

     B.    The Amended Complaint Fails to State a Claim for Breach of Contract ........23

     C.    The Amended Complaint Fails to State a Claim for Fraud .............................24

1.   Google's Explanation for Rejecting Plaintiff's Ads Does Not Support a Claim for Fraud.....................................................................................25

2.   Google's Public Statements Cannot and Do Not Support a Claim for Fraud ............................................................................................26

3.   Because He Has Not Alleged Any Damages, Plaintiff Lacks Article III Standing To Assert a Fraud Claim.......................................................27

D.   The Amended Complaint Fails to State a Claim for Deceptive Trade Practices under Either the Common Law or Deceptive Trade Practices Act.................27

E.   The Amended Complaint Fails to State a Claim Against Google for Discrimination by One Engaged in a "Public Calling" ..................................28

CONCLUSION.................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alderwood Assocs. v. Washington Envtl. Council*, 635 P.2d 108 (Wash. 1981) ..........................22

*Almeida v. Amazon.com, Inc*, 456 F.3d 1316 (11th Cir. 2006)......................................................13

*American Homepatient, Inc. v. Collier*, 2006 WL 1134170 (Del. Ch. Apr. 19, 2006) ...............................................................................................................................................30

*ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 42 Cal Rptr. 3d 256 (Cal. Ct. App. 2006)........................................................................................................... 11-12

*Asociacion de Trabajadores Agricolas de Puerto Rico v. Green Giant Co.*, 518 F.2d 130 (3d Cir. 1975)...........................................................................................................18

*Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133 (9th Cir. 1971).......................11, 19

*Avins v. Rutgers, State Univ. of N.J.*, 385 F.2d 151 (3d Cir. 1967) ..............................................11

*Baker v. Kohn*, 457 U.S. 830 (1982).............................................................................................20

*Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227 (S.D.N.Y. 1994)..................................4

*Batchelder v. Allied Stores Int'l, Inc.*, 445 N.E.2d 590 (Mass. 1983)...........................................22

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)............................................................................13

*Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo. 1991) ............................................................22

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)........................................................................................................................................20, 23

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ................................................................................................................................................2

*Browne v. Robb*, 583 A.2d 949 (Del. 1990)..................................................................................26

*Brzoska v. Olson*, 668 A.2d 1355 (Del. 1995) ..............................................................................26

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961).....................................................20, 22

*Cable Invs., Inc. v. Woolley*, 867 F.2d 151 (3d Cir. 1989) ..........................................................17

*Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119 (9th Cir. 2003)..............................................14

*Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494 (3d Cir. 2006) .................................................24

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .......................................................................27

*Commonwealth v. Tate*, 432 A.2d 1382 (Pa. 1981) .....................................................................18

*CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015 (S.D. Ohio 1997) ...................16

*Concepcion v. Resnik*, 143 Fed. Appx. 422 (3d Cir. 2005), *cert. denied*, 126 S. Ct.
    1420 (2006).........................................................................................................................10

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788
    (1985)..................................................................................................................................18

*Cyber Promotions, Inc. v. America Online, Inc.*, 948 F. Supp. 436 (E.D. Pa. 1996) .. 16, 19, 20-21

*Delaware Solid Waste Auth. v. Eastern Shore Env., Inc.*, 2002 WL 537691 (Del.
    Ch. Mar. 28, 2006).............................................................................................................30

*DiSabatino v. U.S. Fid. & Guar. Co.*, 635 F. Supp. 350 (D. Del. 1986) .....................................26

*Don's Hydraulics, Inc. v. Colony Ins. Co.*, 417 F. Supp. 2d 601 (D. Del. 2006) .........................29

*Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978) ......................................................................17

*Fuester v. Conrail*, 1994 WL 555526 (Del. Super. Sept. 16, 1994).............................................22

*Gannett Co. v. State*, 571 A.2d 735 (Del. 1989).........................................................................21

*Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 29 P.3d 797 (Cal. 2001).....................23

*Grand Ventures, Inc. v. Whaley*, 632 A.2d 63 (Del. 1993)......................................................28-29

*Green v. America Online (AOL)*, 318 F.3d 465 (3d Cir. 2003) ............................................ *passim*

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496 (1939) ...............................................................18

*Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487 (Del. 1982).....................................................26

*Hartz v. Friedman*, 919 F.2d 469 (7th Cir. 1990).......................................................................10

*Helman v. State*, 784 A.2d 1058 (Del. 2001)..............................................................................25

*Higgins v. Beyer*, 293 F.3d 683 (3d Cir. 2002)...........................................................................23

*Howard v. America Online Inc.*, 208 F.3d 741 (9th Cir. 2000)...................................................16

*Hudgens v. NLRB*, 424 U.S. 507 (1976) ................................................................. 16-17, 18, 19

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) ..............................................................................................11, 12, 13

*Indeck Maine Energy, L.L.C. v. ISO New England Inc.*, 167 F. Supp.2d 675 (D. Del. 2001) ...................................................................................................................4

*Island Online, Inc. v. Network Solutions, Inc.*, 119 F. Supp. 2d 289 (E.D.N.Y. 2000) ..................................................................................................................22

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) ...........................................20

*Joint Stock Society v. UDV North America, Inc.*, 53 F. Supp. 2d 692 (D. Del. 1999) , *aff'd*, 266 F.3d 164 (3d Cir. 2001). *f* .............................................27, 29

*Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003) .........................................................23

*Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993) ...................................................... 14-15

*Laguna Publ'g Co. v. Golden West Publ'g Corp.*, 177 Cal Rptr. 703 (Cal. Ct. App. 1981) ...................................................................................................................18

*Langford v. City of Atlantic City*, 235 F.3d 845 (3d Cir. 2000) ....................................14

*Leshko v. Servis*, 423 F.3d 337 (3d Cir. 2005) .............................................................15

*Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261 (Del. Super. 2001) ..........................30

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) ..................................................17, 18

*Lloyd's Corp., Ltd. v. Whiffen*, 849 P.2d 446 (Or. 1993) ..............................................22

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) .......................................................15

*Madden v. Queens County Jockey Club*, 72 N.E.2d 697 (N.Y. 1947) ...........................31

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000) .........................................................27

*Marsh v. Alabama*, 326 U.S. 501 (1946) ................................................................17, 19

*Metzker v. Int'l Paper Co.*, 825 F. Supp. 641 (D. Del. 1993) ........................................24

*Mezzetti v. State Farm Mut. Auto. Ins. Co.*, 346 F. Supp. 2d 1058 (N.D. Cal. 2004).....10

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) ...........................................11

*Morrow v. USA Today Newspaper*, 1988 WL 52833 (S.D.N.Y. May 16, 1988) ...........19

*Munn v. Illinois*, 94 U.S. 113 (1876) ...................................................................18

*NFL v. Governor of Delaware*, 435 F. Supp. 1372 (D. Del. 1977) ...............................30

*New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 650
    A.2d 757 (N.J. 1994)....................................................................................22

*Niemotko v. Maryland*, 340 U.S. 268 (1951) ..........................................................18

*Nike, Inc. v. Kasky*, 539 U.S. 654 (2003) ...............................................................27

*Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003), *aff'd*, 2004
    WL 602711 (4th Cir. Mar. 24, 2004)..................................................13, 14, 16, 24

*Northeastern Florida Chapter of the Associated Gen. Contractors of America v.
    City of Jacksonville, Florida*, 508 U.S. 656 (1993) .........................................27

*Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004) .......................14

*Pacific Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1 (1986)...............11

*Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269 (3d Cir. 2004) .........................6

*Parker v. Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006) .....................................14

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir.
    1993) .........................................................................................................4

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)...........................................18

*Pryor v. NCAA*, 288 F.3d 548 (3d Cir. 2002) ............................................................3

*Radich v. Goode*, 886 F.2d 1391 (3d Cir. 1989)......................................................17

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) .........................................................22

*Resident Participation of Denver, Inc. v. Love*, 322 F. Supp. 1100 (D. Colo. 1971) ....19

*Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384 (3d Cir. 2002) .........................3

*S & R Assocs., L.P. v. Shell Oil Co.*, 725 A.2d 431 (Del. Super. Ct. 1998) .................29

*Smith v. Delaware First Fed. Credit Union*, 395 F. Supp. 2d 127 (D. Del. 2005).........23

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229 (3d Cir. 2005)...........10-11

*State v. Brown*, 195 A.2d 379 (Del. 1963)..........................................................31, 32

*State v. Cargill*, 786 P.2d 208 (Or. Ct. App. 1990) ...........................................22

*State v. Elliott*, 548 A.2d 28 (Del. Super. 1988) *aff'd*, 851 P.2d 1141 (Or. 1993) ...............22, 23

*State v. Schmid*, 423 A.2d 615 (N.J. 1980) ...........................................22

*State v. Shack*, 277 A.2d 369 (N.J. 1971) ...........................................22

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del. 1983) .......................................25

*Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278 (Del. Super. Ct. 1960) ...........................................26

*United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003) ...........................................9, 10

*United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980) ...........................................9

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998)...........................................10

*In re Westinghouse Securities Litig.*, 90 F.3d 696 (3d Cir. 1996) ...........................................8

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...........................................27

*Williams v. Potter*, 384 F. Supp. 2d 730 (D. Del. 2005)...........................................3, 9

*Young v. Joyce*, 351 A.2d 857 (Del. 1975) ...........................................28, 29

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)...........................................13

## STATUTES

42 U.S.C. § 1983...........................................15, 23

47 U.S.C. § 230 *et seq.*...........................................7, 12, 13, 14, 15

Del. Code Ann. tit. 6 § 2513 (2006) ...........................................28

Del. Code Ann. tit. 6, § 2517 (2006) ...........................................6, 28

Del. Code Ann. tit. 6 § 2532 (2006) ...........................................28

Del. Code Ann. Tit. 6, § 2533 (2006) ...........................................28, 30

## RULES

Fed. R. Civ. P. 8...........................................1, 7, 8, 9, 10

Fed. R. Civ. P. 12 ................................................................................ *passim*

Fed. R. Civ. P. 41 ................................................................................3

## OTHER AUTHORITIES

5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1217 at 246 (3d ed. 2004) ................................................................8

62 Fed. Proc., L. Ed. § 62:508 ................................................................3

Del. Const. art. I, § 5 ................................................................21, 23

Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J.L. & Tech. 188 (2006) ................................................................32

Order of Hon. Lacy H. Thornberg, *Langdon v. Tippett* and *Langdon v. Swain*, Nos. 01 Civ. 107 and 01 Civ. 139 (Aug. 6, 2001) ................................................10

Order of Hon Lacy H. Thornberg, *Langdon v. Tippett* and *Langdon v. Swain*, Nos. 01 Civ. 107 and 01 Civ. 139 (Oct. 23, 2003) ................................................10

## INTRODUCTION

Facing Google's initial Motion to Dismiss, *pro se* plaintiff Christopher Langdon ("Plaintiff") voluntarily dismissed numerous claims from his original pleading and filed an Amended Complaint ostensibly to correct the numerous deficiencies that Google had identified. But Plaintiff's Amended Complaint is a lengthy, confusing, stream-of-consciousness rant, from which it is impossible to determine what claims are actually being asserted or the factual basis for them. Plaintiff's failure to comply with Rule 8(a)(2)'s requirement of "a short and plain statement of the claim" is alone grounds to dismiss the Amended Complaint.

In truth, Plaintiff's amendments shed light on only one point – what he hopes to achieve in this lawsuit. Plaintiff asks this Court to second-guess Google's editorial decisions with respect to the ads it chooses to carry on its Internet website, and to override Google's decisions about which sites to recommend to users in its search results. Both the First Amendment and the statutory immunity Congress granted to interactive service providers such as Google mandate rejection of Plaintiff's requests.

To the extent that Plaintiff's claims for relief can be discerned, they remain frivolous. Plaintiff does not come close to pleading facts sufficient to support them. Accordingly, Plaintiff's Amended Complaint should be dismissed with prejudice.

# BACKGROUND

## I.   PROCEDURAL HISTORY

### A.   Plaintiff's Initial Complaint

On May 17, 2006, Plaintiff filed his original Complaint against Google, Yahoo! Inc., Time-Warner Companies, Inc., and Micro-soft Corporation ("Complaint" or "Compl.," D.I. 1). Although the Complaint was by no means clear, the claims against Google appeared to be based on Google's decision not to display online advertisements for two of Plaintiff's websites in connection with the operation of its popular Internet search engine.[1]   Plaintiff's first website, located at www.ncjusticefraud.com, purports to "expose[] some of the fraud perpetrated on the U.S. Supreme Court, and other courts, by North Carolina Attorney General Roy Cooper" and certain of his colleagues.    Compl. at 1.    Plaintiff's second website, located at www.chinaisevil.com, criticizes the Chinese government.  *Id.*  Based on Google's rejection of Plaintiff's proposed ads for the first site, and failure to accept Plaintiff's second ad within a time deemed reasonable by Plaintiff, Plaintiff claimed that Google (1) violated his free speech rights; (2) violated the Commerce Clause; (3) violated the federal and Delaware antitrust laws; and (4) violated provisions of the Communications Act applicable to common carriers.   Plaintiff also used the word "fraud" in his allegations, but made no effort to actually state such a claim.

---

[1] The Ninth Circuit has described an Internet search engine generally as follows:  "When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list related to the entered keyword.  Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used."  *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1045 (9th Cir. 1999).  When Google presents search results to a user, it often presents advertisements it believes will be of interest to the user alongside those search results.

**B.    Plaintiff's Amended Complaint**

Google moved to dismiss the original Complaint on July 24, 2006.    In the face of Google's motion, on September 19, 2006, Plaintiff voluntarily dismissed his claims against Google for violation of (1) the Commerce Clause; (2) federal or state antitrust laws; and (3) the Communications Act.    *See* D.I. 43.    Two days later, and a day after a Court-Ordered deadline, Plaintiff filed an Amended Complaint ("Am. Compl.," D.I. 44).[2]

The Amended Complaint has swelled to thirty-five pages, much of which could fairly be called a screed.    In addition to continuing to press a free speech claim and continuing to use the word "fraud," Plaintiff has buried the phrases "breach of contract" and "deceptive business practice" within his prolix pleading.

## II.    FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT

As best as Google can tell from the Amended Complaint, Plaintiff alleges that he created an account with Google earlier this year, seeking to participate as an advertiser in Google's AdWords Program.    *See* Am. Compl. at 2.    In signing up for the AdWords program, Plaintiff necessarily entered into an agreement with Google—the AdWords Terms and Conditions (the "Agreement").[3]    DiNucci Decl., Ex. A.

---

[2] On August 1, 2006, Plaintiff filed a motion seeking, *inter alia*, additional time to respond to Google's Motion to Dismiss, and to file an amended complaint. D.I. 24. By Order dated August 24, 2006, this Court granted Plaintiff's motion and ordered that Plaintiff file his brief in response to Google's Motion to Dismiss no later than September 18, 2006, and file any amended complaint no later than September 20, 2006. D.I. 38. Plaintiff's late filing of his Amended Complaint is itself grounds for dismissing it. *See* Fed. R. Civ. P. 41(b).

[3] In deciding a motion to dismiss, the Court may consider any exhibits attached to the complaint as well as documents attached to the motion to dismiss which form the basis of the plaintiff's claims. *See Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 388 n.4 (3d Cir. 2002). In addition, documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered. *Pryor v. NCAA*, 288 F.3d 548, 559-60 (3d Cir. 2002) (quoting 62 Fed. Proc., L. Ed. § 62:508); *Williams v. Potter*, 384 F. Supp. 2d 730, 733 n.4 (D. Del. 2005) (considering defendant's written denial of benefits to plaintiff in evaluating motion to dismiss even though plaintiff did not rely on writing itself because plaintiff's claims were based upon denial). Here, the Amended Complaint refers both to Google's Content Policy (*see, e.g.,* Am. Compl. at 4) and (continued...)

The Agreement could not be clearer about Google's unlimited discretion to reject any of Plaintiff's advertisements, stating that Google "may reject or remove any ad[vertisement] . . . for any or no reason." DiNucci Decl., Ex. A at ¶ 2. The Agreement also incorporates Google's Content Policy, which Plaintiff himself acknowledges sets forth "standards" for advertising and again makes plain that Google "reserve[s] the right to reject or approve any ads." Compl., App. I ("Content Policy"). Despite the fact that the documents governing the parties' relationship gave Google the unequivocal right to reject his proposed ads for any reason, Plaintiff's Amended Complaint unabashedly "centers around the Defendants' refusals to run my ads for my websites." Am. Compl. at 1.

According to the Amended Complaint, Plaintiff asked Google to display an advertisement promoting his website at www.ncjusticefraud.com. *Id.* at 2. The text of Plaintiff's proposed ad read:

> Roy Cooper's Fraud
> Cooper's fraud on the Supreme Court
> Corruption within the N.C.D.O.J.
> www.ncjusticefraud.com

*Id.* at 1 & Compl., App. I. Google rejected the ad, explaining:

> Your ad in campaign #1 was just disapproved for the following issues:
> Unacceptable content

---

(...continued from previous page)

Appendix I to the initial Complaint (*see, e.g.,* Am. Compl. at 3), which includes Google's Content Policy. By alleging breach of contract (Am. Compl. at 20), the Amended Complaint makes the AdWords Terms and Conditions a basis of Plaintiff's claims. Those Terms and Conditions are attached as Exhibit A to the Declaration of David DiNucci, submitted herewith ("DiNucci Decl."). *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) (considering purchase and sale agreement attached to defendant's motion to dismiss and stating that a court may consider a document that forms the basis for plaintiff's claim, even where plaintiff did not attach document to its complaint); *Indeck Maine Energy, L.L.C. v. ISO New England Inc.,* 167 F. Supp.2d 675, 678-79 (D. Del. 2001) (considering contracts "integral" to plaintiff's claims that were attached to parties' briefs on motion to dismiss) (citation omitted). *See also Barnum v. Millbrook Care Ltd. P'ship,* 850 F. Supp. 1227, 1232 (S.D.N.Y. 1994) (considering contract not attached to complaint but included with defendant's motion to dismiss).

> POLICY DEFINITIONS:
> Unacceptable Content: At this time, Google policy does not permit ad text that advocates against an individual, group, or organization. In addition, this policy does not permit the advertisement of websites that advocate against a group protected by law. *As noted in our advertising terms and conditions, we reserve the right to exercise editorial discretion when it comes to the advertising we accept on our site.* Please note that both your ad and keywords have been suspended at this time.

Am. Compl. at 3 and Compl., App. I (emphasis added).[4] Google asked Plaintiff to revise his ad consistent with its Content Policy. Compl., App. I. Plaintiff then proposed another ad reading:

> Roy Cooper
> The truth about Roy Cooper
> The North Carolina Attorney General

Am. Compl. at 2-3. Google rejected this second ad, citing the same reasons. *Id.* at 3 and Compl., App. I.

Subsequently, Plaintiff attempted to place an ad promoting a second website, www.chinaisevil.com, which he proposed to read:

> Communist China
> Has Murdered Millions
> Boycott China

Am. Compl. at 2-3. Google informed Plaintiff that this proposed ad was under review to determine if it met Google's Content Policy. *Id.* at 3. Plaintiff withdrew the ad for consideration, re-submitted it, then cancelled his AdWords account because he believed Google

---

[4] In his Amended Complaint, Plaintiff quotes only a portion of the reason given by Google, selectively leaving out Google's specific reference to its advertising terms and conditions. However, he cites to Appendix I filed with his original Complaint, which contains the complete language.

had taken too long to review his ad. *Id*. At Plaintiff's request, Google refunded his $5.00 enrollment fee. Compl. at 13.[5]

According to Plaintiff, after Google rejected his ads, Google supposedly "eliminated" his website from certain of its search results, if only for a brief period of time. Am. Compl. at 13-15.[6] He contends that Google "eliminated" the site for "no reason," and that the supposed removal was inconsistent with various public statements by Google over the years concerning Google's removal of websites from its search results generally. *Id.* at 16-18.

## III. PLAINTIFF'S CLAIMS

Plaintiff's claims for relief span at least fourteen pages of the Amended Complaint, but are not specifically identified. It is therefore difficult to ascertain exactly what claims Plaintiff is attempting to assert. Construing his allegations liberally, Plaintiff contends that by choosing not to carry Plaintiff's proposed ads for www.ncjusticefraud.com and www.chinaisevil.com, and allegedly "censoring" www.ncjusticefraud.com by briefly removing it from search results, Google: (1) violated Plaintiff's right to free speech under the United States Constitution and the Delaware Constitution; (2) breached its contract with Plaintiff; (3) committed common law fraud; (4) engaged in deceptive business practices in violation of the common law and Title 6, Chapter 2517 of the Delaware Statutes; and (5) discriminated against Plaintiff while engaged in a public calling.

---

[5] Although Plaintiff removed this allegation from his Amended Complaint, it appeared in his original Complaint and thus serves as a judicial admission for purposes of this action. *See Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) (facts conceded in complaint constitute judicial admission binding for purposes of the case in which admission is made).

[6] Notably, Plaintiff pleads no facts to suggest the site was "eliminated" as opposed to simply failing to appear as a natural result of Google's automated processes.

## SUMMARY OF THE ARGUMENT

1.      The 35-page Amended Complaint, which contains no numbered paragraphs, but page after page of immaterial factual allegations, should be dismissed for failure to comply with Rule 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief" and Rule 8(e)(1)'s requirement that a pleading's averments be "simple, concise, and direct."

2.      The relief sought by Plaintiff would violate Google's First Amendment right to exercise editorial discretion over the content it displays on its website.

3.      Section 230 of the Communications Decency Act immunizes Google from claims based upon Google's alleged "censorship" of Internet ads and search engine results.

4.      Plaintiff does not and cannot state a claim against Google for violation of his civil rights under the First and Fourteenth Amendments to the United States Constitution, because Google is not a state actor.   The Supreme Court rejected Plaintiff's "public forum" theory decades ago.  Furthermore, Google's search results and advertising space are not open to the public, but controlled exclusively by Google.   The government entanglement theory of state action also does not support Plaintiff's free speech claims, because the Amended Complaint does not and cannot allege in good faith that the government has any, much less significant, involvement in either the Google AdWords Program, or Google's search engine.   Plaintiff's claim under the Delaware Constitution necessarily fails for the same reasons, because the free speech provision of the Delaware Constitution has the same scope as the Federal First Amendment.   Additionally, because Plaintiff is a citizen of Florida and all the conduct at issue took place in California, there is no basis for his claim seeking redress under the Delaware Constitution.

5.      The Amended Complaint fails to state a claim for breach of contract because the contract between Plaintiff and Google specifically authorizes Google to refuse Plaintiff's ad for any or no reason, so there has been no breach, assuming one were even identified.

6.      The Amended Complaint fails to state a claim for common law fraud because it does not allege facts supporting each element of a fraud claim.  Because there are no allegations of damages that can be fairly traced to the allegedly false representations, Plaintiff also lacks constitutional standing to assert a fraud claim.

7.      The Amended Complaint fails to state a claim for deceptive business practices because Plaintiff does not have standing to invoke such claim and, even if he did, he fails to allege any actual or likely damages flowing from the allegedly deceptive conduct.

8.      The Amended Complaint fails to state a claim for discrimination by one engaged in a public calling under Delaware common law, because such a claim lies only against innkeepers.

**ARGUMENT**

**I.      THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH RULE 8**

Rule 8 provides that a complaint shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8(e)(1) further provides that "[e]ach averment of a pleading shall be simple, concise, and direct."  Rule 8 "underscore[s] the emphasis placed on clarity and brevity by the federal pleading rules."  5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1217 at 246 (3d ed. 2004).  A complaint that "rambles" and is "unnecessarily complicated and verbose," *In re Westinghouse Securities Litig.*, 90 F.3d 696, 703 (3d Cir. 1996), or comprised of "vague,

conclusory, and inconsistent" allegations, does not comply with Rule 8. *United States v. City of Philadelphia*, 644 F.2d 187, 205 (3d Cir. 1980). As Judge Easterbrook has explained:

> Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud. Federal judges have better things to do, and the substantial subsidy of litigation (court costs do not begin to cover the expense of the judiciary) should be targeted on those litigants who take the preliminary steps to assemble a comprehensible claim. [Plaintiff's] lawyer filed documents so long, so disorganized, so laden with cross-references and baffling acronyms, that they could not alert either the district judge or the defendants to the principal contested matters.

*United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003). If a complaint fails to meet the standard set forth in Rule 8, "it is subject to dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim." *Williams v. Potter*, 384 F. Supp. 2d 730, 733 (D. Del. 2005) (dismissing *pro se* complaint for failure to comply with Rule 8, even when judged by the less stringent pleading standards applicable to non-lawyers). *See also Garst*, 328 F.3d at 379 (affirming dismissal of complaint).

Plaintiff's Amended Complaint lacks any semblance of compliance with the Rule 8 standards. It comprises 35 pages of disorganized, unnumbered paragraphs, which are replete with redundancies, vague and conclusory allegations, inflammatory personal attacks, and irrelevant material that serve to obscure rather than illuminate Plaintiff's claims. Contrary to Rule 8(e)(1)'s requirement that the averments of a complaint be "simple, concise, and direct," the Amended Complaint begins with 20 pages of rambling assertions regarding Google's supposed political bias, three full pages of which do nothing more than list names of other websites. Plaintiff uses the Amended Complaint as a forum to cast unfounded aspersions on the personal and professional integrity of defendants' representatives, accusing another defendant's attorney of perpetrating a "fraud on the court"—allegations that have no apparent bearing on Plaintiff's claims. *See* Am. Compl. at 19. In addition, Plaintiff devotes a large portion of the

Amended Complaint to rehashing his allegations that public officials in North Carolina defrauded him and a federal court there. None of these allegations have any relevance to any possible claim in the Amended Complaint. Their only function is to require Google to expend time and resources sifting through a surfeit of unnecessary details. Under such circumstances, the Court should dismiss the Amended Complaint for failure to comply with Rule 8. *See, e.g., Concepcion v. Resnik*, 143 Fed. Appx. 422, 426, n.1 (3d Cir. 2005) (attached hereto as Ex. A) (complaint that contained surplusage including "discussions about irrelevant statutes, the alleged invalidity of birth certificates, terms such as 'legal fiction,' and proper punctuation as set forth in a N.A.S.A. handbook" did not comply with Rule 8), *cert. denied*, 126 S. Ct. 1420 (2006); *Hartz v. Friedman,* 919 F.2d 469, 471 (7th Cir. 1990) (125-page complaint that contained "mass of details" that were "surplusage" and made it difficult to sort out the necessary elements of the claim was "egregious violation" of Rule 8, and could have been dismissed on those grounds); *Mezzetti v. State Farm Mut. Auto. Ins. Co.*, 346 F. Supp. 2d 1058, 1067 (N.D. Cal. 2004) (noting that "[g]obbledygook can be no less obfuscatory than an outright lie"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998) (dismissing a complaint on Rule 8 grounds which required "a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations").[7]

## II.    PLAINTIFF'S CLAIMS ARE BARRED AS A MATTER OF LAW

It is well established that a complaint is subject to dismissal under Rule 12(b)(6) where an affirmative defense or immunity appears on the face of the complaint. *Stanziale v. Nachtomi*

---

[7] It should be noted that Plaintiff is hardly an inexperienced litigant. Indeed, the Western District of North Carolina has found that Plaintiff has "engaged in a persistent pattern of frivolous litigation," Order of Hon. Lacy H. Thornberg, *Langdon v. Tippett* and *Langdon v. Swain*, Nos. 01 Civ. 107 and 01 Civ. 139 (Aug. 6, 2001), at 5 (attached hereto as Ex. B), and barred him from filing anything in that court without prior judicial approval. *See* Order of Hon. Lacy H. Thornberg, *Langdon v. Tippett* and *Langdon v. Swain*, Nos. 01 Civ. 107 and 01 Civ. 139 (Oct. 23, 2003), at 5 (attached hereto as Ex. C).

*(In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). Here, facts pled in the Amended Complaint bar Plaintiff's claims as a matter of law.

### A.    The Relief Sought By The Amended Complaint Is Precluded By Google's First Amendment Rights

Plaintiff seeks an order compelling Google to (1) place his ads for his websites "in prominent places" on Google's search engine results, and (2) provide a search result ranking for Plaintiff's websites in a manner deemed by Plaintiff to be "honest[]." Am. Compl. at 34. Plaintiff thus seeks an order compelling Google to speak in the manner deemed appropriate by Plaintiff and preventing Google from speaking in ways that Plaintiff does not like. Such relief plainly would contravene the First Amendment. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 572-73 (1995) (application of state law to require defendants to alter expressive content violated First Amendment because "a speaker has the autonomy to choose the content of his own message"); *Pacific Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (order requiring utility company to allow a political group to use its envelopes to distribute its speech impermissibly burdened company's First Amendment rights because it forced company to associate with the views of other speakers); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (law that required newspapers to conspicuously publish replies to attacks on an election candidate's character "fails to clear the barriers of the First Amendment because of its intrusion into the function of editors"); *Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 136 (9th Cir. 1971) (First Amendment precluded order prohibiting private newspaper from censoring proffered advertisement; "We can find nothing in the United States Constitution, any federal statute, or any controlling precedent that allows us to compel a private newspaper to publish advertisements without editorial control of their content merely because such advertisements are not legally obscene or unlawful."); *Avins v. Rutgers, State Univ. of N.J.*, 385 F.2d 151, 153 (3d Cir. 1967) (rejecting claim that author had a First Amendment right to publish in the law review of a state-run university); *ARP Pharmacy*

*Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 42 Cal Rptr. 3d 256, 260 (Cal. Ct. App. 2006) (statute requiring prescription drug claims processors to submit drug processing costs to their clients was unconstitutional because it improperly compelled speech; "The prohibition against compelled speech encompasses compelled access, where a speaker is required to disseminate the speech of another, even if not required to endorse the content."). Indeed, "[s]ince all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley*, 515 U.S. at 573-74 (citations and quotation marks omitted). In short, the First Amendment bars Plaintiff from obtaining the relief he seeks.

**B.    Google Is Immune From All Claims Grounded Upon Google's Exercising Editorial Discretion Over Internet Content Prepared By Others**

Plaintiff's central allegation concerning Google seems to be a suggestion that Google does not always apply its stated policies when excluding certain advertisements and references to certain websites when displaying its search-results pages. But any claim against an interactive computer service like Google based on such exercises of editorial discretion is barred as a matter of federal law.

Section 230 of the Communications Decency Act ("CDA") states in relevant part:

> No provider … of an interactive computer service shall be held liable on account of … any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2)(A) (2006). Congress enacted this protection to encourage Internet service providers to exercise control over the material presented to or accessed by its users. *See* 47 U.S.C. § 230(b)(1), (4) (reciting Congress's intention "promote the continued development of the Internet and other interactive computer services" and encourage "the development and utilization of blocking and filtering technologies"). As interpreted by the Third Circuit, Section 230 "bars

'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content.'" *Green v. America Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)); *see Batzel v. Smith*, 333 F.3d 1018, 1030 n.14 (9th Cir. 2003) (protections of § 230 intended to encourage service providers to edit third-party content by "protecting service providers and users from liability for claims arising out of the removal of potentially 'objectionable' material from their services"); *Almeida v. Amazon.com, Inc*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006) ("The language of section 230(c)(2) is clearly inconsistent with state law that makes interactive service providers liable based on their efforts to screen content.").    Section 230 immunity applies to all claims other than those specifically exempted by 47 U.S.C. § 230(e), including claims for alleged civil rights violations. *See, e.g., Noah v. AOL Time Warner, Inc.,* 261 F. Supp. 2d 532, 539 (E.D. Va. 2003) (rejecting argument that § 230 immunity did not apply to civil rights claims and finding defendant immune from public accommodations claim under Title II of the Civil Rights Act of 1964), *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004) (attached hereto as Ex. D).

In *Green*, the Third Circuit reviewed a district court's application of Section 230(c)(2) on a motion to dismiss.  The Court of Appeals affirmed a decision holding that an online service provider was immune from claims arising from the alleged failure to fairly enforce its "Community Guidelines" for online speech, and its conduct in blocking the plaintiff's access to email and bulletin boards that the service provider deemed objectionable.  318 F.3d at 469-71, 473.

Section 230 similarly bars Plaintiff's claims, which are all based on Google's editorial decisions regarding screening and deletion of content from its service.  There can be no doubt

that Google is an interactive computer service under § 230(c)(2).[8]  It is equally clear, given

Plaintiff's own allegations, that Google's actions regarding Plaintiff's proposed ads and one of

his websites fall squarely within the protections of § 230(c)(2)(A).   As in *Green*, Plaintiff

complains that Google has not properly enforced its own policy guidelines with respect to third-

party content.   *See, e.g.*, Am. Compl. at 2-3 (Google rejected Plaintiff's ad based upon

unacceptable content); *id.* at 5 (Google allows other ads that do not comply with Google's

Content Policy).   And, again as in *Green*, Plaintiff also complains that Google blocked

information that Google found objectionable.   *See* Am. Compl. at 12-14 (alleging that Google

delisted Plaintiff's website).   Because all of Plaintiff's claims seek to hold Google liable for

decisions regarding screening and deletion of content from its network, they are barred by § 230.

*Green*, 318 F.3d at 471-72; *see also Noah*, 261 F. Supp. 2d at 538-39 (§ 230 barred claims based

on service provider's alleged failure to enforce its content guidelines).

## III.   THE AMENDED COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint

for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).   When

deciding a Rule 12(b)(6) motion to dismiss, courts "must accept as true the factual allegations in

the complaint and all reasonable inferences that can be drawn therefrom."  *Langford v. City of*

*Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000).   However, courts are "not required to accept

---

[8]  "Interactive computer service" is defined broadly as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ."  47 U.S.C. § 230(f)(2).  Courts have uniformly held that search engines like Google are interactive computer services.  *See, e.g., Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006) ("there is no doubt that Google qualifies as an 'interactive computer service'" and is subject to the protections of § 230); *Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 452-53 (E.D.N.Y. 2004) (same); *see also Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119 (9th Cir. 2003) (online matchmaking service held to be interactive service provider under § 230(c)).

legal conclusions either alleged or inferred from the pleaded facts." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation and quotation marks omitted).  Here, Plaintiff's failure to state a claim is obvious.

### A.    The Complaint Fails to State a Claim Against Google for Violation of Plaintiff's Right to Free Speech

Plaintiff cannot state a claim against Google for violation of his free speech rights under either the Federal or Delaware Constitution because Google – a private for-profit corporation – is not a state actor.  Plaintiff concedes, as he must, that state action is required to state a civil rights claim under 42 U.S.C. § 1983.  Am. Compl. at 25; *see Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) ("Section 1983 subjects to liability those who deprive persons of federal constitutional or statutory rights 'under color of any statute, ordinance, regulation, custom, or usage' of a state. . . . We consider actions 'under color of law' as the equivalent of 'state action' under the Fourteenth Amendment.") (citations omitted).    The First Amendment itself provides that "*Congress* shall make no law . . . abridging freedom of speech."  U.S. Const. amend. I (emphasis added).  Applied to the states through the Fourteenth Amendment, it is well established that "the constitutional guarantee of free speech is a guarantee only against abridgment by government." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976); *see Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982) ("Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.").  The determination of whether a party is a state actor and obligated to safeguard First Amendment rights of others is a pure question of law for the Court and is routinely decided under Rule 12(b)(6).  *See, e.g., Green*, 318 F.3d at 471 (affirming motion to dismiss and ruling that plaintiff's First Amendment claim against AOL was meritless).

In this case, the question is easily resolved.  Plaintiff's allegations make clear that Google is a for-profit corporation owned by its shareholders. *See* Am. Comp. 1 (caption identifying Google as a corporation); Compl. at 1-5, 13, 25-26 (describing Google's for-profit AdWords

program); *id.* at 5-12 (acknowledging Google's private property interest in its search engine). Like other for-profit Internet service companies, Google simply is not a state actor. *See, e.g, Howard v. America Online Inc.*, 208 F.3d 741, 754 (9th Cir. 2000) (affirming dismissal of First Amendment claim against Internet service provider on ground that it is not a state actor despite plaintiff's contention that it is a "quasi-public utility" that "involv[es] a public trust" and is responsible for Internet access and communications for millions of users); *Cyber Promotions, Inc. v. America Online, Inc.*, 948 F. Supp. 436, 441 (E.D. Pa. 1996) (dismissing First Amendment claim against AOL as a matter of law on ground that it is not a state actor); *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003) (AOL could not be held liable under First Amendment for briefly terminating plaintiff's account allegedly based upon plaintiff's political views because ISP is not a state actor), *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004) (attached hereto as Ex. D); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1025-26 (S.D. Ohio 1997) (dismissing First Amendment claim against Internet service provider as a matter of law due to absence of state action).

Notwithstanding the obvious fact that Google is not the government, Plaintiff contends that Google should be treated as a state actor because: (1) Google's private search engine is allegedly "a public forum," and (2) Google is an Internet company, and the Internet is entwined with the government. These contentions are squarely foreclosed by longstanding Supreme Court precedent.

### 1.    Internet Search Engine Results Pages Are Not Public Forums Subject to First Amendment Protections

According to Plaintiff, "Internet search engines are public forums, and have been dedicated such, by the Defendants," Am. Compl. at 21, and therefore Google must accept Plaintiff's ads and include his websites in its search engine results. This is a gross misrepresentation of the law. Decades ago the Supreme Court put to rest the theory that a private property owner could be subject to the First Amendment merely because the property at issue

was "open to the public." *See Hudgens v. NLRB*, 424 U.S. 507, 518 (1976) (overruling prior decision finding First Amendment applicable to private shopping center). The *Hudgens* Court categorically rejected the notion of a First Amendment right to access private property for speech. *See id.*, 424 U.S. at 520-21 (where a party claimed the right to speak in a publicly accessible, but privately owned shopping center, "the constitutional guarantee of free expression has no part to play"). As a result, under the First Amendment, a private property owner does not assume First Amendment obligations simply because it opens its property to public access. *See Radich v. Goode*, 886 F.2d 1391, 1398 (3d Cir. 1989) ("The first and fourteenth amendments, however, do not prevent an individual from restricting the exercise of free speech on private property."); *Cable Invs., Inc. v. Woolley*, 867 F.2d 151, 161-62 (3d Cir. 1989) (rejecting claim that apartment complex owners violated plaintiff's First Amendment rights by refusing to permit plaintiff to offer cable television service to tenants because defendant's conduct was "not the conduct of the state or a municipality").

The cases relied upon by Plaintiff are inapposite. *Marsh v. Alabama*, 326 U.S. 501 (1946) held that owners of a company town could not preclude free speech activities on the sidewalks of the town. *Id.* at 509. Subsequent Supreme Court decisions have clarified that the holding in *Marsh* was based on the fact that the private entity that owned the company town had taken on all of the functions of a public municipality, and thus became the functional equivalent of a public municipality. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158-59 (1978); *Hudgens*, 424 U.S. at 520-21. The Third Circuit also has recognized the narrow application of *Marsh* to circumstances where a private party "become[s] a substitute for a municipal government . . . ." *Cable Invs.*, 867 F.2d at 162. Because Google does not own a municipality or function as a government equivalent, *Marsh* has no application.

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) is also off-point. The Court in *Lloyd* rejected the applicability of *Marsh* beyond the circumstances where a defendant performed the full spectrum of municipal powers and thus stood in the shoes of the state. *See id.* at 569

(holding that shopping center could prohibit distribution of handbills on mall property). Any *dicta* in *Lloyd v. Tanner* suggesting that the First Amendment might apply to owners of private property in certain circumstances was rejected by the Court in *Hudgens*. *Hudgens*, 424 U.S. at 514-21 ("the constitutional guarantee of free expression has no part to play in a case such as this"; shopping center owner could prohibit peaceful picketing of store in shopping center). The *dicta* in *Asociacion de Trabajadores Agricolas de Puerto Rico v. Green Giant Co.*, 518 F.2d 130 (3d Cir. 1975), decided before *Hudgens*, is likewise inapposite for that reason. Moreover, the *Green Giant* Court determined that even a company-owned labor camp could prevent access by those wishing to exercise free speech rights. *Id.* at 138.[9]

Even if private property owners could theoretically assume free speech obligations by making their property publicly accessible, Plaintiff's claim against Google would still fail because Google's advertising space is not open to the public for unfettered speech. Plaintiff's own allegations emphasize the fact that Google has a Content Policy, and is contractually entitled to reject ads for any reason or no reason. *See, e.g.,* Am. Compl. at 5, 10; Google's

---

[9] Equally off-point is *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788 (1985), which addressed the conditions in which the government may control access to speech depending on the classification of the *government property* at issue. *See id.* at 801-05. It did not address what conduct would amount to dedication of private property to public use such that the property would become the functional equivalent of public property. Similarly, *Niemotko v. Maryland*, 340 U.S. 268, 273 (1951), and *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939), addressed free speech rights on *public property*. *Munn v. Illinois*, 94 U.S. 113 (1876), addressed the constitutionality of an Illinois statute that fixed the maximum charge for the storage of grain, *see id.* at 123, and has no application to rights of free speech. The other cases cited in the Amended Complaint address state statutes or constitutional provisions that are distinct from the protections afforded by the Federal First and Fourteenth Amendments. *See PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 79-81 (1980) (addressing California constitutional provision and recognizing that states may adopt Constitutional provisions more expansive than those conferred by the Federal Constitution); *Commonwealth v. Tate*, 432 A.2d 1382, 1385 (Pa. 1981) (addressing rights under Pennsylvania statute); *Laguna Publ'g Co. v. Golden West Publ'g Corp.*, 177 Cal Rptr. 703 (Cal. Ct. App. 1981) (addressing free press rights under California Constitution).

AdWords Content Policy, Compl., App. I ("[W]e maintain high standards for ads accepted into the AdWords program. . . . To run your ads on Google . . . you must adhere to both our content and editorial policies.  Application of our policies will always involve an element of discretion and we reserve the right to reject or approve any ads.").  Google's advertising space is thus the opposite of private property that has been dedicated as a public speech forum.  It is private property over which Google expressly exercises exclusive editorial control.  Under virtually identical circumstances, the Ninth Circuit Court of Appeals made plain that there is no basis under the Constitution or otherwise to require a private party like Google to carry another's advertisements:

> We can find nothing in the United States Constitution, any federal statute, or any controlling precedent that allows us to compel a private newspaper to publish advertisements without editorial control of their content merely because such advertisements are not legally obscene or unlawful.

*Associates & Aldrich,* 440 F.2d at 136; *see also Morrow v. USA Today Newspaper,* 1988 WL 52833, at *1 (S.D.N.Y. May 16, 1988) ("The First Amendment places no limit on private conduct, absent a showing of state action.  A private newspaper's refusal to carry a classified advertisement manifests no element of state action, and is thus not prohibited under the First Amendment."); *Resident Participation of Denver, Inc. v. Love,* 322 F. Supp. 1100, 1101-05 (D. Colo. 1971) (newspaper's refusal to print an advertisement did not violate the First Amendment); *cf. Cyber Promotions,* 948 F. Supp. at 445 (Internet service provider did not violate First Amendment by blocking e-mailed advertisements).  The same principle applies here.  The fact that Google's speech is freely *accessible* to the public does not transform its private search engine into a forum that has been dedicated to the public any more than a freely distributed newspaper must accommodate the speech of others simply because it is made available to the public at large.

### 2.    Neither Google's AdWords Program Nor Its Search Engine Is Entwined with the Government

Plaintiff also suggests that Google's refusal to run his ads and alleged delisting of his website from Google search-engine results can be fairly treated as conduct of the government itself, because of the government's "entwinement" with the Internet.    Again, Plaintiff misapprehends the law.    Under an entanglement theory a private party must be so entwined with the government *with respect to the specific conduct at issue*, "that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (constitutional standards apply only "when it can be said that the State is responsible for the specific conduct of which the plaintiff complains" (citation and quotation marks omitted)).    *Brentwood* found sufficient public entanglement in the management and control of a private athletic association to support state action with respect to a decision by the association to sanction a private school for violating an association rule, where 84% of the association's members were public schools represented by their officials acting in their official capacity, members of the decision-making body of the association were State officials, and the association's employees were eligible to participate in the State retirement system.    *Id.* at 299-300.    *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961), also found sufficient government entwinement between the State parking authority and a restaurant located in a space leased by the parking authority to attribute the restaurant's refusal to serve people based on race conduct of the State.    *See id.* at 725.    The Court based its conclusion on the facts that the land and building where the restaurant was located were publicly owned and dedicated to public uses, the restaurant was an indispensable part of the State's plan to operate the overall project, and profits earned by the discrimination were an indispensable element in the governmental agency's financial success.    *See id.* at 723-24.    *Burton* has been limited to cases involving leases of public property, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357-58 (1974), and where the State stands to benefit from the discriminatory conduct.    *See Rendell-*

*Baker v. Kohn*, 457 U.S. 830, 843 (1982). Here, there is no such governmental involvement in Google's AdWords program or search engine results.

Plaintiff cites a laundry list of examples in which the government has been generally involved with the Internet. Am. Compl. at 23-24. These allegations are irrelevant because Google is not the Internet. Google simply operates a search engine that functions as a recommended website list, and selects advertisements to publish on its website. There is no allegation, nor could there be in good faith, that the government has any role in Google's decisions regarding which advertisements it chooses to accept, or the contents of Google's search results. Nor could there be any suggestion that the government stands to benefit financially from Google's rejection of Plaintiff's ads or alleged delisting of his website. Accordingly, Google's actions cannot be fairly attributed to the state, and Google cannot plausibly be deemed a state actor. *See Green v. America Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) (rejecting argument that Internet service provider was transformed into a state actor because it provided an Internet connection permitting users to access government websites and opened its network to the public); *Island Online, Inc. v. Network Solutions, Inc.*, 119 F. Supp. 2d 289, 304-307 (E.D.N.Y. 2000) (corporation with government-authorized monopoly over Internet domain name system not a state actor). Plaintiff's First Amendment claim must be dismissed under Rule 12(b)(6). *See, e.g., Kirtley v. Rainey*, 326 F.3d 1088, 1094-95 (9th Cir. 2003) (affirming dismissal where defendant's alleged actions not fairly attributable to the state under *Brentwood*); *Smith v. Delaware First Fed. Credit Union*, 395 F. Supp. 2d 127, 130 (D. Del. 2005) (dismissing claim under Rule 12(b)(6) where credit union was not a state actor as a matter of law).

### 3. The Delaware Constitution Does Not Expand First Amendment Protection beyond the U.S. Constitution

Because Plaintiff's First Amendment claim fails, his Delaware free speech claim also fails, because the two Constitutional provisions have the same scope. *See Gannett Co. v. State*, 571 A.2d 735, 741 n.9 (Del. 1989) (holding Del. Const. art. I, § 5 has the same scope as the

federal First Amendment); *Fuester v. Conrail*, 1994 WL 555526, at *2 (Del. Super. Sept. 16, 1994) (attached hereto as Ex. E) ("The free press provision of the Constitution of the State of Delaware has the same scope as the First Amendment.").

Plaintiff wrongly asserts that "[u]nder Delaware law, a shopping mall is considered a public forum." Am. Compl. at 20. *State v. Elliott*, 548 A.2d 28 (Del. Super. 1988), to which Plaintiff attributes an apparently made-up quote,[10] stands for no such proposition. The *Elliott* court held that abortion protesters could constitutionally be subject to criminal penalties based on their demonstration on the private property of a health clinic. *Id.* at 33.[11] It did not address

---

[10] Plaintiff quotes *Elliott* as follows: "'Owners of private property held out for public purposes, such as shopping malls, are not entitled to prevent individuals from picketing on landowners private property.'" Am. Compl. at 20. This quoted language does not appear anywhere in the text of the opinion.

[11] Notably, although the *Elliott* court stated that it was deciding the case under the Federal Constitution, 548 A.2d at 31 n.5, it applied a test taken from a New Jersey case, which was decided under the expanded protections of the New Jersey Constitution. *See State v. Schmid,* 423 A.2d 615, 624 (N.J. 1980) ("These concerns persuade us to stay our hand in attempting to decide the question of whether the First Amendment applies to Princeton University in the context of the present appeal. Defendant, moreover, has presented compelling alternative grounds for relief founded upon the State Constitution, which we now reach."). Now that the Delaware Supreme Court has made clear that the Delaware free speech clause has the same scope as the First Amendment, *Elliott's* precedential value is questionable at best. Plaintiff's citation to cases from other states with broader free speech protections than the First Amendment is misplaced, for the same reason. *See Bock v. Westminster Mall Co.*, 819 P.2d 55, 56 n.1 (Colo. 1991) (noting that "[t]he United States Supreme Court has held that the First and Fourteenth Amendments to the United States Constitution do not protect the distribution of leaflets within a privately-owned mall"); *Alderwood Assocs. v. Washington Envtl. Council*, 635 P.2d 108, 111-12 (Wash. 1981) (noting that "the First Amendment . . . does not confer the untrammeled right to speak, picket, or petition in a privately owned shopping center"); *Batchelder v. Allied Stores Int'l, Inc.*, 445 N.E.2d 590, 592 (Mass. 1983) (noting that under the United States Constitution, "[a] person has no First Amendment right to distribute handbills in a privately owned shopping center"); *Lloyd's Corp., Ltd. v. Whiffen*, 849 P.2d 446, 453-54 (Or. 1993) (decided under Oregon constitution); *State v. Cargill*, 786 P.2d 208, 214 n.12 (Or. Ct. App. 1990) (observing that the Supreme Court has held that activists had no federal constitutional right to distribute anti-war literature within a privately owned shopping center); *aff'd*, 851 P.2d 1141 (Or. 1993); *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 650 A.2d 757, 768-70 (continued...)

speech at shopping malls, or determine that the Delaware Constitution provided expanded protections beyond the protections of the Federal First Amendment. *See Elliott,* 548 A.2d at 31 n.5 ("This Court does not presently decide whether the Delaware Constitution provides equal or greater such leverage than the Federal Constitution."). In any event, the *Elliott* court's conclusion that the property owner had not "devote[d] its property to public use such that it was subject to expressional obligations," *id.* at 34, applies equally here. Google has not dedicated its advertising space or search engine results to the public for free discourse. As Plaintiff's allegations make clear, Google alone controls the content of such advertising and search results.

In any event, Plaintiff is a citizen of Florida, not Delaware, and does not allege that any of the events relevant to this case took place in Delaware. Plaintiff therefore has no claim under the Delaware Constitution. *See, e.g.,* Del. Const. art. I, § 5 (granting freedom of the press to *citizens*); *Helman v. State,* 784 A.2d 1058, 1071 (Del. 2001) (noting that the open courts clause "secures a Delaware *citizen's* right to seek redress in the Courts of this State for an injury done to him or her") (emphasis added).[12]

### B.    The Amended Complaint Fails to State a Claim for Breach of Contract

--------

(...continued from previous page)
(N.J. 1994) (noting that "[i]t is now clear that the Federal Constitution affords no general right to free speech in privately-owned shopping centers, and most State courts facing the issue have ruled the same way when State constitutional rights have been asserted") (citing cases); *State v. Shack,* 277 A.2d 369, 371-72 (N.J. 1971) (decided under New Jersey Constitution and recognizing that conduct would not violate Federal Constitution); *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n,* 29 P.3d 797, 800 (Cal. 2001) (noting that union had "no federal constitutional right to picket in a shopping center because the actions of the private owner of the shopping center did not constitute state action").

[12] The statute upon which monetary damages are available for violation of Federal Constitutional claims, 42 U.S.C. § 1983, affords a private right of action only for violations of a *federal* right. *See Higgins v. Beyer,* 293 F.3d 683, 689 (3d Cir. 2002) ("In order to state a claim under § 1983, a plaintiff must allege a violation of a federal right . . . .") (citation and quotation marks omitted). For this reason as well, Plaintiff cannot seek any redress under the federal statute for an alleged violation of the Delaware Constitution.

The Amended Complaint alludes to defendants' alleged use of fraud to "breach their contracts" with Langdon "to advertise on their respective engines," suggesting that Plaintiff may be attempting to assert a breach of contract claim based on Google's failure to accept his proposed advertisements. *See* Am. Compl. at 20. However, nothing in Google's advertising contract with Langdon requires Google to accept proposed ads. Indeed, the AdWords Terms and Conditions, which is the controlling agreement between Langdon and Google, makes clear that Google "may reject or remove any ad[vertisement] . . . for any or no reason." *See* DiNucci Decl., Ex. A at ¶ 2. Google's Content Policy, from which the Amended Complaint quotes extensively, similarly provides that "[a]pplication of our policies will always involve an element of discretion and we reserve the right to reject or approve any ads." Compl., App. I. Because Google's contract for advertising with Plaintiff, as reflected in both the AdWords Terms and Conditions and Content Policy, did not require Google to accept any ad proposed by Plaintiff, and indeed, gives Google the right to approve or reject any advertisement for any or no reason, Google's failure to accept Plaintiff's proposed ads cannot constitute a breach of its contract. *See, e.g., Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 509 (3d Cir. 2006) (holding that where contract did not contain a provision requiring defendants to provide a particular benefit, contract was not breached by defendant's failure to do so); *Metzker v. Int'l Paper Co.*, 825 F. Supp. 641, 649 (D. Del. 1993) (holding that where parties' contract allowed defendant to terminate, that termination could not constitute a breach of contract); *Noah,* 261 F. Supp. 2d at 545 (dismissing breach of contract claim where plain language of member agreement expressly disclaimed any duty to act).

### C.    The Amended Complaint Fails to State a Claim for Fraud

While Plaintiff invokes the words "fraud," "fraudulent," and "misrepresentation" in his Amended Complaint, it is not at all clear that he is attempting to assert a fraud claim. To state a claim for fraud, a plaintiff must allege facts from which it could be found that: (1) the defendant made a materially false representation of fact to the plaintiff; (2) with knowledge of its falsity;

(3) the defendant had an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff acted in justifiable reliance upon the representation; and (5) the plaintiff was damaged as a result of such reliance. *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). The Amended Complaint sets forth five categories of allegedly "fraudulent" statements by Google: (1) Google's explanation for rejecting Plaintiff's proposed ads for his first website; (2) Google's statement in its Content Policy that such Policy applies to anyone who wants to advertise on Google; (3) Google's public statements inviting people to advertise on its site; (4) Google's public statements that its search results are determined objectively; and (5) Google's implied statement by allegedly "de-listing" Plaintiff's website that it either was legally compelled to so, or that Plaintiff was trying to manipulate search results. None of these statements support a fraud cause of action under the circumstances alleged in the Amended Complaint.

### 1. Google's Explanation for Rejecting Plaintiff's Ads Does Not Support a Claim for Fraud

According to the Amended Complaint, Google stated to Plaintiff:

Your ad in campaign #1 was just disapproved for the following issues: Unacceptable content

POLICY DEFINITIONS:
Unacceptable Content: At this time, Google policy does not permit ad text that advocates against an individual, group, or organization. In addition, this policy does not permit the advertisement of websites that advocate against a group protected by law. As noted in our advertising terms and conditions, we reserve the right to exercise editorial discretion when it comes to the advertising we accept on our site. Please note that both your ad and keywords have been suspended at this time.

*Id.* at 3 & Compl., App. I. Plaintiff claims that this statement was false "for several reasons." Am. Compl. at 3-4. Beyond identifying this supposed knowing misrepresentation by Google, Plaintiff does not come close to satisfying any of the other elements of a fraud claim. Plaintiff does not and could not allege that Google's supposed misstatement was intended to induce him

to act in a particular way; that he did, in fact, justifiably act in that way because of Google's statement;[13] or that he was damaged in any way because of his justifiable reliance on Google's explanation.[14]   In short, Plaintiff's fraud claim, based upon Google's supposedly false and after-the-fact explanation, fails at virtually every turn.

## 2.    Google's Public Statements Cannot and Do Not Support a Claim for Fraud

Plaintiff contends that the other four categories of allegedly false statements were made to the public at large, but never claims to have received them himself.  It is well established that to state a claim for fraud, the alleged misrepresentations must have been made *to the plaintiff*. *DiSabatino v. U.S. Fid. & Guar. Co.*, 635 F. Supp. 350, 353 n.4 (D. Del. 1986) ("In an action based on fraud . . . [t]he deceiver must make a false representation of a material fact to the victim." (quoting *Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 284 (Del. Super. Ct. 1960)); *Brzoska v. Olson*, 668 A.2d 1355, 1366 (Del. 1995) (same).  Because Plaintiff does not allege that any of Google's public statements were made to him, the other elements of a fraud claim (Google's intent to induce Plaintiff's reliance, Plaintiff's justifiable reliance, and

---

[13]  Indeed, given that the statements Plaintiff identifies came after rejection of his ad, no such "reliance" would possible.

[14]  The only allegation in the Amended Complaint suggesting harm to Plaintiff is that he claims he has "no viable alternative than advertising on the defendants search engines."  Am. Compl. at 34.  Even if this allegation were true (and it is facially false), Plaintiff's alleged inability to advertise on an Internet search engine flows from Google's rejection of Plaintiff's proposed ads (which Google had the right to reject for any reason), not because of any reliance by Plaintiff on a supposed, after-the-fact misrepresentation, as is required to state a claim for fraud.  *See Browne v. Robb*, 583 A.2d 949, 955-56 (Del. 1990) (to plead claim for fraud, must allege "reliance damaged" the party); *see also Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 499 (Del. 1982) (damages available for fraudulent misrepresentation limited to those which are the direct and proximate result of the false representation).

Plaintiff's damages caused by that reliance) could not possibly be established. Not surprisingly, Plaintiff makes no attempt even to plead these other required elements of a fraud claim.

### 3. Because He Has Not Alleged Any Damages, Plaintiff Lacks Article III Standing To Assert a Fraud Claim

The lack of any allegations in the Amended Complaint from which it can be inferred that Plaintiff has suffered or is likely to suffer any actual damages as a result of any *statements* made by Google is also fatal to his ability to satisfy constitutional standing requirements. "In order to satisfy the three constitutional standing requirements, a plaintiff must show that it has (1) suffered or will imminently suffer an injury, which is (2) fairly traceable to the defendant's conduct and which is (3) likely to be redressed by a favorable federal ruling on the matter." *Joint Stock Society v. UDV North America, Inc.*, 53 F. Supp. 2d 692, 707 (D. Del. 1999) (citing *Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656, 663 (1993)), *aff'd*, 266 F.3d 164 (3d Cir. 2001). A plaintiff seeking injunctive relief must allege facts demonstrating that the conduct at issue will likely cause injury in the future. *See id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)). A litigant must specifically set forth facts sufficient to satisfy both the "causation" and "redressability" prongs of Article III's standing requirements by showing that his injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citations and quotation marks omitted); *see also Nike, Inc. v. Kasky*, 539 U.S. 654, 667 (2003). Plaintiff's fraud claim is subject to dismissal under Rule 12(b)(1) because he has not, and cannot, identify any actual or likely injury that can be traced to any allegedly false statement by Google, let alone an injury that would be redressed by a favorable decision.[15]

---

[15] If Plaintiff lacks constitutional standing to assert a fraud claim, the claim may be dismissed under Rule 12(b)(1). *See Maio v. Aetna, Inc.*, 221 F.3d 472, 487 n.7 (3d Cir. 2000) ("motions to (continued...)

**D.    The Amended Complaint Fails to State a Claim for Deceptive Trade Practices under Either the Common Law or Deceptive Trade Practices Act**

The Amended Complaint alleges that Google "engaged in deceptive business practices, in violation of the common law and Title 6, Chapter 2517, of the Delaware States [sic]." Am. Compl. at 20. But Title 6, section 2517 of the Delaware Code addresses the Delaware Attorney General's power to investigate fraud, and clearly has no application here. *See* Del. Code Ann. tit. 6, § 2517 (2006).

While hardly clear, Plaintiff perhaps means to invoke the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6 §§ 2532-2533 (2006) ("DTPA").[16] It is well established, however, that consumers do not have standing to assert a deceptive trade practices claim under either the DTPA or the common law.

The DTPA generally codifies the common law of unfair competition, although it is broader in one respect. *See Young v. Joyce*, 351 A.2d 857, 859 (Del. 1975). At common law, a plaintiff was required to prove direct competition with a defendant to state a trade practices claim. *See Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 67 (Del. 1993) (identifying proof of competition as a requirement of common law claim). While the DTPA does not contain that limitation, it applies only to conduct that unreasonably interferes "with the promotion and conduct of another person's business." *Id.* at 67-68 (noting that while the DTPA "is broader than the old common law action for unfair competition, it nonetheless arises from those concepts of unfair trade practices that interfere with the business of another," and that the DTPA did not

---

(...continued from previous page)
dismiss on grounds of a failure to allege an 'injury in fact' implicate constitutional standing principles and thus are predicated on Rule 12(b)(1)").

[16] To the extent that Plaintiff is attempting to plead a claim under the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6 § 2513 (2006), he fails against Google for the reasons articulated by Yahoo! Inc. *See* Defendant Yahoo! Inc.'s Opening Brief in Support of its Motion to Dismiss the Amended Complaint at 15-17.

create a new cause of action "distinct from the common law protections designed to secure businesses against the deceptive trade practices of others"). More specifically, the DTPA "'is not intended to redress wrongs between a business and its customers.'" *Don's Hydraulics, Inc. v. Colony Ins. Co.*, 417 F. Supp. 2d 601, 612 (D. Del. 2006) (quoting *Grand Ventures,* 632 A.2d at 65). Thus, under the DTPA, only a plaintiff with a horizontal business relationship with the defendant has standing to assert a deceptive trade practices claim. *See, e.g., Don's Hydraulics,* 417 F. Supp. 2d at 612 (DTPA inapplicable where no horizontal business relationship between parties); *Young,* 351 A.2d at 859 (DTPA inapplicable to claim by buyer against seller).

Here, Plaintiff is a customer of a Google service, namely, the Google AdWords Program. He is not a competitor of Google, as required to assert a claim under the common law, and he is not in a horizontal business relationship with Google, as required to assert a claim under the DTPA. He paid for a service that he is not happy with because Google exercised its right to reject his www.ncjusticefraud.com ads, and neither accepted nor rejected his proposed www.chinaisevil.com ads within the time that Plaintiff unilaterally determined to be reasonable. There are no allegations in the Amended Complaint from which it can be inferred that Google in any way unreasonably interfered with the conduct of Plaintiff's business. Plaintiff therefore lacks standing to pursue a deceptive trade practices claim against Google. *See, e.g., Joint Stock Soc'y v. UDV North America, Inc.,* 53 F. Supp. 2d 692, 671 (D. Del. 1999) (party that was not competing with defendant in any way had no reasonable business interest to protect, and therefore had no standing to pursue DTPA claim); *Grand Ventures,* 632 A.2d at 70 (purchaser of defendant's products lacked standing to pursue claim under DTPA); *S & R Assocs., L.P. v. Shell Oil Co.,* 725 A.2d 431, 440 (Del. Super. Ct. 1998) (consumer lacked standing to assert DTPA claim).[17]

---

[17] The same standing requirement applies to claims of "unfair competition," which involve "alleg[ations] that [the plaintiff] has a reasonable expectancy of entering a valid business

(continued...)

In any event, even if Plaintiff had standing to assert a deceptive trade practices claim against Google, his claim still would be subject to dismissal because there are no factual allegations from which it can be inferred that Plaintiff has or is likely to suffer any monetary damages because of any alleged "deceptive trade practice" of Google. Under the common law, a showing of damages proximately caused by the conduct at issue is a required element of a deceptive trade practices claim. *American Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *4 (Del. Ch. Apr. 19, 2006) (attached hereto as Ex. F) (rejecting common law unfair competition claim where, *inter alia*, party failed to prove that loss of business was proximately caused by defendant's activities). The DTPA requires a showing that the plaintiff is "likely to be damaged by a deceptive trade practice of another." *See* Del. Code Ann. tit. 6, § 2533(a) (2006). The Amended Complaint does not allege that Plaintiff either was harmed in any way, or is likely to be harmed in any way by any alleged deceptive practice of Google. Absent any such actual damages or likely future harm, Plaintiff's common law and statutory deceptive trade practices claims must be dismissed. *See NFL v. Governor of Delaware*, 435 F. Supp. 1372, 1389 (D. Del. 1977) (rejecting plaintiff's unfair competition claim where challenged conduct would not cause injury); *Lipson v. Anesthesia Servs., P.A.,* 790 A.2d 1261, 1290 (Del. Super. 2001) (lack of basis for injunctive relief precluded claim under DTPA). Indeed, absent actual or threatened damages fairly traceable to the challenged action, which can be redressed by a favorable decision, Plaintiff lacks constitutional standing to pursue this claim. *See* Argument III.C.3, *supra*.

---

(...continued from previous page)
relationship with which the defendant wrongfully interferes, thereby defeating the plaintiff's legitimate expectancy and causing the plaintiff harm." *Delaware Solid Waste Auth. v. Eastern Shore Env., Inc.*, 2002 WL 537691, at *6 (Del. Ch. Mar. 28, 2006) (attached hereto as Ex. G).

**E.    The Amended Complaint Fails to State a Claim Against Google for Discrimination by One Engaged in a "Public Calling"**

The Amended Complaint asserts that Google is engaged in a "public calling" and that under Delaware common law it therefore may not discriminate against its customers on the basis of "political bias, and/or advertising budgets." Am. Compl. at 20-21.  Plaintiff's contention lacks legal merit, because Google is not engaged in a "public calling," as recognized by the Delaware common law.

The common law "public calling" doctrine does not apply to an Internet search engine, such as Google.  As the New York Court of Appeals has observed, "[a]t common law a person engaged in a public calling, such as an innkeeper or common carrier, was held to be under a duty to the general public and was obliged to serve, without discrimination, all who sought service." *Madden v. Queens County Jockey Club*, 72 N.E.2d 697, 698 (N.Y. 1947).  Other private enterprises, however, "enjoy[] an absolute power to serve whom they pleased." *Id.*  Delaware has interpreted this common law principle to require innkeepers who serve the general public "to receive all travelers who conducted themselves with propriety and had the ability to pay for a meal and lodging." *State v. Brown*, 195 A.2d 379, 382 (Del. 1963).  However, in doing so, the Delaware Supreme Court specifically recognized that an innkeeper's obligation to serve the general public is "materially different from the duties imposed upon owners of other places of public accommodation," and that, apart from the category of public establishments "held out by the proprietor as offering sleeping accommodations, and, if so required, food and drink . . . it is clear that at common law the owner of a restaurant or other place of public refreshment, amusement, or entertainment was free to select patrons upon any basis deemed satisfactory to

him." *Id.* at 381-82.[18]   Google, an Internet search engine, plainly does not fall within the definition of an innkeepers governed by Delaware's common law "public calling" principle.

## CONCLUSION

For all the foregoing reasons, Defendant Google Inc. respectfully requests that the Court dismiss Plaintiff's Amended Complaint with prejudice under Rules 12(b)(1) or 12(b)(6).

PROCTOR HEYMAN LLP

Kurt M. Heyman (# 3054)
Email:  kheyman@proctorheyman.com
Patricia L. Enerio (# 3728)
Email:  penerio@proctorheyman.com
1116 West Street
Wilmington, DE 19801
(302) 472-7300
Attorneys for Defendant Google Inc.

---

[18] To the extent Langdon is alleging that Google discriminated against him with respect to the results displayed by its search engine, the claim is nonsensical.  Search engines, by their very nature, necessarily discriminate in favor of some sites and against others because their goal is to return search results that most accurately and effectively respond to their users' queries.  As one leading law professor recently explained in a Yale law journal, "search engines make editorial choices designed to satisfy their audience.  These choices systematically favor certain types of content over others . . . ."  Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J.L. & Tech. 188 (2006).  Search engines' very effectiveness *depends upon* editorial choices that value some websites more highly than others.  Absent such editorial control, or "discrimination," as Plaintiff seeks to characterize it, the search engine's "system quickly and inevitably will be overtaken by spammers, fraudsters and malcontents[,] . . . becom[ing] worthless to searchers." *Id.*

OF COUNSEL:

WILSON SONSINI GOODRICH & ROSATI PC
David H. Kramer
Colleen Bal
Bart E. Volkmer
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

Tonia Ouellette Klausner
Emily Shepard Smith
12 East 49th Street, 30th Floor
New York, NY 10017
(212) 999-5800


Dated: October 16, 2006

## CERTIFICATE OF SERVICE

Kurt M. Heyman, Esquire, hereby certifies that on October 16, 2006, copies of the foregoing Opening Brief in Support of Google Inc.'s Motion to Dismiss the Amended Complaint were served as follows:

### VIA FEDERAL EXPRESS

Christopher Langdon
1835 Edwin Blvd.
Winter Park, FL 32789

### VIA E-FILING

Daniel V. Folt, Esquire
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

Kurt M. Heyman (# 3054)

# EXHIBIT A

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

Westlaw.

143 Fed.Appx. 422                                                           Page 1

143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3 (N.J.))
**(Cite as: 143 Fed.Appx. 422)**

**H**
Briefs and Other Related Documents
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
      United States Court of Appeals,Third Circuit.
            Alberto CONCEPCION, Appellant,
                            v.
      Scott A. RESNIK; Alfred J. Lechner, Jr.; Carolyn
      Murray; Robert J. Cleary; Thomas R. Ashley;
      Ashley & Charles; Michael A. Armstrong; John S.
      Furlong; Catherine M. Brown; Esther Salas;
      Jerome Ballarotto; John F. Murphy, Jr.; Kenneth
      Shuey; Nicholas Mendez; Nicholas Vince; Peter
      Mickwalter; Joseph J. Santiago; Barry J. Collicelli;
      James O'Conner; Jerry O'Conner; Robert Boyer;
      Anthony Arsey; Madaline Loper, a/k/a Madline
      Gacta; Detective Julian Jova; Howard W. Bailey;
      Nicole Amato; Mark Arderl; John Azzarello;
      Maureen Kelly-Leon; Joseph J. Napurano; Beth L.
      Neuguss; Jennie Perez-Ray; Shawna Yen; Joanne
      M. Bilancia-Young; Derek White; Clerk William
      T. Walsh; Thomas McTigue; Warden John Nash;
      Deneen P. Sweet; A. Matevousin; Rick Lavella;
      C. Bergan; Ronald J. Hedges; Susan J. Steele;
      Stuart A. Minkowitz; Christopher Fair; John W.
      Bissell; Paul W. Bergain; Michael Brown; James
      M. Munley; John D. Caruso; Lee H. Vicker;
                  George S. Leone.
                    **No. 05-1840.**

      Submitted for Possible Summary Action Under
      Third Circuit LAR 27.4 and I.O.P. 10.6 July 8,
                          2005.
                  Decided July 27, 2005.

**Background:** Inmate brought suit for alleged
violations of the Racketeer Influenced and Corrupt
Organizations Act (RICO) against 56 defendants,
including state and federal prosecutors and judges,

F.B.I. agents, and police officers. The United States
District Court for the District of New Jersey, Garrett
E. Brown, Jr., J., denied inmate's motion to recuse,
dismissed inmate's complaint, and ordered inmate to
show cause why he should not be barred from filing
further claims. Inmate appealed.

**Holdings:** The Court of Appeals held that:

(1) district court judge was not required to recuse
himself;

(2) inmate lacked standing to seek imposition of
RICO criminal liability on defendants;

(3) civil RICO complaint was properly dismissed
for failure to state a claim and as a malicious
complaint;

(4) district court properly refused inmate leave to
amend his complaint; and

(5) district court did not abuse its discretion when it
ordered inmate to show cause why he should not be
enjoined from filing additional claims.


Affirmed.

            West Headnotes

**[1] Judges 227 ⟜42**

227 Judges
      227IV Disqualification to Act
            227k41 Pecuniary Interest
                  227k42 k. In General. Most Cited Cases

**Judges 227 ⟜49(1)**

227 Judges
      227IV Disqualification to Act

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3 (N.J.))
**(Cite as: 143 Fed.Appx. 422)**

227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases

**Judges 227 ☞51(2)**

227 Judges
227IV Disqualification to Act
227k51 Objections to Judge, and Proceedings
Thereon
227k51(2) k. Time of Making Objection.
Most Cited Cases

**Judges 227 ☞51(3)**

227 Judges
227IV Disqualification to Act
227k51 Objections to Judge, and Proceedings
Thereon
227k51(3) k. Sufficiency of Objection or
Affidavit. Most Cited Cases
District court judge was not required to recuse
himself from inmate's Racketeer Influenced and
Corrupt Organizations Act (RICO) suit against state
and federal prosecutors and judges, since inmate did
not file his motion to recuse within 10 days of the
transfer of his case, he failed to present facts in the
proper form of an affidavit, judge's impartiality had
not been put into question by earlier case involving
inmate, and judge did not have a financial interest
that could be affected by the outcome of the RICO
case. 18 U.S.C.A. § 1961 et seq.; 28 U.S.C.A. §
144.

**[2] District and Prosecuting Attorneys 131 ☞8**

131 District and Prosecuting Attorneys
131k8 k. Powers and Proceedings in General.
Most Cited Cases
Inmate lacked standing to seek imposition of
criminal liability on state and federal prosecutors
under the Racketeer Influenced and Corrupt
Organizations Act (RICO). 18 U.S.C.A. § 1961 et
seq.

**[3] Racketeer Influenced and Corrupt
Organizations 319H ☞72**

319H Racketeer Influenced and Corrupt
Organizations

319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk68 Pleading
319Hk72 k. Pattern. Most Cited Cases
Allegations that state and federal prosecutors and
judges conspired to commit fraud, bribery,
extortion, obstruction of justice, witness tampering,
kidnapping, false arrest, false imprisonment,
slavery, peonage, breach of contract, and forgery
were insufficient to state civil claim under the
Racketeer Influenced and Corrupt Organizations
Act (RICO), absent explanation as to how
defendants participated in a pattern of racketeering
activity. 18 U.S.C.A. § 1961 et seq.; 28 U.S.C.A. §
1915A.

**[4] Racketeer Influenced and Corrupt
Organizations 319H ☞69**

319H Racketeer Influenced and Corrupt
Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk68 Pleading
319Hk69 k. In General. Most Cited
Cases
Eighty-page complaint, alleging violation of the
Racketeer Influenced and Corrupt Organizations
Act (RICO), that included discussions about
irrelevant statutes, terms such as "legal fiction," and
improper punctuation did not comply with federal
civil procedure rule governing pleadings. 18
U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule
8, 28 U.S.C.A.

**[5] Convicts 98 ☞5**

98 Convicts
98k5 k. Crimes. Most Cited Cases
Since allegations in inmate's Racketeer Influenced
and Corrupt Organizations Act (RICO) complaint
against state and federal prosecutors and judges
were made to retaliate and harass, they were
malicious, warranting dismissal of the complaint.
18 U.S.C.A. § 1961 et seq.; 28 U.S.C.A. § 1915A.

**[6] Federal Civil Procedure 170A ☞851**

170A Federal Civil Procedure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

143 Fed.Appx. 422

Page 3

143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3 (N.J.))
**(Cite as: 143 Fed.Appx. 422)**

170AVII Pleadings and Motions
   170AVII(E) Amendments
      170Ak851 k. Form and Sufficiency of
Amendment. Most Cited Cases
Leave to amend inmate's Racketeer Influenced and
Corrupt Organizations Act (RICO) complaint
against state and federal prosecutors and judges was
properly denied, since amendment would have been
futile and inequitable. 18 U.S.C.A. § 1961 et seq.

**[7] Federal Courts 170B ☞774**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk773 Estoppel to Allege Error;
Invited Error
            170Bk774 k. Particular Errors.
Most Cited Cases
Reviewing court would treat case as one in which
leave to amend was required, notwithstanding
appellant's argument that he should have been
permitted to amend his complaint as a matter of
course, where he filed a motion for leave to amend
instead of just filing an amended complaint.
Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[8] Injunction 212 ☞115**

212 Injunction
   212III Actions for Injunctions
      212k115 k. Process and Appearance. Most
Cited Cases

**Injunction 212 ☞130**

212 Injunction
   212III Actions for Injunctions
      212k130 k. Trial or Hearing. Most Cited
Cases
District court did not abuse its discretion when it
ordered inmate, who had filed a meritless Racketeer
Influenced and Corrupt Organizations Act (RICO)
complaint against state and federal prosecutors and
judges, to show cause why he should not be
enjoined from filing additional claims in that court,
since inmate had filed meritless RICO claims in
other district courts against many of the same

defendants and he was given notice and an
opportunity to respond when the court issued the
order. 18 U.S.C.A. § 1961 et seq.

**[9] Federal Civil Procedure 170A ☞1271**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(A) In General
         170Ak1271 k. Proceedings to Obtain.
Most Cited Cases

**Federal Civil Procedure 170A ☞1837.1**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1837 Effect
            170Ak1837.1 k. In General. Most
Cited Cases
Since inmate's Racketeer Influenced and Corrupt
Organizations Act (RICO) claims against state and
federal prosecutors and judges were properly
dismissed, denial of inmate's discovery motions was
also proper. 18 U.S.C.A. § 1961 et seq.; 28
U.S.C.A. § 1915A.

***424** On Appeal From the United States District
Court For the District of New Jersey. (D.C.Civ.
No. 04-cv-05177). District Judge: Honorable
Garrett E. Brown, Jr.

Alberto Concepcion, White Deer, PA, pro se.
Thomas R. Ashley, Ashley & Charles, Newark, NJ,
pro se.
James B. Clark, III, Office of United States
Attorney, Gary S. Lipshutz, Newark, NJ, Darryl W.
Simpkins, Simpkins & Simpkins, Hillsborough, NJ,
for Defendants.

Before RENDELL, FISHER and VAN
ANTWERPEN, Circuit Judges.

OPINION

PER CURIAM.
**\*\*1** Alberto Concepcion, an inmate at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

143 Fed.Appx. 422                                                                                                 Page 4

143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3 (N.J.))
(Cite as: 143 Fed.Appx. 422)

F.C.I.-Allenwood, brought suit for alleged violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1961, *et seq.* (2005), against fifty-six defendants, including state and federal prosecutors and judges, F.B.I. agents, and police officers, in the United States District Court for the District of Columbia. In that court, three defendants filed motions to dismiss, and one of the three paired his motion with a motion to transfer the case to the United States District Court for the District of New Jersey. The case was transferred, and soon thereafter, Concepcion filed motions to amend his complaint, to recuse the District Court judge, and for summary judgment. Not long after Concepcion filed those motions, the federal government employees named as defendants (as listed in the District Court's Memorandum & Order) filed a motion to dismiss the complaint pursuant to 28 U.S.C. § 1915A and Federal Rule of Civil Procedure 8, and a motion to enjoin Concepcion from filing further lawsuits in the United States District Court for the District of New Jersey without permission *425 of the Court. The state prosecutorial defendants (as named in the District Court's Memorandum & Order) filed a motion to dismiss pursuant to Rule 12(b)(6), or, in the alternative, Rule 56 of the Federal Rules of Civil Procedure.

The District Court judge declined to recuse. The District Court granted the motions of the federal employees and the state prosecutors; denied all of Concepcion's other pending motions, including those listed above, as well as discovery motions, a motion for appointment of counsel, and a motion for summary judgment; and dismissed Concepcion's complaint in its entirety. The District Court also ordered Concepcion to show cause why he should not be barred from filing further claims in the District Court's jurisdiction without leave of the Court.

Concepcion appeals. Two groups of defendants-appellees, the federal government employees and the state prosecutors, each filed a motion for summary affirmance. Three other defendants, joining in and relying on the arguments of the federal government employees and the state prosecutors, also filed motions for summary

affirmance. Because there is no substantial question on appeal, we will grant the motions for summary affirmance, and the District Court's order will be summarily affirmed.

[1] First, Judge Brown, the District Court judge, did not abuse his discretion in declining to recuse. Concepcion, purporting to proceed under 28 U.S.C. § 144 and 28 U.S.C. § 455, argued that Judge Brown should recuse because, as a former " debtor-party" in *United States v. Day*, D.N.J. C.A. No. 02-05009, Judge Brown had "personal interests which could reasonably be presumed to prejudice or bias his ability to impartially adjudicate this case," as well as personal knowledge about the disputed evidence in Concepcion's RICO Act lawsuit, and a financial interest that could be affected by its outcome. Concepcion also contended that Judge Brown should recuse because he was "the subject of 'Rider' to the 'Security Agreement' of Roger Charles Day, Jr."

**2 First, Concepcion did not meet the procedural requirements of § 144. Concepcion did not file his motion within 10 days of the transfer of his case to Judge Brown, and failed to present facts in the proper form of an affidavit, deficiencies that provided grounds for denial of Concepcion's motion under § 144. *See* 28 U.S.C. § 144 (2005); *GMC v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 336 (3d Cir.2001); *Simonson v. Gen. Motors Corp.*, 425 F.Supp. 574, 578 (E.D.Pa.1976) (citing *U.S. v. Clark*, 398 F.Supp. 341, 362 (E.D.Pa.1975), *aff'd*, 532 F.2d 748 (3d Cir.1976)).

Second, recusal is not necessary because a reasonable person, with knowledge of the relevant facts and circumstances, would not doubt the District Court judge's impartiality. *See Edelstein v. Wilentz*, 812 F.2d 128, 131 (3d Cir.1987). Judge Brown's impartiality would not be put into question because of a case involving Concepcion and/or Roger Charles Day, Jr., in a separate (and now-closed) case before a different judge. The United States, not Judge Brown, pursued Concepcion in that case. Judge Brown was just one of many who may have benefitted-quite modestly-from the default judgment awarded to the government. Furthermore, that case did not make

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

143 Fed.Appx. 422                                                                                       Page 5

143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3 (N.J.))
**(Cite as: 143 Fed.Appx. 422)**

Judge Brown privy to extrajudicial knowledge relevant to the unrelated RICO Act claims in Concepcion's case. Judge Brown also does not have a financial interest that could be affected by the outcome of Concepcion's case.

[2] The District Court's order dismissing Concepcion's complaint was proper. To the extent that Concepcion sought to impose RICO criminal liability on the defendants,*426 he lacked standing to proceed. *See U.S. v. Friedland*, 83 F.3d 1531, 1539 (3d Cir.1996) ("[T]he United States Attorney is responsible for the prosecution of all criminal cases within his or her district.").

[3][4] Furthermore, as the District Court concluded, Concepcion's civil RICO Act claims had to be dismissed under 28 U.S.C. § 1915A.FN1 Despite generally alleging that defendants conspired to commit all manner of fraud, as well as to engage in bribery, extortion, obstruction of justice, witness tampering, kidnapping, false arrest, false imprisonment, slavery, peonage, breach of contract, and forgery, *see, e.g.,* Complaint at § PPP, ¶ 17(a)-(m), Concepcion did not explain, as was required, how defendants participated in a pattern of racketeering activity in violation of the RICO Act. *See Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir.1999). In fact, Concepcion did not include specific allegations of objectionable actions for many of the defendants.

> FN1. In addition, for the reasons detailed by the District Court, Concepcion's complaint did not comply with Rule 8. *See Hartz v. Friedman*, 919 F.2d 469, 471 (7th Cir.1990). The surplusage in the 80-page complaint included discussions about irrelevant statutes, the alleged invalidity of birth certificates, terms such as "legal fiction," and proper punctuation as set forth in a N.A.S.A. handbook.

[5] Moreover, Concepcion's allegations targeted those who had represented, arrested, or prosecuted him, and those who had presided over, or were otherwise involved, in his criminal or civil proceedings or their outcomes. *See* Complaint at §

CCC, ¶ 1(A)-(Z)(30)). Such allegations, made to retaliate against and harass defendants, were malicious. *See Tapia-Ortiz*, 185 F.3d at 11.

**3 [6][7] Similarly, the District Court did not abuse its discretion by refusing Concepcion leave to amend his complaint. Leave to amend should be granted unless amendment is futile or inequitable. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 106 (3d Cir.2002). Based on the nature of the allegations and the time that had passed since the complaint was originally filed, the District Court had reason to determine that an amendment would be both futile and inequitable. Although Concepcion argues on appeal that he should have been permitted to amend his complaint as a matter of course, *see* Fed. R. Civ. P. 15(a) (2005), he filed a motion for leave to amend instead of just filing an amended complaint. Accordingly, we treat this as a case in which leave to amend was required. *See Centifanti v. Nix*, 865 F.2d 1422, 1431 (3d Cir.1989) (so holding).

[8] The District Court did not abuse its discretion by ordering Concepcion to show cause why he should not be enjoined from filing additional claims in the United States District Court for the District of New Jersey without leave of the Court.FN2 The District Court considered that Concepcion has filed meritless RICO claims in other District Courts against many of the same defendants, among others. Also, the District Court gave Concepcion notice and an opportunity to respond when it issued its order, which was a type of order within the scope of the All Writs Act. *See* *427Brow v. Farrelly*, 994 F.2d 1027, 1038 (3d Cir.1993); *In re Oliver*, 682 F.2d 443, 445 (3d Cir.1982).

> FN2. We do not consider the validity of the later order enjoining Concepcion from filing further claims in the United District Court for the District of New Jersey. The issue is outside the scope of Concepcion's notice of appeal. Furthermore, Concepcion did not appeal from the order when he submitted, to the District Court, a copy of the injunction marked with the words "refuse for fraud without dishonor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

143 Fed.Appx. 422                                                                   Page 6

143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3 (N.J.))
**(Cite as: 143 Fed.Appx. 422)**

       U.C.C. 3-501." Even if the filing
requirements are liberally construed, his
submission did not include the necessary
contents of a notice of appeal, *see* Fed.
R.App. P. 3(c), that are required to give
notice of an appeal to the other parties and
the District Court. *See Smith v. Barry,*
502 U.S. 244, 248, 112 S.Ct. 678, 116
L.Ed.2d 678 (1992).

[9] Because Concepcion's claims were properly
dismissed pursuant to 28 U.S.C. § 1915A, the
District Court committed no error in denying
Concepcion's other motions. Summary judgment
in Concepcion's favor was not warranted. Also, the
District Court did not abuse its discretion when it
denied motions related to discovery, specifically,
the motion for the release of grand jury transcripts
and the motion to compel production of information
about certain defendants, or motions related to the
control of its docket, such as the motion for
reconsideration of the Magistrate Judge's order
granting leave to file a motion to dismiss, the
motion to compel the U.S. Marshal to serve process
on certain defendants, and the motion for leave to
answer any filed motions.

For the reasons set forth above, and because no
substantial question is presented on appeal, we will
grant the motions for summary affirmance, and will
affirm the District Court's order. *See* I.O.P. 10.6.

C.A.3 (N.J.),2005.
Concepcion v. Resnik
143 Fed.Appx. 422, 2005 WL 1791699 (C.A.3
(N.J.))

Briefs and Other Related Documents (Back to top)

• 05-1840 (Docket) (Mar. 17, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

FILED
ASHEVILLE, N.C.
2001 AUG -6  PM 3: 56
U.S. DISTRICT COURT
W. DIST. OF N.C.

| | | |
|---|---|---|
| CHRISTOPHER LANGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Civil No. 1:01CV107 |
| | ) | |
| LYNDO TIPPETT, Secretary of | ) | |
| Transportation; NORTH CAROLINA | ) | |
| DEPARTMENT OF | ) | |
| TRANSPORTATION; ROY COOPER, | ) | |
| Attorney General; STATE OF NORTH | ) | |
| CAROLINA; and NORTH CAROLINA | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CHRISTOPHER LANGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Civil No. 1:01CV139 |
| | ) | |
| J. J. SWAIN; JACK MURDOCK; | ) | |
| F. D. MARTIN; DAVE HENDERSON | ) | |
| (ALL CURRENT OR FORMER | ) | |
| EMPLOYEES OF THE N.C. | ) | |
| DEPARTMENT OF TRANSP.), | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND
## ORDER OF DISMISSAL

**THESE MATTERS** are before the Court on numerous motions filed by the Plaintiff.

For the reasons set forth herein, the cases are consolidated and dismissed.

*13*

2

## I. CONSOLIDATION

On May 21, 2001, Plaintiff filed Civil No. 1:01cv107, *Langdon v. Tippett, et al.*,

("Tippett" action) in this Court against the North Carolina Department of Transportation (DOT)

and other agencies alleging that certain state statutes are unconstitutional and seeking a

declaration thereof.    Defendants answered that complaint by asserting numerous defenses,

including *res judicata*.  On June 18, 2001, Plaintiff filed Civil No. 1:01cv139, *Langdon v. Swain,*

*et al.*, ("DOT" action) suing four employees of DOT.  Both lawsuits stem from the same set of

facts pursuant to which Plaintiff claims that an inverse condemnation of his real property

occurred.

Exhibits attached to the Plaintiff's complaints show that beginning in 1995, he became

embroiled in a dispute with DOT over the location of a drainage pipe which Plaintiff claimed

destabilized his property and caused a landslide.  He also claimed that an earth mass located on

his property should be moved by DOT because it presented a potential danger to users of the road

beneath.  DOT declined because there had been no activity by the department on or near the

Plaintiff's property.  DOT also noted that the pipe had been extant for the past 50 years and there

was no geological evidence that it was the cause of the landslide.  Because of the instability of

the earth mass, Plaintiff has been unable to obtain the permits necessary to develop the real estate

and hence, claims the land was inversely condemned, his constitutional rights have been violated,

and he has been financially damaged.

Federal Rule of Civil Procedure 42 provides for consolidation "[w]hen actions involv[e] a

common question of law or fact . . . [in order] to avoid unnecessary costs or delay." **Fed. R. Civ.**

**P. 42(a).**  District courts have the inherent authority to order consolidation *sua sponte.* ***Pickle v.***

3

*CharLee Seafood, Inc.*, 174 F.3d 444 (4th Cir. 1999) (**Acknowledging authority although determining inappropriate under the facts.**). The two pending cases in this Court clearly involve common questions of law and fact and consolidation will avoid unnecessary costs and delay. The undersigned therefore consolidates the actions.

## II. *RES JUDICATA*

In 1998, Plaintiff filed an action in state court against DOT alleging damage to his property and his reputation.[1] *Langdon v. North Carolina Dept. of Transp.*, **Polk County Superior Court File No. 98 CVS 139.** On January 15, 1999, he signed a release in which, for the sum of $2,000, he acknowledged the release to be "a complete bar to all claims or suits for injuries or damages of whatsoever nature resulting from said incident, excepting only the purported inverse condemnation claim set forth in Christopher Langdon v. North Carolina Department of Transportation, Polk County Superior Court File No. 98 CVS 139." **Exhibit 10,** *attached to* **DOT Complaint.** As to that claim, the trial court thereafter granted DOT's motion for summary judgment and the North Carolina Court of Appeals affirmed the dismissal of the action without published opinion. *Langdon v. North Carolina Dept. of Transp.*, **138 N.C. App. 553, 536 S.E.2d 366,** *cert. denied,* **352 N.C. 675, 545 S.E.2d 425 (2000).**

---

[1]Either prior to or while this state court action was pending, Plaintiff filed three tort claims with the North Carolina Industrial Commission. Last year, Plaintiff filed yet another action against DOT and the same individual Defendants named in this action. *Langdon v. Swain, et. al.*, **Polk County Superior Court File No. 00 CVS 206.** That action contained the same factual allegations as set forth herein and in the previous actions. After the DOT answered and demanded sanctions against the Plaintiff, he voluntarily dismissed the action. Plaintiff also filed suit in the state district court for Henderson County alleging state agents had withheld from him public records involving construction on his property.

4

The undersigned *sua sponte* finds the consolidated cases must be dismissed because they are barred by the doctrine of *res judicata*. *Arizona v. California*, 530 U.S. 392 (2000) **(recognizing *sua sponte* dismissal on the grounds of *res judicata* in the interest of judicial economy).**

> *Res judicata* precludes the assertion of a claim after a judgment on the merits in a prior suit by parties or their privies based on the same cause of action. The preclusive affect of a prior judgment extends beyond claims or defenses actually presented in previous litigation, for [n]ot only does *res judicata* bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.

*Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir. 1991) **(citations omitted).** Stated simply, "if the later litigation arises from the same cause of action as the first, then the judgment bars litigation not only of every matter actually adjudicated in the earlier case, but also of every claim that might have been presented." *In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). In order to be barred by the doctrine, there must be "(1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Jones v. S.E.C.*, 115 F.3d 1173, 1178 (4th Cir. 1997). Each of these elements is met here. Plaintiff attempts to create new claims; however, each "new claim arises out of the same transactions or series of transactions as the claim resolved by the prior judgment" and, thus, are barred because they could have brought in the earlier action. *Meekins*, 946 F.2d at 1058.

5

## III. FRIVOLOUS AND MALICIOUS LITIGATION

Moreover, the undersigned finds the Plaintiff has engaged in a persistent pattern of frivolous litigation designed to harass the state defendants and the individual employees thereof. Federal law requires that, "[n]otwithstanding any filing fee . . . that may have been paid, the court *shall dismiss* the case at any time if the court determines that . . . the action . . . is frivolous or malicious . . . ." **28 U.S.C. § 1915(e)(2) (emphasis added).** The Court is therefore obligated to dismiss such a case. *Carr v. Dvorin*, **171 F.3d 115, 116 (2nd Cir. 1999).**

## IV. WARNING AGAINST FUTURE FRIVOLOUS FILINGS

Federal Rule of Civil Procedure 11 provides in pertinent part:

> By presenting to the court . . . a pleading . . . an . . . unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances-
>> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>> (2) the claims . . . are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law . . .;
>> (3) the allegations and other factual contentions have evidentiary support or, . . . are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

**Fed. R. Civ. P. 11(b).** Moreover, federal courts have an inherent obligation to protect themselves and the public from malicious and frivolous filings. *Foley v. Fix*, **106 F.3d 556 (4th Cir. 1997);** *Plimpton v. Cooper*, **141 F.Supp.2d 573 (W.D.N.C. 2001).** Plaintiff is hereby warned that the future filing in this District of a frivolous or malicious action stemming from the facts and circumstances involved in these actions may subject him to the imposition of sanctions, including an injunction against further filings.

6

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the above-captioned actions are hereby

**CONSOLIDATED**; and

**IT IS FURTHER ORDERED** that the following motions of the Plaintiff are hereby

**DENIED**:

1.   the motion for an extension of time to respond to the Defendants' answer;

2.   the motion for default judgment and request for an evidentiary hearing;

3.   the motion for hearing and oral arguments;

4.   the motion to enjoin note holders and trustees;

5.   a notice of appeal which is construed as a motion to certify this matter as an interlocutory

appeal; and

**IT IS FURTHER ORDERED** that these actions are hereby **DISMISSED WITH**

**PREJUDICE** in their entirety.

THIS the ___6th___ day of August, 2001.


LACY H. THORNBURG
**UNITED STATES DISTRICT COURT JUDGE**

jhg

United States District Court
for the
Western District of North Carolina
August 6, 2001

* * MAILING CERTIFICATE OF CLERK * *

Re:  1:01-cv-00139

True and correct copies of the attached were mailed by the clerk to the
following:

    Christopher Langdon
    1835 Edwin Blvd.
    Winter Park, FL  32789

    Robert O. Crawford III, Esq.
    N. C. Attorney General's Office
    1505 Mail Service Center
    Raleigh, NC  27699-1505

cc:
Judge                        (X)
Magistrate Judge             ( )
U.S. Marshal                 ( )
Probation                    ( )
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Court Reporter               ( )
Courtroom Deputy             ( )
Orig-Security                ( )
Bankruptcy Clerk's Ofc.      ( )
Other _Lawyers Weekly_       (X)

    Date: _Aug 6, 2001_

Frank G. Johns, Clerk

By: _____
    Deputy Clerk

# EXHIBIT C

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

IN THE DISTRICT COURT OF THE UNITED STATES **FILED**
FOR THE WESTERN DISTRICT OF NORTH CAROLINA ASHEVILLE, N. C.
ASHEVILLE DIVISION

OCT 2 3 2003

U.S. DISTRICT COURT
W. DIST. OF N. C.

| | | |
|---|---|---|
| CHRISTOPHER LANGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Civil No. 1:01CV107 |
| | ) | |
| LYNDO TIPPETT, Secretary of | ) | |
| Transportation; NORTH CAROLINA | ) | |
| DEPARTMENT OF | ) | |
| TRANSPORTATION; ROY COOPER, | ) | |
| Attorney General; STATE OF NORTH | ) | |
| CAROLINA; and NORTH CAROLINA | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CHRISTOPHER LANGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Civil No. 1:01CV139 |
| | ) | |
| J. J. SWAIN; JACK MURDOCK; | ) | |
| F. D. MARTIN; DAVE HENDERSON | ) | |
| (ALL CURRENT OR FORMER | ) | |
| EMPLOYEES OF THE N.C. | ) | |
| DEPARTMENT OF TRANSP.), | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

**THESE MATTERS** are before the Court on Plaintiff's following motions:

1.    a motion for relief from judgment, filed September 12, 2003;

2

2.    a motion to recuse, filed September 12, 2003;

3.    a motion to stay, filed September 19, 2003;

4.    a motion to change venue, filed September 19, 2003;

5.    a motion for an extension of time to respond to the Defendant's response, filed October 2, 2003;

6.    a second motion to stay, filed October 10, 2003; and

7.    a second motion for an extension of time to amend and file additional authorities, filed October 20, 2003.

For the reasons stated herein, each of the above motions is stricken from the record and Christopher Langdon is enjoined from filing in this Court.

## I. DISCUSSION

On May 21, 2001, Langdon filed a lawsuit in this Court against the North Carolina Department of Transportation (DOT) and other agencies alleging that certain state statutes were unconstitutional and seeking a declaration thereof. *Langdon v. Tippett, et al.*, **Civil Case No. 1:01cv107.** Defendants answered that complaint by asserting numerous defenses, including *res judicata*. On June 18, 2001, Langdon filed a second suit against four employees of DOT. *Langdon v. Swain, et al.*, **Civil Case No. 1:01cv139.** Both lawsuits stemmed from the same set of facts pursuant to which Langdon claimed that an inverse condemnation of his real property had occurred. By Memorandum and Order of Dismissal filed August 6, 2001, the undersigned consolidated these actions.

3

In 1995, Langdon became embroiled in a dispute with DOT over the location of a drainage pipe which he claimed destabilized his property and caused a landslide. He also claimed that an earth mass located on his property should be moved by DOT because it presented a potential danger to users of the road beneath. DOT declined because there had been no activity by the Department on or near Langdon's property. DOT also noted that the pipe had been extant for the past 50 years and there was no geological evidence that it was the cause of the landslide. Because of the instability of the earth mass, Landgon claimed he was unable to obtain the permits necessary to develop the real estate and hence, claimed the land was inversely condemned, his constitutional rights were violated, and he was financially damaged.

In 1998, Plaintiff filed an action in state court against DOT alleging damage to his property and his reputation.[1] *Langdon v. North Carolina Dep't of Transportation*, **File No. 98 CVS 139.** On January 15, 1999, he signed a release in which, for the sum of $2,000, he acknowledged the release to be "a complete bar to all claims or suits for injuries or damages of whatsoever nature resulting from said incident, excepting only the purported inverse condemnation claim set forth in Christopher Langdon v. North Carolina Department of Transportation, Polk County Superior Court File No. 98 CVS 139." **Exhibit 10,** *attached to* **Complaint filed in Case No. 1:01cv139.** As to that claim, the trial court thereafter granted

---

[1] Either prior to or while this state court action was pending, Plaintiff filed three tort claims with the North Carolina Industrial Commission. Plaintiff filed yet another action against DOT and the same individual defendants named in this action. *Langdon v. Swain*, **File No. 00 CVS 206.** That action contained the same factual allegations as set forth here and in the previous actions. After the DOT answered and demanded sanctions against the Plaintiff, he voluntarily dismissed the action. Plaintiff also filed suit in the state district court for Henderson County alleging state agents had withheld from him public records involving construction on his property. In one of the motions now pending, Langdon admits to having filed yet another action in the Superior Court of Polk County.

4

DOT's motion for summary judgment and the North Carolina Court of Appeals affirmed the dismissal of the action without published opinion. *Langdon v. North Carolina Dep't of Transportation*, 138 N.C. App. 553, 536 S.E.2d 366, *cert. den.* 352 N.C. 675, 545 S.E.2d 425 (2000).

The consolidated federal action in this Court was dismissed *sua sponte* by the undersigned on August 6, 2001, on *res judicata* grounds. The Fourth Circuit Court of Appeals affirmed that dismissal and warned Langdon against future frivolous filings in either the Circuit or this Court. *Langdon v. Swain*, 29 Fed.Appx. 171 (4th Cir.), *cert. denied*, 537 U.S. 947 (2002).

Undeterred, Langdon has moved for relief from the judgment of this Court and the Fourth Circuit Court of Appeals. This Court has previously warned him against future frivolous filings. *See* **Memorandum and Order of Dismissal,** *supra,* **at 5 ("Moreover, the undersigned finds the Plaintiff has engaged in a persistent pattern of frivolous litigation designed to harass the state defendants and the individual employees thereof. Federal law requires that, '[n]otwithstanding any filing fee . . . that may have been paid, the court *shall dismiss* the case at any time if the court determines that . . . the action . . . is frivolous or malicious . . . .'" 28 U.S.C. § 1915(e)(2) (emphasis added). The Court is therefore obligated to dismiss such a case. . . . Moreover, federal courts have an inherent obligation to protect themselves and the public from malicious and frivolous filings. Plaintiff is hereby warned that the future filing in this district of a frivolous or malicious action stemming from the facts and circumstances involved in these actions may subject him to the imposition of sanctions, including an injunction against further filings." (citations omitted)).**

5

## II. ORDER

**IT IS, THEREFORE, ORDERED** that the captioned motions be **STRICKEN** from the record; and

**IT IS FURTHER ORDERED** that as a sanction for frivolous filings, the Court hereby imposes a pre-filing injunction. No document or pleading presented within the Western District of North Carolina shall be filed by the Clerk of Court unless and until a District Court judge orders the same to be filed.

The Clerk is directed to send copies of this Order to each judicial officer and to each Clerk of Court's Office in this District.

THIS the 23rd day of October, 2003.

LACY H. THORNBURG
**UNITED STATES DISTRICT COURT JUDGE**

ejb

United States District Court
for the
Western District of North Carolina
October 23, 2003

* * MAILING CERTIFICATE OF CLERK * *

*1:01cv107*

Re: 1:01-cv-00139


True and correct copies of the attached were mailed by the clerk to the following:


Christopher Langdon
1835 Edwin Blvd.
Winter Park, FL 32789

Robert O. Crawford III, Esq.
N. C. Attorney General's Office
1505 Mail Service Center
Raleigh, NC 27699-1505


cc:  *Thornburg*
Judge: *Mullen, Voorhees; McKnight* ( )
Magistrate Judge: *Coghurn:* ( )
U.S. Marshal               *Horn* ( )
Probation                  ( )
U.S. Attorney              ( )
Atty. for Deft.            ( )
Defendant                  ( )
Warden                     ( )
Bureau of Prisons          ( )
Court Reporter             ( )
Courtroom Deputy           ( )
Orig-Security              ( )
Bankruptcy Clerk's Ofc.    ( )
Other *Statesville Clerk's ofc (✓)*
     *Charlotte Clerk's ofc (✓)*
     *Asheville Clerk's ofc (✓) given*

Date: 10/23/03

Frank G. Johns, Clerk

By: *E. Barton*
    _____
    Deputy Clerk

# EXHIBIT D

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2004 WL 602711 (C.A.4 (Va.))
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Noah  v.  AOL-Time  Warner,  Inc.C.A.4
(Va.),2004.Only the Westlaw citation is currently
available.This case was not selected for publication
in the Federal Reporter.UNPUBLISHEDPlease use
FIND to look at the applicable circuit court rule
before citing this opinion. Fourth Circuit Rule
36(c). (FIND CTA4 Rule 36(c).)
      United States Court of Appeals, Fourth Circuit.
           Saad S. NOAH, Plaintiff-Appellant,
                              v.
        AOL-TIME WARNER, INCORPORATED;
              America Online, Incorporated,
                 Defendants-Appellees.
                    **No. 03-1770.**

               Submitted Nov. 14, 2003.
               Decided March 24, 2004.

Appeal from the United States District Court for the
Eastern District of Virginia, at Alexandria. T.S.
Ellis, III, District Judge. (CA-02-1316-A).

Saad S. Noah, Appellant, pro se.
Charles  Colin  Rushing,  Wilmer,  Cutler  &
Pickering, Washington, D.C., for Appellees.

Before NIEMEYER, LUTTIG, and TRAXLER,
Circuit Judges.

                    *UNPUBLISHED*
PER CURIAM.
*1 Affirmed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in
this circuit. See Local Rule 36(c).

Saad S. Noah appeals the district court's order
granting Defendants' motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6) and dismissing Noah's cause
of action. Noah also appeals from the scheduling
order entered by the magistrate judge. We have

reviewed the record and find no reversible error.
Accordingly, we affirm for the reasons stated by the
district court. *See Noah v. AOL Time Warner, Inc.,*
No. CA-02-1316-A (E.D.Va. May 15, 2003). We
deny the motion to dismiss.FN* We dispense with
oral argument because the facts and legal
contentions are adequately presented in the
materials before the court and argument would not
aid the decisional process.

        FN* Noah's notice of appeal was docketed
        by the district court on June 17, 2003, one
        day after the expiration of the thirty-day
        appeal period. Fed. R.App. P. 4(a). Noah,
        however, has submitted a delivery receipt
        from the United States Postal Service
        confirming a delivery to the district court
        on June 16, 2003. This document suggests
        that Noah filed a timely notice of appeal.

*AFFIRMED*

C.A.4 (Va.),2004.
Noah v. AOL-Time Warner, Inc.
Slip Copy, 2004 WL 602711 (C.A.4 (Va.))

Briefs and Other Related Documents (Back to top)

• 03-1770 (Docket) (Jun. 23, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

Westlaw.

Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 1994 WL 555526 (Del.Super.), 22 Media L. Rep. 2376
**(Cite as: Not Reported in A.2d)**

**C**
Fuester v. Conrail Del.Super.,1994.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, Kent County.
Cynthia E. FUESTER, as the Ancillary
Administratrix of the Estate of Walter E. Fuester,
deceased; and Cynthia E. Fuester, as widow of
Walter E. Fuester, deceased; Roger W. Fuester,
Carole Fuester Convington, and John R. Fuester,
Plaintiffs,
v.
CONRAIL, a/k/a Consolidated Rail Corporation, a
Pennsylvania corporation; and Amtrak, a/k/a
National Railroad Passenger Corporation, a
corporation registered and existing under the laws
for the District of Columbia, Defendants.
**No. 91C-09-013.**

Submitted: July 13, 1994.
Decided: Sept. 16, 1994.

Upon Motion to Quash Defendants' Subpoena
Duces Tecum GRANTED.

William D. Fletcher, Jr., and Noel E. Primos, of
Schmittinger and Rodriguez, P.A., Dover, for
plaintiffs.
Somers S. Price, Jr., and Todd L. Goodman, of
Potter Anderson & Corroon, Wilmington, for
Consol. Rail Corp.
Richard G. Elliott, Jr., and John T. Dorsey, of
Richards, Layton & Finger, Wilmington, for Chuck
McGowan.

MEMORANDUM OPINION
RIDGELY, President Judge.
\*1 This is an action against Consolidated Rail
Corporation ("Conrail") and National Railroad
Passenger Corporation ("Amtrak") to recover
damages for wrongful death arising out of a fatal
automobile-train collision which occurred on
September 5, 1989. Defendants have served a

subpoena on Chuck McGowan ("McGowan"), a
news photographer employed by The News Journal
Company ("The News Journal"), seeking reprints of
photographs taken of the accident scene.
McGowan moves to quash this subpoena asserting
the photographs are protected by the reporter's
privilege under the First Amendment to the United
States Constitution and Article I, Section 5 of the
Constitution of the State of Delaware. For the
reasons that follow, the motion to quash is granted.

I. BACKGROUND

Plaintiffs allege in their complaint that on
September 5, 1989 an Amtrak owned and operated
locomotive struck an automobile driven by Walter
E. Fuester. Mr. Fuester subsequently died from the
injuries sustained in the collision.

One of the primary issues at trial will be the speed
of the locomotive at the time of the accident.
Plaintiffs allege that Amtrak was negligent because
the train was traveling above the thirty mile per
hour limit when the collision occurred. In support
of this claim, Plaintiffs contend the stopping
distance of the locomotive reflects that the train was
speeding.

On the day of the accident, McGowan, a
photographer employed by the News Journal, took
photographs of the accident scene shortly after the
accident occurred, including photographs of the
location where the locomotive and the vehicle
stopped after the collision. The News Journal
published one of the photographs. The camera
angle of the published photograph was from in front
of the train looking back toward the crossing. The
remaining photographs have not been published or
provided to a third-party. No photographs of the
final resting point of the train and the automobile
were taken by anyone else.

Defendants contacted McGowan regarding his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 1994 WL 555526 (Del.Super.), 22 Media L. Rep. 2376
**(Cite as: Not Reported in A.2d)**

photograph appearing in the News Journal. During this telephone call, McGowan told the Defendants he possessed other photographs of the accident scene. McGowan refused to provide any of his photographs to the Defendants. Subsequently, on January 10, 1994, the Defendants issued a subpoena *duces tecum* seeking production of all of McGowan's photographs. The News Journal and McGowan refused to produce the photographs and filed this motion to quash the subpoena *duces tecum.*

## II. CONTENTIONS OF THE PARTIES

McGowan argues that the photographs are protected by a qualified reporter's privilege and that Defendants have failed to prove the unpublished photographs are material, relevant and necessary to their defense. McGowan also contends Defendants have failed to prove the information sought from the photos is unavailable from other sources.

Defendants acknowledge the existence of the qualified privilege but argue the photographs will permit a determination of stopping distance, which will facilitate cross examination of the Plaintiffs' experts. Defendants argue no other evidence exists to allow an accurate determination of stopping distance since no other photographs were taken and only a rough approximation appears in the police report. Defendants contend since the photographs are the only accurate evidence of the resting point of the locomotive, the photographs are critical to their defense.

## III. ANALYSIS

*2 The First Amendment to the United States Constitution provides:
Congress shall make no law ... abridging the freedom of speech, or of the press....

The First Amendment is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296 (1940).

Article I, Section 5 of the Constitution of the State

of Delaware provides:
The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty.

The free press provision of the Constitution of the State of Delaware has the same scope as the First Amendment. *In re Opinion of the Justices,* Del.Supr., 324 A.2d 211, 213 (1974). Thus, any privileges created from the text or policies of the First Amendment will be included in the scope of the free press provision of the Delaware Constitution.

Based upon policies deeply rooted in the First Amendment, a reporter has a qualified privilege to refuse to disclose unpublished material in his possession. *See United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126 (1981); *State v. McBride,* Del.Super., IK80-05-0058, *et al.,* Wright, J. (May 6, 1981) at 2, *aff'd on other grounds,* Del.Supr., 477 A.2d 174 (1984). This qualified privilege applies in civil and criminal cases. *See Riley v. City of Chester,* 612 F.2d 708, 715 (3d Cir.1979). Cameramen, including photographers, may assert this First Amendment privilege. *Solargen Elec. Motor Car Corp. v. American Motors Corp.,* 506 F.Supp. 546, 552 (N.D.N.Y.1981).

The United States Court of Appeals for the Third Circuit has fashioned a set of general principles to test whether a reporter can be compelled to disclose material protected by this qualified privilege:
In striking the delicate balance between the assertion of the privilege one the one hand and the interest of ... civil litigants seeking the information the materiality, relevance and necessity of the information sought must be shown.

*United States v. Criden,* 633 F.2d 346, 358 (3d Cir.1980) (citing *Riley,* 612 F.2d at 716), *cert. denied,* 449 U.S. 1113 (1981). In examining the balance of interests between compelling disclosure and allowing the material to remain privileged, the *Riley* court also isolated three factors the moving party must prove before production is warranted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 3

Not Reported in A.2d, 1994 WL 555526 (Del.Super.), 22 Media L. Rep. 2376
**(Cite as: Not Reported in A.2d)**

*Criden,* 633 F.2d at 358-59 (citing *Riley,* 612 F.2d at 717). First, the moving party must offer proof that an attempt was made to obtain the information from other sources. *Id.* Second, the movant must prove the only access to the information is through the journalist and the requested material. *Id.* Third, the moving party must demonstrate the information is crucial to the claim. *Id.* In this instance, because Defendants have failed to adequately prove the information is necessary to their defense, an examination of all of these factors is unnecessary.

*3 Defendants argue the photos are material, relevant and necessary to establish the speed of the train at the time of the accident. Plaintiffs allege the train was traveling above the speed limit of thirty miles per hour when the collision occurred. The Plaintiffs' experts have estimated the train was traveling between thirty and forty-five miles per hour based upon the reported stopping distance of the locomotive. Defendants contend that the only evidence of the stopping distance is the estimate contained in the police report. Thus, Defendants argue the photographs are material, relevant and necessary to determine the validity of Plaintiffs' claims concerning stopping distance.

The crux of Plaintiffs' claim is that the locomotive was traveling at an excessive speed at the time of the collision. However, defendants have failed to demonstrate that the photographs they seek will show the speed of the train at the time of the accident. They admit that a train does not leave skid marks on the track, thus the photographs will not show when the locomotive engineer first applied the train's brakes. Defendants have not shown through expert testimony or otherwise how the photographs will refute the contentions of the plaintiffs.

Furthermore, Defendants acknowledge they have access to the precise speed of the locomotive at the time of impact from a recording device located on board the locomotive. The device recorded the speed of the train at all times, including the speed of the train at the time of impact. It was recovered intact after the accident, and Defendants admit the instrument was calibrated to establish the exact speed of the train at impact.

## IV. CONCLUSION

Defendants have failed to demonstrate that the photographs of the news reporter in issue are material, relevant and necessary to their defense. On the facts presented, the reporters qualified privilege under the First Amendment of the United States Constitution and Article I, Section 5 of the Delaware Constitution to refuse the disclosure of unpublished material in his possession is sustained. Consequently, McGowan's motion to quash the subpoena *duces tecum* is GRANTED.

IT IS SO ORDERED.

Del.Super.,1994.
Fuester v. Conrail
Not Reported in A.2d, 1994 WL 555526 (Del.Super.), 22 Media L. Rep. 2376

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

Westlaw.

Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
(Cite as: Not Reported in A.2d)

c

American Homepatient, Inc. v. CollierDel.Ch.,2006.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
AMERICAN HOMEPATIENT, INC., Plaintiff,
v.
Joseph J. COLLIER and Med-Equip, Inc., Defendants.
No. Civ.A. 274-N.

Submitted March 21, 2006.
Decided April 19, 2006.

**Background:** Employer brought action against former employee and former employee's present employer for breach of non-compete agreement and settlement agreement.

**Holdings:** The Court of Chancery, New Castle County, Chandler, Chancellor, held that:

(1) non-compete agreement and settlement agreement were enforceable contracts;

(2) former employee's delivery of non-respiratory durable medical equipment (DME) to present employer's patients did not constitute breach of non-competition agreement;

(3) in obtaining execution of stale certificates of medical necessity (CMNs), former employee did not breach non-compete and settlement agreements;

(4) former employee's use of cell phone, in his work as respiratory therapist, did not violate terms of settlement agreement;

(5) employer could not state action against former employee's present employer for tortious interference with contractual relationship;

(6) employer failed to establish that former employee and former employee's present employer engaged in unfair competition; and

(7) employer failed to establish claim of tortious interference with prospective economic advantage.

Judgment for defendants.

**[1] Compromise and Settlement 89 ⟜7.1**

89 Compromise and Settlement
   89I In General
      89k7 Validity
         89k7.1 k. In General. Most Cited Cases

**Contracts 95 ⟜116(1)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k115 Restraint of Trade or Competition in Trade
            95k116 In General
               95k116(1) k. In General. Most Cited Cases

**Contracts 95 ⟜117(2)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k115 Restraint of Trade or Competition in Trade
            95k117 General or Partial Restraint
               95k117(2) k. Limitations as to Time and Place in General. Most Cited Cases
Non-compete agreement between employer and former employee, and settlement agreement between employer, former employee, and former

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

employee's current employer, were enforceable contracts; agreements were result of mutual assent, agreements were supported by consideration, and agreements, which were limited to one year and radius of 50 miles, were of reasonable scope and duration.

Non-compete agreement between employer and former employee, and settlement agreement between employer, former employee, and former employee's current employer, were enforceable contracts; agreements were result of mutual assent, agreements were supported by consideration, and agreements, which were limited to one year and radius of 50 miles, were of reasonable scope and duration.

**[2] Compromise and Settlement 89 ☜20(1)**

89 Compromise and Settlement
    89I In General
        89k20 Performance or Breach of Agreement
        89k20(1) k. In General. Most Cited Cases

**Contracts 95 ☜312(4)**

95 Contracts
    95V Performance or Breach
        95k312 Acts or Omissions Constituting Breach in General
        95k312(4) k. Contract Not to Engage in or Injure Business Carried on by Another. Most Cited Cases
Former employee's delivery of non-respiratory durable medical equipment (DME) to present employer's patients did not constitute breach of non-competition agreement between employer and former employee, or of settlement agreement between employer, former employee and present employer; settlement agreement did not specify equipment or services provided by former employee, as respiratory therapist, must be respiratory in nature, there was no recognized distinction between respiratory and non-respiratory DME, present employer's practice had always been to require full time respiratory therapists to deliver all DME, and former employee followed present employer's practice.

Former employee's delivery of non-respiratory durable medical equipment (DME) to present employer's patients did not constitute breach of non-competition agreement between employer and former employee, or of settlement agreement between employer, former employee and present employer; settlement agreement did not specify equipment or services provided by former employee, as respiratory therapist, must be respiratory in nature, there was no recognized distinction between respiratory and non-respiratory DME, present employer's practice had always been to require full time respiratory therapists to deliver all DME, and former employee followed present employer's practice.

**[3] Compromise and Settlement 89 ☜20(1)**

89 Compromise and Settlement
    89I In General
        89k20 Performance or Breach of Agreement
        89k20(1) k. In General. Most Cited Cases

**Contracts 95 ☜312(4)**

95 Contracts
    95V Performance or Breach
        95k312 Acts or Omissions Constituting Breach in General
        95k312(4) k. Contract Not to Engage in or Injure Business Carried on by Another. Most Cited Cases
In obtaining execution of stale certificates of medical necessity (CMNs), former employee was only acting as liaison, as respiratory therapist, between present employer and patient's doctor, and thus there was no breach of non-compete and settlement agreements between employer, former employee, and former employee's current employer.

In obtaining execution of stale certificates of medical necessity (CMNs), former employee was only acting as liaison, as respiratory therapist, between present employer and patient's doctor, and thus there was no breach of non-compete and settlement agreements between employer, former employee, and former employee's current employer.

**[4] Compromise and Settlement 89 ☜20(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

89 Compromise and Settlement
   89I In General
      89k20 Performance or Breach of Agreement
         89k20(1) k. In General. Most Cited Cases
Former employee's use of cell phone, in his work as respiratory therapist, did not violate terms of settlement agreement between employer, former employee, and former employee's present employer; former employee's use of cell phone was indispensable in promptly responding to patients' need, medical representatives' inquiries, and present employer's customer service, and such general responsibilities were clearly permitted by settlement agreement.

**[5] Labor and Employment 231H ☞904**

231H Labor and Employment
   231HIX Interference with the Employment Relationship
      231Hk904 k. Elements. Most Cited Cases
Former employee's actions did not constitute breach of non-compete agreement between employer and former employee, and thus employer could not state action against former employee's present employer for tortious interference with contractual relationship.

**[6] Antitrust and Trade Regulation 29T ☞54**

29T Antitrust and Trade Regulation
   29TII Unfair Competition
      29TII(A) In General
         29Tk54 k. Miscellaneous Particular Practices. Most Cited Cases
Employer failed to establish that former employee and former employee's present employer engaged in unfair competition; home respiratory and medical equipment services industry was field of robust competition, employer's expectation of business relationships with customers was not reasonable in absence of written contract with customers, and former employee and present employer could not have wrongly interfered with relationships between employer and customers given that former employee's activities were expressly permitted by terms of settlement agreement between employer, former employee, and former employee's present employer.

**[7] Torts 379 ☞241**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)2 Particular Cases
            379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
Employer failed to establish claim of tortious interference with prospective economic advantage against former employee's current employer; employer's expectancy of maintained business from its customers was not reasonable in light of competitive market in which employer operated, and employer failed to demonstrate any intentional interference by former employee or his present employer that caused termination of business employer had reasonably expected.

John H. Newcomer, Jr., of Duane Morris LLP, Wilmington, Delaware, for Plaintiff.
Charles Gruver III, of Charles Gruver III, P.A., Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*
CHANDLER, Chancellor.
*1 American Homepatient, Inc. ("AHOM") brought this action to enforce the terms of a Confidentiality and Non-Compete Agreement (the "Non-Compete Agreement") between AHOM and its former employee, defendant Joseph J. Collier, and a Settlement Agreement (the "Settlement Agreement" and, together with the Non-Compete Agreement, the "Agreements") among AHOM, Collier, and Med-Equip, Inc. ("Med-Equip"), Collier's present employer. AHOM alleges breach of contract and tortious interference with contract and prospective business relations. AHOM seeks damages and injunctive relief, including specific performance of a covenant not to compete.

This matter was tried over three days in August and September, 2005. The parties completed post-trial briefing on March 21, 2006. This Memorandum Opinion reflects the Court's post-trial findings of fact and conclusions of law. For the reasons set forth later, the Court concludes that the Agreements are valid and enforceable but were not breached by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 4

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Collier and Med-Equip, and that Collier and Med-Equip did not tortiously interfere with AHOM's contracts and prospective business relationships.

## I. FACTUAL BACKGROUND

AHOM provides home respiratory and medical equipment services, focusing its business on in-home patient care, developed through referral sources such as hospitals, physicians and home health care agencies. Marketing efforts are not directed towards individual patients because there is no effective means of identifying an individual who may need services or equipment, and presumably because the patient will oftentimes defer to a physician's recommendation. Therefore, targeting the physician, nurse, or other individual (the " referral source") empowered to place such an order is an integral part of AHOM's business.

Collier was employed by AHOM from 1996 to 2003, working principally from the company's Newark branch. The Newark branch provides durable medical equipment ("DME"), such as walkers, wheelchairs, hospital beds, and commodes; the branch also provided respiratory services, such as oxygen and related equipment.

Collier began his employment with AHOM as a respiratory therapist, but at his request in 2000 he began working as an account executive. Account executives develop relationships with referral sources that are invaluable to the success of the company; no different from any other account executive at AHOM, Collier executed a form Non-Compete Agreement on August 8, 2001. Once on the job, Collier soon discovered he was a natural born salesman. His forward manner of approaching potential referral sources apparently lacked inhibition. For example, patrolling the hallways of Christiana Hospital, where he served as AHOM's liaison, he would bluntly ask people he knew "Do you have anybody going home today? Do you have a patient for me?" and he was often rewarded with referrals.

Med-Equip is a competitor of AHOM, based in Folsom, Pennsylvania. Having attempted for some time to expand in the Delaware market, Med-Equip hired Collier as the branch manager of its Milford, Delaware location. AHOM quickly brought suit, and following initial discovery, a Settlement Agreement was agreed upon and signed on November 13, 2003. The Settlement Agreement effectively permitted Collier to work as a respiratory therapist, as defined in an exhibit to the Settlement Agreement, while maintaining the force and effect of the Non-Compete Agreement in all other respects.

*2 Over the course of the period covered by the Non-Compete and Settlement Agreements, Collier was involved in the ordering or delivery of DME that was both respiratory and not respiratory in nature. Collier was also the recipient of a company Nextel cell phone that had the capability of receiving and sending direct communications from Med-Equip's office, including customer service, and the ability to be "tweaked" (i.e., used as a walkie-talkie).

In his activity logs, Collier reported contacting referral sources for certificates of medical necessity ("CMN") on a number of occasions, when prior CMNs had gone stale, and a new CMN was required. Those CMNs were therefore obtained only in respect to patients who were already Med-Equip patients. Doctors who executed such stale CMNs were already referral sources of Med-Equip before Collier became employed.

## II. ANALYSIS

### A. Breach of Contract

Plaintiff alleges that Collier breached the Non-Compete Agreement and that both Collier and Med-Equip breached the Settlement Agreement. The Court must first determine whether AHOM had enforceable contracts with Collier and Med-Equip and, if so, whether they were breached.[FN1] Though the Agreements were enforceable, defendants did not breach the contracts.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                     Page 5

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN1. *See All Pro Maids, Inc. v. Layton,*
2004 Del. Ch. LEXIS 116 (Aug. 9, 2004).

### 1. *Enforceability*

[1] To be enforceable, a covenant not to compete
must (1) meet general contract law requirements,
(2) be reasonable in scope and duration, both
geographically and temporally, (3) advance a
legitimate economic interest of the party enforcing
the covenant, and (4) survive a balance of the
equities. [FN2] When seeking specific performance
of a covenant not to compete, the plaintiff has the
burden of establishing her case by clear and
convincing evidence .[FN3]

FN2. *TriState Courier & Carriage, Inc. v.
Berryman,* 2004 Del. Ch. LEXIS 43, at
*35 (Apr. 15, 2004).

FN3. *Id.*

The Agreements satisfy the general requirements of
a valid contract. Those requirements are mutual
assent and consideration.[FN4] AHOM offered
Collier a new position and continued employment in
consideration of the Non-Compete Agreement,
which Collier executed. Collier and Med-Equip
executed the Settlement Agreement in consideration
of AHOM dismissing the original lawsuit.

FN4. *See Research & Trading Corp. v.
Pfuhl,* 1992 Del. Ch. LEXIS 234, at *16
(Nov. 19, 1992); *Delaware Express
Shuttle, Inc. v. Older,* 2002 Del. Ch.
LEXIS 124, at *40 (Oct. 23, 2002).

The Agreements are of reasonable scope and
duration. They are limited to a duration of one year
and a radius of fifty miles.[FN5] Further, the
Agreements advance the legitimate economic
interest of AHOM to protect relationships cultivated
by Collier while an AHOM employee, and survive a
balance of the equities.

FN5. Non-compete agreements covering

limited areas for two or fewer years
generally have been held to be reasonable.
*See All Pro Maids,* 2002 Del. Ch. LEXIS
116, at *18 (one year restriction found
reasonable); *Delaware Express Shuttle,*
2002 Del. Ch. LEXIS 124, at *54 (finding
three years unreasonable because of rapid
customer turnover, and reducing duration
of covenant to two years); *COPI of
Delaware, Inc. v. Kelly,* 1996 Del. Ch.
LEXIS 136, at *12 (Oct. 25, 1996) (two
year restriction reasonable for company
officers and sales personnel).

### 2. *Alleged Breaches*

Plaintiff has failed, however, to establish the breach
of the Agreements. The Settlement Agreement
clearly states that the Non-Compete Agreement
would be subject to the express terms of the
Settlement Agreement.[FN6] The Settlement
Agreement expressly permitted Collier to work for
Med-Equip as a respiratory therapist. Collier's
activities that have been challenged by AHOM were
in fact permitted by this proviso of the Settlement
Agreement. Descriptions of certain of these
challenged activities follow, with an explanation of
how Collier's credible trial testimony and other
evidence in the record have cast sufficient doubt on
Plaintiff's allegation that Collier was acting in
capacities other than as a respiratory therapist.

FN6. Settlement Agreement, ¶ 3.

### a. The DME Deliveries

***3** [2] Plaintiff alleges that Collier's delivery of
non-respiratory DME to Med-Equip patients alone
constituted a breach of the Agreements. As
mentioned above, however, the Settlement
Agreement permits Collier to act as a respiratory
therapist, and an attendant responsibility of a
respiratory therapist is to deliver DME. The
Settlement Agreement's Exhibit A does not specify
that the equipment or services provided by the
respiratory therapist must be respiratory in nature.
Furthermore, there is no distinction between
respiratory and non-respiratory DME recognized in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 6

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the industry, and Med-Equip's practice has always been to require its full time respiratory therapists to deliver all DME. Finally, Collier testified that there were only certain types of circumstances in which he delivered DME, all following Med-Equip's practice of having full time respiratory therapists deliver all DME.

### b. Obtaining Execution of Stale CMNs

[3] Plaintiff alleges that in obtaining the execution of stale CMNs, Collier breached the Agreements. Close examination of the circumstances of obtaining the CMNs casts sufficient doubt on plaintiff's claim, and demonstrates that Collier was only acting as a liaison between Med-Equip and a patient's doctor, as permitted by the Settlement Agreement's description of a respiratory therapist. As discussed above, all challenged CMNs dealt with existing patients of Med-Equip, most of whom suffered from chronic pulmonary problems. The doctors executing such stale CMNs were already referral sources of Med-Equip before Collier became employed. Although plaintiff points to one entry in Collier's daily worksheets dated December 2, 2003 relating to Dr. Valoria, Collier convincingly testified that he did not actually meet with Dr. Valoria on that occasion, but only wrote the doctor's name because he did not know the names of any of Dr. Valoria's office staff at the time of the visit. Furthermore, Collier was called upon to obtain execution of stale CMNs when he was already going to be in the geographical area for other job responsibilities unchallenged by AHOM, and Collier never met with an actual doctor in such circumstances. Finally, pursuit of executed CMNs is viewed by the doctor's office as a nuisance or hindrance of their daily flow so such effort would do little to effectively solicit, market, or otherwise build goodwill. Collier's pursuit of a CMN as a respiratory therapist differed dramatically from AHOM account executives, who would host lunch meetings with doctors as part of their marketing presentation and only after would the doctor execute the CMN. Collier's obtaining the execution of stale CMNs was only the activity of a respiratory therapist and permitted by the Settlement Agreement.

### c. Use of Cell Phone

[4] Plaintiff alleges that Collier's use of the cell phone violated the Settlement Agreement's prohibitions on soliciting new business, and contacting physicians or other referral sources regarding new patients (*i.e.*, patients who aren't at that point existing patients of Med-Equip). Collier's use of the cell phone proved indispensable in responding to patients' needs, medical representatives' inquiries, and Med-Equip's customer service, all on a moment's notice. These general responsibilities of Collier as a respiratory therapist were clearly permitted by the Settlement Agreement.

*4 Plaintiff points specifically to the Nextel records of the cell phone to attempt to demonstrate that certain communication exchanges and transactions were initiated by Collier. In its billing records, however, Nextel does not report tweaking and related incoming calls. Due to this lack of evidence, combined with credible testimony by Collier, and Med-Equip's customer service department daily activities worksheet, I cannot find as plaintiff urges me that Collier placed a number of soliciting calls to Christiana Care between December 5 and 7; rather, these calls were more likely in response to questions regarding the care of Med-Equip patients at the hospital. Therefore, Collier's use of his cell phone did not violate the Settlement Agreement.

### B. Tortious Interference with a Contractual Relationship

[5] Plaintiff argues that Med-Equip's actions in hiring Collier in the face of knowledge that he was subject to the Non-Compete Agreement, as well as fostering Collier's breach of the Non-Compete Agreement, constitutes tortious interference. The elements of a claim of tortious interference with contract are: (i) the existence of a valid contract; (ii) the interferer's knowledge of the contract; (iii) intentional interference that induces or causes a breach of the contract; and (iv) damages.[FN7] Without a breach of contract, there can be no tortious interference. As discussed above, the Settlement Agreement expressly permitted Collier

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 7

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

to work for Med-Equip as a respiratory therapist. Because Collier's activities that have been challenged by AHOM were in fact permitted by this proviso of the Settlement Agreement, there was no breach of either agreement. In other words, because plaintiff did not prove that Collier violated the terms of the Non-Compete Agreement, plaintiff has likewise failed in proving tortious interference.

> FN7. *All Pro Maids,* 2002 Del. Ch. LEXIS 116, at *25.

### C. Unfair Competition

[6] Plaintiff alleges that by trading on the relationships that Collier developed while employed at AHOM in order to obtain new business for Med-Equip, defendants engaged in unfair competition. The elements of the tort of unfair competition are that plaintiff has a reasonable expectancy of entering a valid business relationship, with which defendant wrongfully interferes and, thereby, defeats plaintiff's legitimate expectancy and causes him harm.[FN8] The home respiratory and medical equipment services industry enjoys robust competition, and any expectation of business relationships might be a bit unreasonable without a written contract with the customer. AHOM argues that past referrals of AHOM could be expected to continue to use the company in the future absent some outside interference; such argument, however, ignores the possibilities of price and service competition, and assumes that consumers base their choice of medical equipment provider solely on incumbency. Additionally, defendants could not have wrongly interfered with such relationships when Collier's activities were expressly permitted by the Settlement Agreement that plaintiff was a party to. Finally, without delving into unnecessary detail, defendants failed to prove that their loss of business was proximately caused by Med-Equip, let alone by Collier's activities working for Med-Equip.

> FN8. *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043 (Del.Super.2001).

### D. Interference with a Prospective Economic

### Advantage

*5 [7] Plaintiff alleges that Med-Equip's actions constituted tortious interference with AHOM's prospective business relationship with its referral sources. The elements of a claim of tortious interference with prospect business relation are: (i) the existence of a reasonable probability of a business expectancy; (ii) the interferer's knowledge of the expectancy; (iii) intentional interference that induces or causes termination of the business expectancy; and (iv) damages.[FN9] Once again, AHOM's expectancy of maintained business from customers was not reasonable in light of the comp etitive market in which it operated. Plaintiff has failed to demonstrate any intentional interference by Collier or by Med-Equip that caused a termination of the business plaintiff had reasonably expected. Additionally, plaintiff did not demonstrate damages that were proximately caused by defendants.

> FN9. *All Pro Maids,* 2002 Del. Ch. LEXIS 116, at *25.

### III. CONCLUSION

Based on the findings of fact and conclusions of law made herein, judgment is hereby entered in favor of the defendants on all counts. An Order has been entered consistent with this Memorandum Opinion.

Del.Ch.,2006.
American Homepatient, Inc. v. Collier
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

**To the Opening Brief In Support Of Google Inc.'s
Motion To Dismiss The Amended Complaint**

Westlaw.

Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
(Cite as: Not Reported in A.2d)

▷
Delaware Solid Waste Authority v. Eastern Shore
Environmental, Inc.Del.Ch.,2002.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
DELAWARE SOLID WASTE AUTHORITY, a
body politic and corporate constituting a public
instrumentality of the State of Delaware, Plaintiff,
v.
EASTERN SHORE ENVIRONMENTAL, INC., a
Delaware corporation, Defendant.
No. CIV.A. 1472-K.

Submitted: Dec. 17, 2001.
Decided: March 28, 2002.

Waste authority brought lawsuit against waste
management company for order enjoining company
from operating dry and municipal solid waste
transfer station located on unincorporated county
property. Company moved to dismiss lawsuit. The
Chancery Court, Kent County, held that: (1)
authority did not have standing to bring suit against
company under provision of statute permitting suits
to prevent buildings to be constructed in violation
of county zoning laws or regulations; (2) company
did not violate provision in Deceptive Trade
Practices Act providing remedy for advertising
which created likelihood of confusion concerning
trademarks or trade names; (3) company did not
violate provision in Act providing remedy for
advertising which dealt with false advertising of
goods, services or businesses; (4) company did not
violate provision in Act providing remedy against
new kinds of deceptive trade practices; and (5)
authority did not adequately pled elements of unfair
competition claim against company.

Motion to dismiss granted.
West Headnotes
[1] Zoning and Planning 414 ☞761

414 Zoning and Planning
    414XI Enforcement of Regulations
        414XI(A) In General
            414k761 k. Power and Duty to Enforce.
Most Cited Cases
Waste authority did not have standing to bring suit
against competitor waste management company
under provision of statute permitting suits to
prevent buildings to be constructed in violation of
county zoning laws or regulations, where statute
conditioned standing to sue on ownership of real
estate in district, and company's waste transfer site
at issue in lawsuit was in I-G zoning district
classification in county, but authority owned real
estate outside I-G zoning district, though also on
unincorporated county land. 9 Del.C. § 4919(b).

[2] Zoning and Planning 414 ☞761

414 Zoning and Planning
    414XI Enforcement of Regulations
        414XI(A) In General
            414k761 k. Power and Duty to Enforce.
Most Cited Cases
Case law did not entitle any county resident to sue
to redress zoning violation under statute permitting
suits to prevent buildings to be constructed in
violation of county zoning laws or regulations,
without regard to whether resident resided within
the same zoning district as the defendant. 9 Del.C. §
4919(b).

[3] Trademarks 382T ☞1427

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1423 Particular Cases, Practices, or
Conduct
                382Tk1427 k. Advertising or
Marketing. Most Cited Cases
    (Formerly 382k870(1) Trade Regulation)
Waste management company did not violate
provision in Deceptive Trade Practices Act

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

providing remedy for advertising which created likelihood of confusion concerning trademarks or trade names, where competitor waste authority did not claim that company used false or misleading trademarks or service marks, but rather that advertising was deceptive and misleading because embedded within each of company's advertisements was implied representation that company was operating with appropriate county zoning approvals, where under no set of circumstances would company's alleged violation of zoning ordinance be likely to produce confusion among consumers caused by use of trademark or trade name. 6 Del. C. §§ 2532(a)(2), (3).

**[4] Antitrust and Trade Regulation 29T ⟶163**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(B) Particular Practices
            29Tk163 k. Advertising, Marketing, and Promotion. Most Cited Cases
    (Formerly 382k870(1) Trade Regulation)
Waste management company did not violate provision in Deceptive Trade Practices Act providing remedy for advertising which dealt with false advertising of goods, services or businesses, where competitor waste authority did not specify any particular advertisement that it claimed was explicitly false, but only that company could legally operate in county, a status that was in contention at time claim was brought; ruling for authority would mean that whenever any company was charged with having violated any legal requirement, that alleged violation, unless disclosed, would constitute a deceptive trade practice. 6 Del. C. § 2532(a)(5).

**[5] Antitrust and Trade Regulation 29T ⟶162**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(B) Particular Practices
            29Tk162 k. Omissions and Other Failures to Act in General; Disclosure. Most Cited Cases
    (Formerly 382k870(1) Trade Regulation)
Waste management company did not violate provision in Deceptive Trade Practices Act

providing remedy against new kinds of deceptive trade practices, where theory that company was not disclosing to its customers that it was involved in zoning dispute over waste transfer station, even though company was presently operating transfer station lawfully, did not allege deceptive advertising in any legally meaningful sense. 6 Del. C. § 2532(a)(12).

**[6] Antitrust and Trade Regulation 29T ⟶76**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk74 Pleading
                29Tk76 k. Particular Cases. Most Cited Cases
    (Formerly 382k564 Trade Regulation)
Waste authority did not adequately plead elements of unfair competition claim against competitor waste management company in connection with company's alleged operation of transfer station in violation of zoning ordinances, where even if company did solicit authority's customers, as alleged, authority had not pled facts that would establish that company's conduct was "wrongful" or "malicious;" general assertion that company's conduct was willful and malicious was not supported by any specifically pled facts.

F. Michael Parkowski and Mark F. Dunkle, Esquires of Parkowski & Guerke, P.A., Dover, Delaware; Attorneys for Plaintiff.
William E. Manning, Richard A. Forsten and Francis X. Gorman, Esquires of Klett Rooney Lieber & Schorling, Wilmington, Delaware; Attorneys for Defendant.

MEMORANDUM OPINION
JACOBS, Vice Chancellor.
*1 The plaintiff, Delaware Solid Waste Authority (" DSWA"), has brought this lawsuit against defendant Eastern Shore Environmental, Inc. (" Eastern Shore"), for an order enjoining Eastern Shore from operating a dry and municipal solid waste transfer station (the "transfer station") located on a property in unincorporated Kent County, Delaware (the "property"). DSWA asserts three

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 3

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
(Cite as: Not Reported in A.2d)

claims. In Count I, DSWA claims that Eastern Shore's operation of the transfer station violates 6 *Del. C.* §§ 2531-2536, which prohibits certain deceptive trade practices. In Count II, DSWA claims that Eastern Shore's operation of the transfer station violates the Kent County Zoning Ordinance. And in Count III, DSWA claims that Eastern Shore is engaging in unfair competition.[FN1]

> FN1. Count IV is a claim for an award of attorney's fees.

Eastern Shore has moved to dismiss the complaint in its entirety. For the reasons set forth below, Eastern Shore's motion is meritorious and will be granted.

## I. FACTS

The facts recited below are derived from the well-pled allegations of the complaint.[FN2] On July 3, 2000 the Delaware Department of Natural Resources and Environmental Control ("DNREC") issued a permit authorizing Eastern Shore to operate the transfer station. The DNREC permit authorized the processing (*i.e.*, dumping, washing, sorting and hauling away) of 160 tons per day, and as much as 192,400 tons per calendar year, of various kinds of municipal waste.[FN3]

> FN2. *Weinberger v. UOP, Inc.*, 409 A.2d 1262, 1263-64 (Del.Ch.1979).

> FN3. Before the permit was issued DNREC had authorized the processing of only smaller volumes of dry waste. In 1999, for example, the transfer station processed only 18,648 tons of dry waste.

DSWA claims that the transfer station contains "pathogens ... and offensive odors, " and "disease, water resource contamination, pest control, noise, road damage, unacceptable levels of traffic and other health and safety concerns." Complaint ¶¶ 5, 9. Although extensively discussed in the complaint, the effect of the

transfer station on the health and safety of the community at large is not at issue in this action, and this Court is not required to consider those concerns for the purposes of this motion.

Contrary to the representations Eastern Shore made in its application for a DNREC permit, a transfer station is not a permitted use of the property under the property's current zoning-I-G (Industrial). To operate a transfer station under the property's current zoning, Eastern Shore was required to apply for a conditional use permit from Kent County (the " County").[FN4] The relevant application process includes two public hearings, a submission of the transfer station site plan to the Regional Planning Commission, and a review of the site plan by the Kent County Development Advisory Committee agencies.[FN5] Eastern Shore, however, has never undergone any of those public-hearing procedures, nor has it ever obtained conditional use approval. [FN6]

> FN4. *Kent County, Del., Zoning Ordinance* art. 6, § 5.103.

> FN5. *Id.* at art. 9, § 7.

> FN6. Nor has any previous owner of the property ever obtained conditional use approval for a transfer station from the County.

In a letter dated July 12, 2000, the Kent County Planning Director, Constance Holland, notified Eastern Shore that to comply with the County Zoning Ordinance its transfer station required conditional use site plan approval. Eastern Shore made no effort to apply for such approval, however. Instead, it brought a related lawsuit against the County for injunctive relief and monetary damages. [FN7]

> FN7. *Eastern Shore Envtl. v. Kent County Dep't of Planning*, C.A. No. 1464-K. That case is currently pending before this Court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 4

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

DSWA, the plaintiff, is a public instrumentality of the State of Delaware. Because it owns and operates a solid waste transfer station in unincorporated Kent County, DSWA is a direct competitor of Eastern Shore.

## II. THE ISSUES AND CONTENTIONS

DSWA seeks to enjoin Eastern Shore's use of the transfer station under three distinct theories. First, DSWA claims that Eastern Shore has violated the Delaware Deceptive Trade Practices Act, 6 *Del. C.* § § 2531-2536, in that Eastern Shore's advertisements are likely to confuse and deceive the public into believing that Eastern Shore has obtained the necessary County regulatory approval to operate its transfer station, when in fact that is not the case. Eastern Shore responds that the Act applies primarily to deceptive advertising claims caused by the misuse of a trademark or trade name. Because DSWA's claim does not involve a trademark or trade name, and because no legal authority supports DSWA's claim that a regulatory dispute must be disclosed in a company's advertisements or else be deemed a deceptive trade practice, Eastern Shore argues that DSWA's claim must be dismissed. I find that Eastern Shore's contention has merit.

*2 Second, DSWA is seeking to bring a private enforcement action under 9 *Del. C.* § 4919(b), which allows certain property owners to enforce a county zoning law or regulation against any property owner located within the same district. The only issue on this motion is whether DSWA has standing to sue under Section 4919(b). DSWA contends that any owner of property located within unincorporated Kent County has standing to sue under that Section. Eastern Shore argues, however, that the statute permits suits only by persons who own property situated within the specific zoning district where the offending property is located. I agree with Eastern Shore's interpretation of Section 4919(b), and thus conclude that DSWA does not have standing under that Section.

Third, DSWA claims that Eastern Shore is engaging in unfair competition with DSWA because it is soliciting DWSA's customers to use the transfer

station that Eastern Shore is currently operating without the proper regulatory approval. Eastern Shore responds that DSWA has failed to state a legally cognizable claim of unfair competition. Again, and for the reasons discussed *infra,* I agree.

The basis for my conclusions is next discussed.

## III. ANALYSIS

A. Does DSWA Have Standing to Enforce a Zoning Regulation Under 9 *Del. C.* § 4919(b)?

*1. DSWA Lacks Standing to Bring Suit Under 9 Del. C. § 4919(b)*

[1] In Count II, DSWA seeks relief under 9 *Del. C.* § 4919(b). The issue presented is whether DSWA has standing to bring suit under that provision. I conclude that it does not.

Section 4919(b) authorizes certain persons (including private parties) to bring suit in order to " prevent, enjoin, abate or remove" any building or structure that is "proposed to be erected, constructed, reconstructed, altered, maintained or used" in violation of a county zoning law or regulation. The persons entitled to bring suit under the statute are: (i) the County and (ii) "an owner of real estate [located] *within the district* in which such building, structure or land is situated." [FN8] Thus, unless DSWA is the "owner of real estate within the district," it has no standing to sue under Section 4919(b).

FN8. 9 *Del. C.* § 4919(b) (emphasis added).

Eastern Shore argues that "district" refers to a specific zoning classification district designated by the County. That is, the County is statutorily authorized to divide itself into specifically zoned areas, which are referred to in the statute as " districts." That being the case, Eastern Shore argues, only those persons who own property within

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the I-G zoning district in Kent County may bring an enforcement action against Eastern Shore, and DSWA is not such a property owner.[FN9]

> FN9. Eastern Shore is the only owner of property within that zoning district.

DSWA disputes that interpretation. It argues that "district" means *all* of unincorporated Kent County. As a consequence, any person who owns property situated in unincorporated Kent County would have standing to bring an enforcement action under Section 4919(b). DSWA's argument runs as follows: (i) The term "district" is used ambiguously in Chapter 49 of the Delaware Code; (ii) in Chapter 48, however, "district" is defined as "the Regional Planning District of Kent County," [FN10] which encompasses "that portion of Kent County which is not included within the corporate limits of any city or town." [FN11] Thus, under Chapter 48, "district" means all of unincorporated Kent County. From that premise DSWA next argues that (iii) because this Court has held that Chapters 48 and 49 must be read *in pari materia,*[FN12] the term "district" as used in Chapter 49 must be interpreted consistent with the meaning in Chapter 48. Therefore, DSWA concludes, (iv) because DSWA owns property in unincorporated Kent County, it has standing to bring this enforcement action under Section 4919(b).

> FN10. 9 *Del. C.* § 4801(5).

> FN11. *Id.* § 4802.

> FN12. *Scarborough v. Mayor and Council of Cheswold,* 303 A.2d 701, 706 (Del.Ch.1973) ("[Chapters 48 and 49] are *in pari materia,* treating the same general subject, and reference may be made to the one in construing the other."); *see also Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* 492 A.2d 1242, 1245 (Del.1985) ("A statute is passed by the General Assembly as a whole and not in parts or sections. Consequently, each part or section should be read in light of every other part or section to produce a

harmonious whole.").

**\*3** The difficulty with this argument is that DSWA's definition of "district" as encompassing all of unincorporated Kent County conflicts with the meaning of "district" as that term is used elsewhere in Chapter 49. That is, as used elsewhere in Chapter 49, "district" means the zoning classification district designated by the County. Section 4902, for example, states that "the county government may divide the territory of Kent County into *districts* or zones ... and within such *districts* ... may regulate the erection, construction, reconstruction, alterations and uses of buildings and structures and the uses of land." [FN13] Section 4911, which is entitled "changes in zoning *district;* plan or regulation; procedure," provides that the "county government may, from time to time, make amendments ... with respect to the number, shape, boundary or area of any *district or districts.*" [FN14] Thus, in those Sections, "district" means a divided area of Kent County where the County regulates land use. Consequently, "district" cannot mean all of unincorporated Kent County without ignoring the actual language of Chapter 49 and producing an absurd reading of that Chapter.[FN15]

> FN13. 9 *Del. C.* § 4902 (emphasis added).

> FN14. *Id.* § 4911 (emphasis added).

> FN15. *See Snell v. Eng'd Sys. & Designs, Inc.,* 669 A.2d 13, 20 (Del.1995) (holding that courts should interpret statutes to achieve a common sense result and to avoid unreasonable or absurd results). Furthermore, "district," a defined term, is always capitalized in Chapter 48, but is never capitalized in Chapter 49. The purposeful capitalization of "district" throughout Chapter 48 is evidence of the General Assembly's intent to give the same term different meanings in each Chapter.

Because DSWA has not shown that it owns property "within the [same] district" as Eastern Shore's transfer station, DSWA has no standing to assert its claim under Section 4919(b).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 6

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
(Cite as: Not Reported in A.2d)

### 2. Delaware Case Law Does Not Give DSWA Standing to Sue Under 9 Del. C. § 4919(b)

[2] DSWA next argues that *Scarborough v. Mayor and Council of Cheswold* [FN16] entitles any County resident to sue to redress a zoning violation under Section 4919(b), regardless of whether that plaintiff resided within the same zoning district as the defendant. DSWA misreads *Scarborough*, however.

FN16. 303 A.2d 701 (Del.Ch.1973).

In *Scarborough*, the plaintiffs were residents of the town of Cheswold who sought to enjoin the construction of a drive-in theater within that town. After the lawsuit commenced, the parties discovered that Cheswold had not properly adopted *any* zoning regulations. The plaintiffs then argued that because Cheswold had not adopted its own zoning regulations, zoning issues pertinent to the town should be governed by the Kent County Zoning Ordinance. Because Kent County failed to provide specifically for any zoning regulations for the town, the County Zoning Ordinance mandated that the town be zoned A-C (Agriculture-Conservation) by default. That zoning classification prohibited the drive-in theater from being built. [FN17]

FN17. That is, the plaintiffs were arguing that the County was statutorily bound to regulate zoning within Cheswold, but had failed to do so. Under the County Zoning Ordinance, if the County fails to provide zoning for a property within its jurisdiction, that property will be classified A-C. *Scarborough*, 303 A.2d at 705 (citing *Kent County, Del., Zoning Ordinance* art. 1, § 4). Under 9 *Del. C.* § 4901, Kent County may apply its own Zoning Ordinance to municipalities that have no zoning code, at the request of the municipality. Cheswold never made such a request.

The *Scarborough* Court first addressed the defendants' procedural argument that if the Kent County Zoning Ordinance applied, the plaintiffs were obligated to follow the administrative zoning procedures and appeal to the County Board of Adjustment. The Court ruled that the plaintiffs were entitled to seek relief under § 4919(b), without addressing the issue of whether the plaintiffs owned property in the same district as the drive-in theater. DSWA contends that because the Court held that the plaintiffs were found to be entitled to proceed, *Scarborough* must be viewed as holding that any property owner of Kent County has standing to bring suit under Section 4919(b).

*4 Although the *Scarborough* Court allowed the plaintiffs to sue under Section 4919(b), it did not do so on the basis that any Kent County property owner had standing to bring an enforcement action under Section 4919(b). Rather, the holding in *Scarborough* is consistent with Eastern Shore's interpretation of the word "district." In *Scarborough*, there were two possible outcomes: (i) no zoning regulations applied to Cheswold, in which case the suit would be dismissed because without any zoning regulations there could be no zoning violation; or (ii) the entire town was subject to the Kent County Zoning Ordinance, in which case all of Cheswold would be zoned A-C (Agriculture-Conservation). Therefore, by allowing the suit to go forward, the Court implicitly held that *if* the Kent County Zoning Ordinance applied to Cheswold (as the plaintiffs argued), the plaintiffs would have standing to sue under Section 4919(b) because the entire town would be zoned entirely as Agriculture-Conservation, [FN18] and the plaintiffs owned property within the same district as the drive-in theater. Because *Scarborough* does not compel the conclusion that DSWA advocates, it does not support DSWA's standing to seek enforcement of the Kent County Zoning Ordinance.

FN18. The Court ultimately held that the Kent County Zoning Ordinance did not apply to Cheswold, and therefore, the case was dismissed. *Scarborough*, 303 A.2d at 708.

### B. Has Eastern Shore Violated the Delaware Deceptive Trade Practices Act?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

[3] DSWA's next claim is that Eastern Shore has violated the Delaware Deceptive Trade Practices Act, 6 *Del. C.* §§ 2531-2536 (the "Act"). The complaint alleges violations of subsections 2532a(2), (a)(3), (a)(5) and (a)(12) of the Act, which state:
(a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

The Act "codifies [the 1964] Uniform Deceptive Trade Practices Act [ (the "Uniform Act") ], which in turn, codifies the common law of unfair competition." [FN19] To understand the scope of the Act, it is helpful to review the pertinent Delaware case law, and also the text and related Comments of the Uniform Act.

   FN19. *Young v. Joyce,* 351 A.2d 857, 859 (Del.1975).

The Uniform Act was intended to provide a remedy "to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising." [FN20] The Uniform Act thus encompasses two broad areas: (i) false or misleading use of trademarks or other trade identification and (ii) deceptive advertising.

   FN20. *Unif. Deceptive Trade Practices Act,* prefatory note (1964).

*5 DSWA does not claim that Eastern Shore used false or misleading trademarks or service marks. Rather, its claim is that Eastern Shore's advertising is deceptive and misleading because embedded within each of Eastern Shore's advertisements [FN21] is an implied representation that Eastern Shore is operating with the appropriate County zoning approvals. Because Eastern Shore is not operating with the appropriate County zoning approvals, members of the public (*i.e.,* present and future Eastern Shore customers) are being misled to believe that Eastern Shore is operating its transfer station legally.

   FN21. Eastern Shore has placed advertisements for its services in various publications, including the Bell Atlantic Yellow Pages.

Although DSWA's claim is of an "implied misrepresentation" is novel, it unfortunately finds no legal justification in the Uniform Act or Delaware case law for the reasons next discussed. [FN22]

   FN22. DSWA argues that the Uniform Act is based upon the Lanham Act, and then proceeds to argue that Eastern Shore's advertising practices violate the Lanham Act. The Lanham Act is not the Uniform Act, however, and DSWA has cited no authority adequate to support its proposition that the Uniform Act is based on the Lanham Act, or that a possible violation of the Lanham Act would also be a violation of the Uniform Act. Because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

DSWA has not brought a claim under the Lanham Act, this Court will not consider whether Eastern Shore's conduct has violated that Act.

*1. DSWA's Claim Under 6 Del. C. §§ 2532(a)(2)
and (a)(3)*

First, DSWA's claims under Sections 2532(a)(2) and (a)(3) of the Act are not legally cognizable. The Comments to the Uniform Act state that claims brought under those Sections-which use a " likelihood of confusion" standard-are to be based on the "approval, endorsement, or certification of goods or services caused by *trademarks, service marks, certification marks, or collective marks* likely to be associated with preexisting trade symbols," [FN23] or by "misleading *trade names.*" [FN24]

FN23. *Unif. Deceptive Trade Practices Act* § 2(a)(2), cmt. (emphasis added).

FN24. *Id.* § 3(a)(2), cmt. (emphasis added).

The difficulty is that even if DSWA's claims are assumed to be factually true, under no set of circumstances would Eastern Shore's alleged violation of County Zoning Ordinance (and any related misrepresentation on its DNREC application) be likely to produce confusion among consumers *caused by the use a trademark or a trade name.* DSWA has cited no authority supporting its argument that misrepresentations in advertising that are related to a zoning violation are actionable under Sections 2532(a)(2) and (a)(3). DSWA's claims under those statutory provisions are not legally cognizable and must be dismissed.

*2. DSWA's Claim Under 6 Del. C. § 2352(a)(5)*

[4] Similarly defective is DSWA's claim under 9 *Del. C.* § 2353(a)(5), which "deals with false advertising of goods, services or businesses." [FN25] In its complaint DSWA does not specify any particular advertisement that it claims is *explicitly* false. Rather, DSWA contends that all of Eastern

Shore's advertising falsely *implies* that Eastern Shore "can legally operate in Kent County." [FN26] Specifically, DSWA argues that "[b]y failing to disclose Kent County's objection, Eastern [Shore] falsely conveys to its potential customers, and in particular, the City of Milford, that it can legally provide the waste hauling services that it solicits." [FN27] I find this claim legally insufficient.

FN25. *Id.* § 2(a)(5), cmt.

FN26. DSWA Ans. Br. at 17.

FN27. *Id.* at 18.

One major problem with this claim is Eastern Shore's position that it is operating legally. Eastern Shore has filed an action in this Court against Kent County to establish its right to operate the transfer station,[FN28] and the County has indicated that it will take no enforcement action against Eastern Shore during the pendency of the litigation.[FN29] Furthermore, no zoning violation has been determined by any competent tribunal. Those being the circumstances, on what basis can it be claimed that there is "implicit falsity" in Eastern Shore's advertisements? It would be an odd result if this Court were to announce a rule that when a dispute arises over a company's permit to operate and while the dispute is pending the company is permitted to operate, the company has a duty to disclose the existence of the dispute in all its advertisements, or else be found to have committed a deceptive trade practice. Such a rule, taken to its logical conclusion, would mean that whenever a company is charged with having violated any legal requirement, that alleged violation, unless disclosed, would constitute a deceptive trade practice. DSWA has cited no authority that supports that interpretation of our statute. Even assuming the truth of DSWA's well-pled facts, Eastern Shore's mere advertisement of its services, at a time it is claimed to be in violation of a County zoning ordinance, cannot constitute a deceptive trade practice under the Act.

FN28. *Eastern Shore Envtl. v. Kent County Dep't of Planning,* C.A. No.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                             Page 9

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

1464-K.

FN29. Eastern Shore Reply Br. at Ex. A (oral argument transcript).

### 3. DSWA's Claim Under Section 9 Del. C. § 2532(a)(12)

*6 [5] DSWA's claim under Section 2532(a)(12) is similarly defective. That Section prohibits "any other conduct which similarly creates a likelihood of confusion or misunderstanding." The intent of Section 2532(a)(12) is to enable courts to prevent " new kinds of deceptive trade practices." [FN30] By asserting a claim under this Section, DSWA is asking this Court to find that Eastern Shore has engaged in a "new kind of deceptive trade practice," namely, not disclosing to its present and potential customers that it is involved in a zoning dispute over the transfer station, even though Eastern Shore is presently operating the transfer station lawfully. Again, DSWA cites no authority and makes no reasoned argument that would persuade this Court to find that such advertising is deceptive, or that it creates "a likelihood of public deception" [FN31] in any legally meaningful sense. The Act ought not to be used as a backdoor way for a party to enforce the County Zoning Ordinance indirectly, where that same party would have no standing to enforce the Zoning Ordinance directly. Therefore, DSWA's claim under the Act also fails.

FN30. Unif. Deceptive Trade Practices Act § 2(a)(12), cmt.

FN31. Id.

### C. Has DSWA Stated a Claim for Unfair Competition?

[6] Lastly, DSWA claims that Eastern Shore has engaged in unfair competition by operating "a transfer station without conditional use approval, and [by soliciting] DSWA's customers [causing] DSWA to lose or be threatened to lose its current business." [FN32] DSWA also claims that Eastern Shore's conduct was "willful, malicious and without regard to the consequence of its actions." [FN33] In short, DSWA claims that Eastern Shore engaged in unfair competition by: (i) operating without proper zoning approval where DSWA, its competitor, is in compliance with the County zoning regulations and (ii) soliciting DSWA's customers.

FN32. Compl. ¶ 35.

FN33. Id. ¶ 36. In its answering brief, DSWA argues that Eastern Shore " solicited the City of Milford's business and in turn the City of Milford terminated its contractual relationship with DSWA before the end of the contract." DSWA Ans. Br. at 19.

To state a claim for unfair competition, the plaintiff must allege that it has a reasonable expectancy of entering a valid business relationship with which the defendant wrongfully interferes, thereby defeating the plaintiff's legitimate expectancy and causing the plaintiff harm. [FN34] "Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition.... Unfair competition, which is not privileged, includes fraud, intimidation, or disparagement." [FN35]

FN34. Rypac Packaging Mach. Inc. v. Coakley, 2000 WL 567895, at *8 (Del.Ch.) (citing Int'l Bus. Machs. Corp. v. Comdisco, Inc., 1993 WL 259102 (Del.Super.Ct.)).

FN35. Int'l Bus. Machs. Corp., 1993 WL 259102, at *22.

Given the applicable legal standard, DSWA has not adequately pled the elements of an unfair competition claim. Even if DSWA's pled facts are assumed to be true, DSWA's claim is that Eastern Shore (i) willfully misrepresented on DNREC permit application that the property could be used as a transfer station as currently zoned,[FN36] and then (ii) "solicited customers of DSWA and commenced doing business with those customers." [FN37] But even if Eastern Shore did solicit DSWA's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 10

Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

customers, DSWA has not pled facts that would establish that Eastern Shore's conduct was "wrongful" or "malicious." DSWA does assert that Eastern Shore's conduct generally was willful and malicious, but this conclusory assertion is not supported by any specific pled facts.

> FN36. Compl. ¶ 10. As noted above, it is undisputed that Eastern Shore is currently legally entitled to operate the waste transfer station during this litigation, and the transfer station is currently operating under a valid permit from the DNREC.

> FN37. *Id.* ¶ 19.

*7 It follows that DSWA's claim-that Eastern Shore fraudulently or wrongfully interfered with DSWA's contractual relationship-is not supported by its pleadings. Even DSWA's cited cases require a plaintiff to "plead with particularity sufficient facts to support a claim of malicious interference with contract." FN38 The only fact properly pled here is that Eastern Shore solicited DSWA's customers-an act that without more cannot amount to a malicious interference with a contract. A bald assertion of maliciousness without supporting allegations of fact will not sustain an unfair competition claim.FN39 DSWA's unfair competition claim must therefore be dismissed. FN40

> FN38. *Elder v. El Di, Inc.,* 1997 WL 364049, at *14 (Del.Super.Ct.). *Elder* specifically addresses a claim for malicious interference with contractual relationships, and DSWA frames its unfair competition claim as such. *See, e.g.,* Compl. ¶¶ 35, 37 (alleging a malicious interference with DSWA's relationship with its customers); DSWA Ans. Br. at 19 (arguing Eastern Shore intentionally interfered "with the performance of an existing contract."). In any event, those two claims are treated in a similar (though not identical) manner in Delaware. *Int'l Bus. Machs. Corp.,* 1993 WL 259102, at *21.

> FN39. *See, e.g., Elder v. El Di, Inc.,* 1997 WL 364049, at *14 ("In his complaint, [the plaintiff] has asserted with sufficiency that [the defendant] knowingly and intentionally interfered with [the plaintiff's] lease agreements without justification ...."); *Regal Home Distributors v. Gordon,* 66 A.2d 754, 755 (Del.Super.Ct.1949) ("The improper means [of obtaining a contract from a competitor's customer] stated in the complaint consist of statements by defendant relating to plaintiff's secret connection with another corporation of which its customers would not have approved and (2) imputations of plaintiff's financial irresponsibility. The complaint fails to allege that the statements were false [and therefore summary judgment will be granted].).

> FN40. There is also no authority to support DSWA's claim that operating a business while in violation of a regulation constitutes unfair competition. Indeed, at least one case in Delaware can be reasonably read to hold the opposite. *See Delaware Optometric Corp. v. Sherwood,* 128 A.2d 812 (Del.1957) (holding that a licensed optometrist could not enjoin an unlicensed person from practicing optometry under the licensing statute).

V. CONCLUSION

For the above reasons, Eastern Shore's motion to dismiss DSWA's complaint is granted. IT IS SO ORDERED.

Del.Ch.,2002.
Delaware Solid Waste Authority v. Eastern Shore Environmental, Inc.
Not Reported in A.2d, 2002 WL 537691 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.