## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTOPHER LANGDON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GOOGLE, INC., d.b.a DELAWARE GOOGLE INC., )<br>YAHOO! INC., and MICROSOFT CORP., )<br>)<br>Defendants. ) | Case No. 06–319 (JJF) |

## COMPENDIUM OF UNREPORTED CASES CITED IN
## MICROSOFT'S OPENING BRIEF IN SUPPORT OF
## ITS MOTION TO DISMISS PLAINTIFF'S
## AMENDED COMPLAINT FOR REPEATED
## <u>FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)</u>

Dated: October 16, 2006

**DUANE MORRIS LLP**
Daniel V. Folt (Del. Bar No. 3143)
Gary W. Lipkin (Del. Bar No. 4044)
Matt Neiderman (Del. Bar No. 4018)
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
(302) 657-4900

*Of Counsel*:
**PROSKAUER ROSE LLP**
Christopher Wolf
Stephen D. Solomon
Rachel Faith Glickman
1001 Pennsylvania Avenue, N.W.
Suite 400 South
Washington, D.C. 20004-2533

*Attorneys for Defendant Microsoft*

## TABLE OF CONTENTS

**Name**                                                                                                       **Exhibit**

*International Equity Capital Growth Fund, L.P. v. Clegg,*
    1997 WL 208955 (Del. Ch. Apr. 22, 1997) ........................................................................A

*Fuester v. Conrail,*
    1994 Del. Super. LEXIS 472 (Del. Super. Sept. 16, 1994) ...............................................B

*Morrow v. USA Today Newspaper,*
    1988 WL 52833 (S.D.N.Y. May 16, 1988) ........................................................................C

*Tsau v. National Science Foundation,*
    2000 U.S. Dist. LEXIS 14580 (Sept. 28, 2000)................................................................D

# EXHIBIT A

Westlaw.

Not Reported in A.2d                                          Page 1
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

C
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
INTERNATIONAL EQUITY CAPITAL GROWTH
FUND, L.P., Plaintiff,
v.
C. Stephen CLEGG and Jacob Pollock, Defendants,
and
Globe Building Materials, Inc. and Diamond Home
Services, Inc., Nominal
Defendants.
No. Civ.A. 14995.

Submitted Aug. 16, 1996.
Decided April 22, 1997.
Martin P. Thily, S. Mark Hurd, Morris, Nichols,
Arsht & Tunnell, Wilmington, for Plaintiff.

Charles S. Crompton, Jr., Arthur L. Dent, Potter,
Anderson & Corroon, Wilmington, for Defendants C.
Stephen Clegg, Jacob Pollock.

Lawrence S. Drexler, Oberly, Jennings & Drexler,
P.A., Wilmington, for Nominal Defendants, Globe
Building Materials, Inc., Diamond Home Services,
Inc.

ALLEN, Chancellor

*1 In this action a 26% shareholder in a close
corporation challenges a series of transactions
between the corporation, its 80%-owned subsidiary
Diamond Home Services, ("Diamond"), and two
directors of both corporations. The action is before
this court on a motion to dismiss the complaint
pursuant to Court of Chancery Rule 23.1, and with
regard to certain claims, for dismissal for lack of
standing and failure to state a claim on which relief
can be granted. The motion has been brought by the
individual defendants. This motion requires
determining the independence of a board of directors
for the purposes of excusing demand under Rule
23.1; the time of an alleged wrong in a continuing
contractual relationship, for the purposes of
determining a shareholder's standing to challenge that
alleged wrong; and the ripeness for adjudication of
an alleged usurpation of a corporate opportunity and
an uncompleted merger transaction.

This action is brought as a derivative claim by
International Equity Capital Growth Fund, L.P.
("Fund"), purportedly on behalf of Globe Building
Materials, Inc. ("Globe"). The complaint alleges that
C. Stephen Clegg ("Clegg") and Jacob Pollock
("Pollack"), the chairman and CEO and a director,
respectively of both Globe and its subsidiary
Diamond, have engaged in transactions with Globe
and Diamond to the detriment of those companies in
violation of their fiduciary duties. Plaintiff seeks (1) a
declaration the defendants · violated their fiduciary
duties (2) recissory and compensatory damages and (3) a
declaration that the announced terms of Diamond's
proposed acquisition of The Handy Craftsman, Inc.
("Handy Craftsman") are unfair to Diamond.

For the reasons set forth below, I conclude that (1)
plaintiffs have met their burden under Court of
Chancery Rule 23.1 of casting reasonable doubt upon
the independence of the Globe and Diamond boards
with respect to the majority of the transactions that
are the basis for this action; (2) the plaintiffs have
alleged specific facts relating to the performance of
the financial services contract that state a claim
which the plaintiffs have standing to assert; and (3)
while the alleged usurpation of a corporate
opportunity has been completed, the agreement
between Diamond and Handy Craftsman as described
in the plaintiff's pleadings does not constitute a claim
ripe for judicial review. Consequently, the
defendant's motion for dismissal pursuant to Rule
23.1 for failure to make demand and for lack of
standing must in large part be denied, while the
defendant's motion to dismiss claims relating to
Diamond's prospective purchase of Handy Craftsman
is granted and those claims will be dismissed without
prejudice.

I. THEORIES OF THE COMPLAINT

Count 1 of the Complaint accuses Mr. Clegg of
arranging for Globe to enter into transactions in
which he had a personal financial interest and which
were unfair to Globe. Count II accuses Mr. Clegg of
arranging for Diamond to enter into unfair self-
dealing transactions in violation of his fiduciary duty
of loyalty. Count II accuses Mr. Pollock of
arranging the sale of the Chester Facility to Globe in
violation of his fiduciary duties of loyalty to Globe.
Count IV accuses Mr. Clegg of usurping a corporate

Not Reported in A.2d                                            Page 2
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

opportunity of Diamond's when he purchased Handy Craftsman in 1995.

*2 With regard to Fund's standing to litigate issues relating to the 1989 Financial Services Agreement between Globe and Clegg Industries, Fund claims that Globe's payments under the Agreement became wasteful in 1993 when Clegg Industries became incapable of rendering any services in consideration for the payments. Consequently, Fund argues the wasteful conduct occurred in 1993, after it had made its investment in Globe. As to the ripeness of Fund's claim regarding Diamond's purchase of Handy Craftsman, Fund asserts that Diamond and Clegg have entered into an agreement in principle, a contractual obligation under Delaware law subject to judicial review.

## II. THE PARTIES

Plaintiff is a Bermuda partnership, that on December 31, 1992, purchased 505 shares of Globe common stock, warrants to purchase 1,350 shares of Globe common stock, and $2,000,000 in Globe subordinated debt. Currently, Fund owns 630 shares of Globe common stock, comprising 26.2% of Globe's total common stock.

Nominal defendant Globe is a Delaware corporation manufacturing shingles and other roofing products. Globe was formed in 1989 by Clegg Industries. Nominal defendant Diamond is a Delaware corporation formed in 1993 by Globe. Diamond markets and sells residential roofing systems and home improvement products. It is 80 % owned by Globe.

C. Stephen Clegg is the Chairman of the Board, Chief Executive Officer, Treasurer, and Assistant Secretary of Globe. He also controls the voting rights for 1,472 shares of Globe (56.5% of the voting stock). Directly or indirectly, Mr. Clegg owns or controls 888 shares; 240 of these shares are held by Globe Investors, Inc, 47% of whose voting shares are owned by Clegg, and 225 shares are held by 29 W Partners, 100% of whose voting shares are held by Clegg. Clegg is Chairman of the Board, Chief Executive Officer, and President of Diamond. In addition, Clegg is Chairman of the Board and Chief Executive Officer of Clegg Industries, Mid-West Spring Manufacturing Company, Catalog Holdings, Inc. ("CHI"), and a director and member of the Compensation Committee of the Board of Directors of Ravens Metal Products, Inc. ("Ravens").

Defendant Jacob Pollock has been a director of Globe since 1989, and a director of Diamond since September, 1993. He is also a director of Spring, and the controlling shareholder, Chairman of the Board and Chief Executive Officer of Ravens. Additionally, he allegedly owns and controls J. Pollock & Company.

The directors of Globe currently are Clegg, Pollock, Globe Vice-President John Klikus ("Klikus") and George A. Stinson ("Stinson"). The directors of Diamond are Clegg, Pollock, Diamond Vice-President James M. Gillespie ("Gillespie"), Stinson, and James F. Bere Jr.

## III. THE GOVERNANCE OF GLOBE AND DIAMOND GENERALLY

Defendants' motion seeks to dismiss all claims for failure to make demand upon the boards of Globe and Diamond pursuant to Court of Chancery Rule 23.1. Plaintiff's argument that demand is excused rests in every case on the alleged lack of independence of the majority of those boards. The evaluation of the independence of a board for the purposes of a Rule 23.1 motion is necessarily factually specific. There are few bright lines. Evaluation of director independence for this purpose is performed under the cross-pressures of two applicable principles. First, at such an early stage, plaintiff should be accorded the benefit of a pleading doubt. Second, plaintiff must however not rely on "conclusions" but must plead specific "facts" showing a reasonable doubt as to the applicability of the business judgment presumption.

*3 In evaluating whether the plaintiff has cast reasonable doubt on these Boards' ability independently to evaluate these transactions at the time this suit was filed, I place weight on several allegations that bear upon the extent of the independence of a majority of the boards of directors of Globe and Diamond from Clegg. First, Clegg held 56% of the voting stock of Globe at the time of the filing of the complaint. Globe held 80% of the voting stock of Diamond. Consequently, it was within Clegg's power to designate and to remove members of either Board if he felt so moved. Allegations of voting control coupled with self interested transactions themselves go very far to excusing demand. Second, Clegg is alleged to have used this power in his management of each Board between January and May of 1996 for the purposes of removing directors who had exercised independent judgement.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

In January 1996, Mr. Clegg allegedly refused to reappoint the independent director Abplanalp to the Globe board, replacing him with Globe Vice President John Klikus. Also in January, Mr. Clegg allegedly fired Mr. Griffin as Chief Executive Officer of Diamond and had him removed from Diamond's board, following a disagreement over a transaction in which Mr. Clegg had a personal interest. Finally, Mr. Clegg is alleged to have threatened Mr. Lefkowitz, the plaintiff's nominee to the Globe Board of Director, with being removed from the Globe board at some unspecified time, and to have then actually purported to remove him after plaintiff filed this action.

As to the role of plaintiffs, I note that Fund made a substantial investment in Globe more than three years before the complaint was filed. It sought to participate in the corporation's governance by designating Lefkowitz to Globe's board under a Shareholders Agreement. Lefkowitz is alleged to have objected to some of the transactions which are the subjects of this action. I conclude that these allegations are sufficient to raise a reasonable doubt concerning the independence of the Globe and Diamond boards.

IV. THE CLEGG-GLOBE TRANSACTIONS

A. The Financial Services Transactions

Upon Clegg Industries' incorporation of Globe in 1989 and Mr. Clegg's appointment of Globe's directors, Globe entered into a contract with Clegg Industries for unspecified financial services pursuant to which Globe would pay Clegg Industries $350,000 per year (the "Financial Services Agreement"). In addition, under the contract, Globe was required to compensate any Clegg Industries employee while working for Globe without any reduction in the $350,000 payment due Clegg Industries under the Agreement. This contract was in force at the time of Fund's initial investment in Globe on December 31, 1992.

It is alleged that during 1993, all Clegg Industries employees other than Mr. Clegg were transferred from the Clegg Industries payroll to the Globe payroll. Among the employees purportedly so transferred was a particular Clegg Industries employee who had been performing financial services for Globe. Payments to Clegg Industries under the Financial Services Agreement continued.

*4 Secondly, in July 1993, Globe issued Clegg Industries 1,534 shares of its preferred stock and warrants to purchase 13 shares of common stock having a total assigned value of $152,000. These securities were purportedly issued to compensate Clegg Industries for investment banking services related to Globe's 1993 investment in Diamond. In December 1993, Globe paid Clegg Industries a further $150,000, purportedly as compensation for work related to Globe's senior note offering earlier in 1993. Both payments were approved by Globe's Board of Directors and, plaintiff claims, governed services of the type Clegg Industries had an obligation to provide Globe under the 1989 Financial Services Agreement. Thus the payments are alleged to be wasteful and unfair self-dealing.

Thirdly, in January 1995, Mr. Clegg dismissed the Chief Executive Officer of Diamond and assumed the position himself at a salary of $100,000 per year. Pursuant to Globe's Bank Loan and Security Agreement, payments under the Financial Services Agreement had to be reduced to $250,000 per year as a result. The $100,000 payment to Clegg is challenged as a breach of loyalty.

1. Plaintiffs Standing to Challenge the Financial Services Transactions

For a plaintiff to have standing to bring a derivative action, that plaintiff must have been a shareholder of the corporation at the time the alleged wrong was committed, and must remain a shareholder through the course of the derivative action. 8 Del. C. § 327. Plaintiff claims that Clegg Industries' failure after 1993 to provide services under the Financial Services Agreement created a right to terminate its payments which Globe failed to assert. A failure by a corporation to assert a legal right at the time that right comes into being may be a breach of duty, and thus a possible basis for a shareholder's derivative action. [FN1] Plaintiff was a shareholder throughout 1993 and has remained a shareholder since that time. Consequently plaintiff has standing to bring claims for breach of fiduciary duty arising out of Globe's failure to enforce its contract with Clegg Industries. [FN2]

FN1. *Mills Acquisition Co. v. MacMillan, Inc.,* Del.Supr., 559 A.2d 1261, 1280 (1989).

FN2. The standing rule is to be construed to facilitate the discovery of wrongdoing and discourage "strike suits." There is precedent suggesting that even were the transaction under consideration found to have commenced with the execution of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

Financial Services Agreement in 1989, in the particulars of this case, where the plaintiff has a substantial and continuing equity investment, a limited equitable exception to the standing requirement to facilitate the correction of corporate wrongdoing may apply. *Schreiber v. Bryan,* Del. Ch., 396 A.2d 512 (1978); *Maclary v. Pleasant Hills, Inc.,* Del. Ch., 109 A.2d 830 (1954).

2. Demand Excused

Rule 23.1 requires plaintiffs in a derivative action to "allege with particularity" their reasons for not making a pre-suit demand upon the board of directors to bring the action. Its purpose is to "ensure that a stockholder exhausts his intra corporate remedies, and then to provide a safeguard against strike suits." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811 (1984). Plaintiff has the burden of alleging particularized facts raising a reasonable doubt that the board of directors is disinterested and independent or that the challenged transactions were the product of a valid exercise of business judgment. *Aronson v. Lewis, supra.*

The complaint involves a number of separate transactions occurring over several years and involving different persons in different capacities. In these circumstances, the appropriate approach to board independence is to review each board's independence with respect to each transaction alleged to give rise to a claim against the defendant directors of that corporation.

*5 For the reasons discussed below, I find plaintiff has met its burden of alleging specific facts raising reasonable doubts as to the majority of the board's independence when approving the Financial Services Transactions.

The Financial Services Transactions allegedly each involved Mr. Clegg or corporations he controlled as counter parties. Because Mr. Clegg is alleged to have voting control of Globe, this conflict of interest is sufficient to cast reasonable doubt on Mr. Clegg's independence. But there is more alleged than this alone. Mr. Klikus is an employee of Globe answering to Mr. Clegg. Mr. Clegg allegedly named him to the board in January 1996, replacing the long-standing independent board member, Abplanalp. Additionally, plaintiff alleges that in early 1996, Mr. Clegg removed John Griffin as President of Diamond for refusing to enter into an interested transaction

with Mr. Clegg at the price Mr. Clegg desired. This allegation supports an inference that Mr. Klikus was aware of the alleged circumstances surrounding Mr. Griffin's dismissal. In light of Mr. Clegg's control of 56% of Globe's voting stock, these additional alleged facts are sufficient to support the inference that Klikus is beholden to Clegg and therefore to cast doubt on his ability to independently review the Financial Services Transactions.

With respect to the independence of Mr. Pollock, defendant rightly argues that Mr. Pollock does not have a direct interest in the Financial Services Transactions or the other Clegg-Globe Transactions. Pollock did approve each of the transactions named in this complaint in which either he or Clegg was the counter party. Pollock benefitted from certain of these transactions; Clegg benefitted from others, at the alleged expense of Globe. These allegations reflecting a clear pattern of mutual advantage is sufficient in my opinion to raise a reasonable doubt concerning Mr. Pollock's independence of Mr. Clegg. Finally, Mr. Clegg is on the Compensation Committee of Ravens, with direct involvement in setting Mr. Pollock's compensation as Chief Executive Officer of that company.

Perhaps neither Mr. Clegg's control of the majority of shares of Globe, Mr. Pollock's approval of any single one of the Clegg-Globe Transactions, Mr. Clegg's serving on Ravens' board of director, nor Mr. Pollock's appointment by Mr. Clegg, each taken in isolation, would be sufficient to cast reasonable doubt on Mr. Pollock's independence with respect to the transaction at issue. In combination, however, I find the plaintiff has alleged particular facts that support a reasonable doubt as to Pollock's independence with respect to Globe's Financial Services Transactions. Since Clegg, Klikus, and Pollock made up a majority of the Globe board of directors at the time the complaint was filed, demand is excused with respect to claims arising from the Financial Services Transactions.

B. The Clegg-Globe Marketing Services Transactions

In 1994, Globe allegedly paid $150,000 Catalog Holdings, Inc. ("CHI"), a corporation alleged to be controlled by Mr. Clegg, purportedly in consideration for the future placing of advertisements for Globe's products in the catalog of H.I., Inc., a wholly-owned subsidiary of CHI. In addition, Globe allegedly received an option expiring August 1, 1997 to purchase 3,275 shares of CHI common stock for

Not Reported in A.2d                                                    Page 5
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

$100 per share. Fund asserts that H.I., Inc. was a new company with a limited customer base and limited retail catalog distribution. Additionally, Fund claims that shingles for residential roofing, Globe's principle product, are not generally advertised directly to consumers. Finally, Fund asserts that CIR's current market value is far below $100 per share, implying that the value of the options Globe received is relatively low.

*6 The same analysis that led me to conclude that the plaintiff had cast doubt on the Globe board's independence in approving the Financial Services Transactions for the purposes of excusing demand under Rule 23.1 applies to the Marketing Transactions. Consequently, demand is excused.

V.    E    CLEGG-DIAMOND    MARKETING SERVICES TRANSACTION

Simultaneously with the Globe-CHI transaction, Diamond allegedly paid $150,000 to CI-H, purportedly for access to 3,0004,000 sales leads and certain call center services from H.I., Inc., as well as options to purchase 3,275 shares of CHI common stock for $100 per share. However, plaintiff alleges that H.I., Inc. *had no such sales leads to sell* and that Diamond already owned a call service center. Thus plaintiff alleges that the transaction was self-interested, wasteful, and disloyal.

I find that plaintiffs have met their burden of casting doubt on the independence of the Diamond board with respect to this transaction, and that consequently, demand is excused. Plaintiff alleges, that as an owner of CHI, Mr. Clegg had a direct personal interest in Diamond's issuing securities to CHI in exchange for unnecessary marketing services. This allegation is sufficient to support a reasonable doubt as to Mr. Clegg's independence with respect to these transactions.

Mr. Gillespie is a director of Diamond and an employee of the company. Mr. Clegg, by virtue of his majority control of Globe and Globe's 80% ownership of Diamond, controls Diamond. Mr. Clegg, it is alleged, used this control in February, 1996, to remove an employee director for challenging his judgment on an allegedly self-interested transaction with respect to Mr. Clegg. As was the case with Mr. Klikus, plaintiff pleaded sufficient particular facts to support a reasonable doubt as to Gillespie's independence based on his being beholden to Mr. Clegg.

Finally, as to Mr. Pollock's independence, the same factual circumstances discussed above in relation to Mr. Pollock's involvement in the Clegg-Globe transactions apply to the Clegg-Diamond Marketing Services Transaction. The alleged firing and removal of Mr. Griffin speaks generally to how Mr. Pollock might view Mr. Clegg's approach to board management. Consequently, I conclude plaintiff has pleaded sufficient factually specific allegations to support a reasonable doubt that a majority of the Diamond Board at the time the complaint was filed were capable of independent judgement with respect to both the Clegg-Diamond Marketing Services Transactions and Mr. Clegg's alleged purchase of Handy Craftsman.

VI. THE PURCHASE OF B CHESTER FACILITY

This claim relates to Globe's purchase of a shingle manufacturing plant from a company allegedly controlled by Mr. Pollock. Fund alleges this purchase was the product of Mr. Pollock's fraudulent self-dealing with the assistance of Mr. Clegg. Fund further alleges that Mr. Pollock and Mr. Clegg failed to disclose material information about the state of the shingle plant to the board in violation of their fiduciary duties. For the reasons that follow I conclude that these allegations do support a reasonable doubt as to the independence of the Globe board with respect to both the Chester Facility acquisition itself and the disclosure issue arising out of the acquisition. Thus plaintiff is excused from making presuit demand regarding these claims.

*7 Fund alleges that during 1992 and January 1993, Globe leased a shingle manufacturing plant in Chester, West Virginia, from J. Pollock & Co. for $205,000 and that in February 1993, Mr. Clegg proposed to the Board of Globe that Globe purchase the Chester facility for $940,000. The Board approved the purchase. Fund alleges that at the time of the purchase Globe's shingle operations' sales and gross profits were declining, and its shingle plants were operating at less than full capacity. Fund also alleged that Mr. Clegg and Mr. Pollock knew at the time of the proposal to the board that the Chester facility was "deficient in design and structure," and failed to share their knowledge with Globe's other board members.

In early 1995, Mr. Clegg told the Board of Globe that Diamond was refusing to buy shingles from the Chester Facility. Mr. Lefkowitz later informed the Globe Board that he had learned the Chester Facility manufactured poor quality shingles due to the defects

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

Page 6

present at the time of Globe's purchase of the Chester Facility from J. Pollock & Co. In the fall of 1995, the Chester Facility was closed due to the product quality problems.

Since Mr. Pollock was a board member of Globe, Globe's purchase of the Chester Facility was an interested transaction insofar as he was concerned. However, plaintiffs have not alleged facts that directly would establish a conflict of interest with respect to other members of the Globe board with respect to the Chester Facility Acquisition. In fact, Mr. Clegg's 47% direct ownership of Globe gives him a substantial direct financial interest in Globe obtaining fair terms in the transaction. The complaint alleges Mr. Clegg and Mr. Pollock acted together to mislead the other members of the board into entering purchasing the facility. The complaint does not allege Mr. Clegg's motive for acting against his economic interest, but the clear implication of the complaint as a whole is that Mr. Clegg relied on Mr. Pollock's support in effectuating numerous other transactions that benefited Mr. Clegg carrying out his own allegedly disloyal actions. It is one possible and not unreasonable inference that all the alleged actions complained of together constituted a common scheme by Mr. Clegg and Mr. Pollock. While a finding that such a plan or scheme actually existed would require proof, as a matter of pleading I am satisfied that plaintiff has raised a reasonable doubt as to Mr. Clegg's independence, and thus the independence of a majority of the Globe board, with respect to Globe's acquisition of the Chester Facility.

In addition, plaintiff has alleged that both Mr. Clegg and Mr. Pollock knew at the time of the Globe board's consideration of the Chester Facility Acquisition that the Facility had design and structural flaws rendering it incapable of producing salable shingles. Plaintiff further alleges Clegg and Pollock concealed this information from the board. Such concealment would violate both directors' duty to disclose to other directors. *Hoover Industries v. Chase,* Del. Ch., C.A. No. 9276, slip. op. at 4 (July 13, 1988). With respect to this alleged breach of fiduciary duty, Mr. Pollock has an alleged direct financial interest casting doubt on the applicability of the business judgement rule. Mr. Clegg stands accused of a breach of duty of a more serious nature than the mere approval of the challenged transaction, and Mr. Klikus is, for the purpose of this transaction as well as the Clegg-Globe transactions, subject to reasonable doubts to his independence due to his being beholden to Clegg for his position as an employee of Globe. Consequently, as to allegations

of breach of fiduciary duty due to Mr. Clegg and Mr. Pollock's alleged failure to disclose to the Globe board, plaintiff is excused from the demand requirement of Rule 23.1.

VII.    THE    HANDY    CRAFTSMAN TRANSACTIONS AND THE DIAMOND IPO

*8 On May 12, 1994, the Diamond board allegedly specifically agreed to prohibit any officer from investing in a competitor of Diamond. The complaint is silent as to what form this agreement took. The exact nature of this agreement is of minor relevance in light of the existence of the corporate opportunity doctrine. In 1995, Mr. Clegg acquired Handy Craftsman, allegedly a competitor of Diamond's in the home improvement and repair business. This acquisition is the subject of plaintiff's claim for usurpation of a corporate opportunity.

In early 1996, Clegg approached the Donald Griffin, then the Chief Executive Officer of Diamond, and asked Mr. Griffin to arrange for Diamond to buy Handy Craftsman from him. Mr. Griffin allegedly refused to do so at the price Mr. Clegg wanted. Shortly thereafter, Mr. Clegg allegedly removed Mr. Griffin from the Diamond board, and had him dismissed from his position as Chief Executive Officer.

On April 19, 1996, Diamond filed a Form S-1 with the United States Securities and Exchange Commission, registering a public offering of 3,420,000 shares of Diamond, including a secondary offering of 833,000 Diamond shares owned by Globe. Mr. Clegg allegedly did not seek or obtain the consent of the Globe board for the sale of Globe's 833,000 Diamond shares. These shares constitute one-third of Globe's holding in Diamond. Mr. Lefkowitz has allegedly objected to Globe's sale of Diamond stock.

In its S-1 dated April 19, 1996, Diamond states it is going to acquire all or substantially all of the assets of Handy for $2,000,000. As of this date, the purchase of Handy Craftmen's assets has not been completed.

On the basis of these allegations, plaintiff brings claims derivatively against Mr. Clegg for usurping a corporate opportunity in violation of a board decision when he purchased Handy Craftsman; acting without authority to sell Globe's Diamond holdings in the 1996 IPO, and violating his duty of loyalty by arranging for Diamond's purchase of Handy

Not Reported in A.2d                                                    Page 7
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

Craftsman's assets for a price plaintiff alleges is "grossly in excess of their true worth."

A. Ripeness

Defendant's motion to dismiss seeks to have claims related to Diamond's pending acquisition of Handy Craftsman dismissed as unripe. Defendant argues that no contract for sale of Handy Craftsman exists, and that consequently there is no transaction for this court to review. Plaintiffs response is that an agreement in principle has been reached, which imposes certain obligations on both parties to complete the negotiations, and that consequently the terms on which agreement have been reached thus far are reviewable by this court.

This aspect of the defendant's motion applies solely to the plaintiff's claims of breach of the fiduciary duty of loyalty asserted in relation to the sale of Handy Craftsman to Diamond. It is not a defense to plaintiff's claim of usurpation of corporate opportunity directed at Mr. Clegg's 1995 completed acquisition of Handy Craftsman.

*9 As to the proposed Diamond acquisition, the law of contracts has long reflected the interdependent nature of the specific terms of a contract under negotiation. Consequently, mere agreements to agree are unenforceable at common law. However, plaintiff asserts that agreements to negotiate in good faith may be enforced if all the material terms of the contract have been agreed to by the parties. [FN3] Plaintiff has alleged Diamond "is paying" $2,000,000 for Handy. Plaintiff does not allege that Diamond has executed a contract purchasing Handy or its assets, or that all material terms of such a contract have been agreed to by the relevant parties. Plaintiff only alleges Diamond has announced its intention to make such an acquisition at a particular price. Price is not the only material term in such a contract, and consequently no contractual obligation has been created. Diamond has taken no action this court can review in connection with its announced intention to acquire Handy. Consequently, all claims for breach of fiduciary duty in relation to Diamond's announced intention to acquire Handy are dismissed without prejudice.

FN3. Neither party seeks to show what the governing state law is for the alleged agreement in principle between Diamond and Handy. Fortunately, Delaware law, Indiana law (Diamond's principle place of business), Illinois law (Clegg's place of

residence), and New York law (a common jurisdiction specified in merger and acquisition contracts) all require the parties to have reached agreement on all material terms before an "agreement to agree" will be enforced. *VS & A Communications Partners, LP. v. Palmer Broadcasting L.P.,* Del. Ch., C.A. No. 12521, Allen, C. (July 14, 1992), Mem. Op. at 6; *Kinko's Graphics Corp. v. Townsend,* Ind. D., 803 F.Supp. 1450 (1992); *Wagner Excello Foods, Inc. v. Fearn Intl., Inc.,* Ill.App., 235 Ill.App.3d 224, 176 Ill.Dec. 258, 601 N.E.2d 956 (1992); *Teachers Ins. & Annuity Ass'n of America v. Butler,* S.D.N.Y., 626 F.Supp. 1229 (1986).

B. Demand Futility with Respect to the Claim Arising from Clegg's Acquisition of Handy Craftsman

The reasoning that has led me to excuse the demand requirement in relation to plaintiff's other claims on behalf of Diamond against Mr. Clegg applies with particular force to plaintiffs claim of usurpation of corporate opportunity. Here plaintiff alleges that Mr. Clegg has removed a director specifically over issues relating to Mr. Clegg's investment in Handy Craftsman. This easily casts a reasonable doubt on the ability of Mr. Klikus, a Diamond employee, and Mr. Pollock, who was engaged in a web of dealings with Mr. Clegg, to act independently in reviewing plaintiffs allegations regarding Mr. Clegg's alleged purchase of a competing business.

C. Demand Futility With Respect to the Claim Arising from Prospective Sale of Globe's Stock in Diamond

Plaintiff alleges that Clegg arranged for Globe to include a portion of its investment in Diamond in a forthcoming sale of Diamond stock to the public without Globe's board approving the transaction. However, plaintiffs do not specify how these alleged facts constitute a wrong. Plaintiffs generally allege self-dealing by Mr. Clegg and Mr. Pollock, but this sale to the public is not a self-dealing transaction. A reasonable inference would be that the claim here is that Mr. Clegg as an officer exceeded his authority by selling a substantial portion of Globe's assets without board approval. As a general matter, corporate officers have the "inherent" authority to engage in acts "arising in the usual and regular course of business" without obtaining board approval. *Lee v. Jenkins Brothers,* 268 F.2d 357 (2d Cir.1959), cert.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259
(Cite as: 1997 WL 208955 (Del.Ch.))

denied 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183, as cited in William L. Cary and Melvin Aron Eisenberg, CORPORATIONS: CASES AND MATERALS, 300 (7th Ed.1995). As is often the case in corporation law, there is no bright line distinguishing the ordinary business decision from the extraordinary one. Plaintiffs here allege that all of Globe's 1995 pre-tax earnings came from its stake in Diamond. Consequently, I find these allegations support a reasonable inference that the decision to sell a third of that stake in a public offering was an extraordinary one requiring board approval.

*10 However, plaintiffs have not alleged any facts suggesting this transaction was an interested one or that the board was in any way unable to review this particular action independently. Consequently, plaintiffs claim relating to the sale of Diamond stock is dismissed pursuant to Rule 23.1.

VIII. CONCLUSION

For the reasons set forth, the plaintiff's claims arising out of Diamond's efforts to purchase Handy Craftsman and Globe's efforts to sell a portion of its interest in Diamond are dismissed without prejudice. As to the remainder of the plaintiffs claims, the individual defendants' motion to dismiss is DENIED.

Not Reported in A.2d, 1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

LEXSEE

**CYNTHIA E. FUESTER, as the Ancillary Administratrix of the Estate of Walter E. Fuester, deceased; and CYNTHIA E. FUESTER, as widow of Walter E. Fuester, deceased; ROGER W. FUESTER, CAROLE FUESTER COVINGTON, and JOHN R. FUESTER, Plaintiffs, v. CONRAIL, a/k/a CONSOLIDATED RAIL CORPORATION, a Pennsylvania corporation; and AMTRAK, a/k/a NATIONAL RAILROAD PASSENGER CORPORATION, a corporation registered and existing under the laws for the District of Columbia, Defendants.**

91C-09-013

**SUPERIOR COURT OF DELAWARE, KENT**

*1994 Del. Super. LEXIS 472; 22 Media L. Rep. 2376*

**July 13, 1994, Submitted
September 16, 1994, Decided**

**SUBSEQUENT HISTORY:  [*1]**

Released for Publication by the Court September 7, 1994.

**DISPOSITION:**

Upon Motion to Quash Defendants' Subpoena Duces Tecum GRANTED

**COUNSEL:**

William D. Fletcher, Jr., Esq. and Noel E. Primos, Esq. of Schmittinger and Rodriguez, P.A., Dover, Delaware for the plaintiffs.

Somers S. Price, Jr., Esq. and Todd L. Goodman, Esq. of Potter Anderson & Corroon, Wilmington, Delaware for Consolidated Rail Corporation.

Richard G. Elliott, Jr., Esq. and John T. Dorsey, Esq. of Richards, Layton & Finger, Wilmington, Delaware for Chuck McGowan.

**JUDGES:** RIDGELY

**OPINIONBY:** HENRY duPONT RIDGELY

**OPINION:**

MEMORANDUM OPINION

RIDGELY, President Judge

This is an action against Consolidated Rail Corporation ("Conrail") and National Railroad Passenger Corporation ("Amtrak") to recover damages for wrongful death arising out of a fatal automobile-train collision which occurred on September 5, 1989. Defendants have served a subpoena on Chuck McGowan ("McGowan"), a news photographer employed by The News Journal Company ("The News Journal"), seeking reprints of photographs taken of the accident scene. McGowan moves to quash this subpoena asserting the photographs are protected by the reporter's privilege under the First Amendment to the United States Constitution [*2] and Article I, Section 5 of the Constitution of the State of Delaware. For the reasons that follow, the motion to quash is granted.

**I. BACKGROUND**

Plaintiffs allege in their complaint that on September 5, 1989 an Amtrak owned and operated locomotive struck an automobile driven by Walter E. Fuester. Mr. Fuester subsequently died from the injuries sustained in the collision.

One of the primary issues at trial will be the speed of the locomotive at the time of the accident. Plaintiffs allege that Amtrak was negligent because the train was traveling above the thirty mile per hour limit when the collision occurred. In support of this claim, Plaintiffs contend the stopping distance of the locomotive reflects that the train was speeding.

On the day of the accident, McGowan, a photographer employed by the News Journal, took photographs of the accident scene shortly after the

Case 1:06-cv-00319-JJF    Document 58    Filed 10/16/2006    Page 14 of 23

Page 2

1994 Del. Super. LEXIS 472, *; 22 Media L. Rep. 2376

accident occurred, including photographs of the location where the locomotive and the vehicle stopped after the collision. The News Journal published one of the photographs. The camera angle of the published photograph was from in front of the train looking back toward the crossing. The remaining photographs have not [*3] been published or provided to a third-party. No photographs of the final resting point of the train and the automobile were taken by anyone else.

Defendants contacted McGowan regarding his photograph appearing in the News Journal. During this telephone call, McGowan told the Defendants he possessed other photographs of the accident scene. McGowan refused to provide any of his photographs to the Defendants. Subsequently, on January 10, 1994, the Defendants issued a subpoena duces tecum seeking production of all of McGowan's photographs. The News Journal and McGowan refused to produce the photographs and filed this motion to quash the subpoena duces tecum.

## II. CONTENTIONS OF THE PARTIES

McGowan argues that the photographs are protected by a qualified reporter's privilege and that Defendants have failed to prove the unpublished photographs are material, relevant and necessary to their defense. McGowan also contends Defendants have failed to prove the information sought from the photos is unavailable from other sources.

Defendants acknowledge the existence of the qualified privilege but argue the photographs will permit a determination of stopping distance, which will facilitate cross [*4] examination of the Plaintiffs' experts. Defendants argue no other evidence exists to allow an accurate determination of stopping distance since no other photographs were taken and only a rough approximation appears in the police report. Defendants contend since the photographs are the only accurate evidence of the resting point of the locomotive, the photographs are critical to their defense.

## III. ANALYSIS

The First Amendment to the United States Constitution provides:

Congress shall make no law . . . abridging the freedom of speech, or of the press

The First Amendment is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut, 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900 (1940).*

Article I, Section 5 of the Constitution of the State of Delaware provides:

The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty.

The free press provision of the Constitution of the State of Delaware has the same scope as the First Amendment. *In re Opinion of the Justices, Del. Supr., 324 A.2d 211, 213 (1974).* [*5] Thus, any privileges created from the text or policies of the First Amendment will be included in the scope of the free press provision of the Delaware Constitution.

Based upon policies deeply rooted in the First Amendment, a reporter has a qualified privilege to refuse to disclose unpublished material in his possession. *See United States v. Cuthbertson, 630 F.2d 139, 147 (3d Cir. 1980), cert. denied, 449 U.S. 1126, 67 L. Ed. 2d 113, 101 S. Ct. 945 (1981); State v. McBride,* Del. Super., 1K80-05-0058, *et al.,* Wright, J. (May 6, 1981) at 2, *aff'd on other grounds, Del. Supr., 477 A.2d 174 (1984).* This qualified privilege applies in civil and criminal cases. *See Riley v. City of Chester, 612 F.2d 708, 715 (3d Cir. 1979).* Cameramen, including photographers, may assert this First Amendment privilege. *Solargen Elec. Motor Car Corp. v. American Motors Corp., 506 F. Supp. 546, 552 (N.D.N.Y. 1981).*

The United States Court of Appeals for the Third Circuit has fashioned a set of general principles to test [*6] whether a reporter can be compelled to disclose material protected by this qualified privilege:

In striking the delicate balance between the assertion of the privilege one the one hand and the interest of. . . civil litigants seeking the information the materiality, relevance and necessity of the information sought must be shown.

*United States v. Criden, 633 F.2d 346, 358 (3d Cir. 1980)* (citing *Riley, 612 F.2d at 716), cert. denied, 449 U.S. 1113 (1981).* In examining the balance of interests between compelling disclosure and allowing the material to remain privileged, the *Riley* court also isolated three factors the moving party must prove before production is warranted. *Criden, 633 F.2d at 358-59* (citing *Riley, 612 F.2d at 717).* First, the moving party must offer proof that an attempt was made to obtain the information from other sources. *Id.* Second, the movant must prove the

Case 1:06-cv-00319-JJF    Document 58    Filed 10/16/2006    Page 15 of 23

Page 3

1994 Del. Super. LEXIS 472, *; 22 Media L. Rep. 2376

only access to the information is through the journalist and the requested material. *Id.* Third, the moving party must demonstrate the information [*7] is crucial to the claim. *Id.* In this instance, because Defendants have failed to adequately prove the information is necessary to their defense, an examination of all of these factors is unnecessary.

Defendants argue the photos are material, relevant and necessary to establish the speed of the train at the time of the accident. Plaintiffs allege the train was traveling above the speed limit of thirty miles per hour when the collision occurred. The Plaintiffs' experts have estimated the train was traveling between thirty and forty-five miles per hour based upon the reported stopping distance of the locomotive. Defendants contend that the only evidence of the stopping distance is the estimate contained in the police report. Thus, Defendants argue the photographs are material, relevant and necessary to determine the validity of Plaintiffs' claims concerning stopping distance.

The crux of Plaintiffs' claim is that the locomotive was traveling at an excessive speed at the time of the collision. However, defendants have failed to demonstrate that the photographs they seek will show the speed of the train at the time of the accident. They admit that a train does not leave skid marks [*8] on the track, thus the photographs will not show when the locomotive

engineer first applied the train's brakes. Defendants have not shown through expert testimony or otherwise how the photographs will refute the contentions of the plaintiffs.

Furthermore, Defendants acknowledge they have access to the precise speed of the locomotive at the time of impact from a recording device located on board the locomotive. The device recorded the speed of the train at all times, including the speed of the train at the time of impact. It was recovered intact after the accident, and Defendants admit the instrument was calibrated to establish the exact speed of the train at impact.

## IV. CONCLUSION

Defendants have failed to demonstrate that the photographs of the news reporter in issue are material, relevant and necessary to their defense. On the facts presented, the reporters qualified privilege under the First Amendment of the United States Constitution and Article I, Section 5 of the Delaware Constitution to refuse the disclosure of unpublished material in his possession is sustained. Consequently, McGowan's motion to quash the subpoena duces tecum is **GRANTED.**

**IT IS SO ORDERED.**

Henry [*9] duPont Ridgely, President Judge

# EXHIBIT C

*Westlaw.*

1988 WL 52833
Not Reported in F.Supp., 1988 WL 52833 (S.D.N.Y.)
**(Cite as: 1988 WL 52833 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
James D. MORROW, Plaintiff,
v.
USA TODAY NEWSPAPER, et al., Defendant.
**No. 88 CIV 1976.**

May 16, 1988.

*OPINION*

GRIESA, District Judge.

**\*1** This is a *pro se* action. Plaintiff James David Morrow is presently incarcerated in an Ohio state prison. Named as defendants are the "USA Today Newspaper," Allen Neuharth, and Mercedes A. Smith. Plaintiff alleges that Neuharth is the Chairman of USA Today, and that Smith is employed in the "Classified Customer Service Department."

While *pro se* pleadings must of course be read liberally, plaintiff's allegations here are clearly without merit, and should be summarily dismissed.

Plaintiff, who describes himself as "illegally imprisoned ..." sought to purchase a classified advertisement in USA Today. Pursuant to their policy of editing, or rejecting, certain advertisements, USA declined to print plaintiff's submission. Plaintiff then filed this lawsuit, alleging that this rejection violates his First Amendment rights to free speech.

Plaintiff seeks one million dollars in "compensatory and exemplary" damages, five million dollars in punitive damages, as well as declaratory judgment that defendants actions are unconstitutional.

On May 10, 1988, plaintiff submitted a motion requesting a temporary restraining order enjoining defendants from continuing to refuse to run his advertisement.

The First Amendment places no limit on private conduct, absent a showing of state action. A private newspaper's refusal to carry a classified advertisement manifests no element of state action, and is thus not prohibited under the First

Amendment. *See Resident Participation of Denver, Inc. v. Love,* 322 F.Supp. 1100 (D.Colo.1971).

Because Morrow' claim is patently untenable, his action should be summarily dismissed. It would be a waste of the resources of the court, as well as an unjust imposition on defendants, to allow this matter to proceed.

SO ORDERED.

Not Reported in F.Supp., 1988 WL 52833 (S.D.N.Y.)

END OF DOCUMENT

# EXHIBIT D

·LEXSEE

**JOSEPH H TSAU, Plaintiff, v. NATIONAL SCIENCE FOUNDATION, U.S. DEPARTMENT OF EDUCATION, UNIVERSITY OF CHICAGO, AMERICAN PHYSICS SOCIETY, SCIENTIFIC AMERICAN, INC., Defendants.**

**Case No. 00 CV 6**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2000 U.S. Dist. LEXIS 14580*

**September 28, 2000, Decided**
**September 28, 2000, Filed for Docketing; September 29, 2000, Docketed**

**SUBSEQUENT HISTORY:** Related proceeding at *Tsau v. NSF, 2004 U.S. Dist. LEXIS 25949* (N.D. Ill., Dec. 27, 2004).

**DISPOSITION:** [*1] Court concluded that plaintiff's complaint lacks federal subject matter and fails to state a claim on which relief granted. Defendants' motions to dismiss [5-1,21-1,39-1] granted. Case terminated.

**COUNSEL:** JOSEPH H TSAU, plaintiff, Pro se, Libertyville, IL.

For UNIVERSITY OF CHICAGO, defendant: Patricia Therese Bergeson, University of Chicago, Office of Legal Counsel, Chicago, IL.

For AMERICAN PHYSICS SOCIETY, defendant: Robert A. Filpi, Paul F. Stack, Stack, Filipi & Kakacek, Chicago, IL.

For SCIENTIFIC AMERICAN, INC., defendant: Vincent Thomas Borst, Kenneth D. Peters, Askounis & Borst, Chicago, IL.

**JUDGES:** HON. RONALD A. GUZMAN, United States Judge.

**OPINIONBY:** RONALD A. GUZMAN

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Pending are defendants National Science Foundation, et. al's motions to dismiss Plaintiff's complaint pursuant to Fed. R's. Civ. Proc. 12(b)(1) and 12(b)(6). For the reasons set forth below these motions are all granted (# # 5-1, 21-1, and 39-1).

### BACKGROUND FACTS

Plaintiff, Joseph Tsau, filed this handwritten pro-se complaint against defendants, National Science Foundation ("NSF"), United States Department of Education, University of Chicago, American [*2] Physics Society ("APS"), and Scientific America, Inc. ("SA") alleging violations of § 1 of the Sherman Act, the First Amendment to the United States Constitution, and various other state law claims. n1 Plaintiff's supplement to his complaint further alleges a *Bivens* claim, a Federal Torts Act claim, and a claim under the Civil Rights Act of 1964. On April 20, 2000 the Chicago Tribune and ABC, Inc. were voluntarily dismissed by Plaintiff.

> n1 Plaintiff's complaint is inartfully drafted, alleging, generally, that all of the defendants have committed the numerous harmful acts in furtherance of a monopoly.

Plaintiff, Joseph Tsau, alleges the following facts in his complaint and his supplement which, for the purposes of this motion are accepted as true. Plaintiff developed a new gravity theory, the Theory of the Universe ("TOU"), to interpret gravity, light, and the universe. His gravity theory is based on classical (Newtonian) physics and he believes it is the most important scientific theory ever developed. [*3] Plaintiff's TOU directly contradicts the theories of modern physics which are currently embraced by today's scientific community. As a result, the book Plaintiff published heralding his TOU and the attempts he has made to get his TOU published in peer reviewed physic's journals has met with neither commercial nor

critical success. Plaintiff blames the lack of interest in his TOU on corrupted physical science societies, education institutions, science magazines, scientific funding foundations, and the United States Department of Education.

Plaintiff alleges that these organizations discriminate against any new theories that disagree with modern physics in order to create a worldwide monopoly for the theories of modern physics. Plaintiff reasons that these organizations have created such a monopoly in order to protect the vested financial interests that the leaders of these organizations have in the theories of modern physics.

Plaintiff filed this action against the University of Chicago because it allegedly teaches the theory of modern physics as the only correct physical science theory and is a suitable representative of educational institutions throughout the world. The University [*4] of Chicago's decision to only teach about the theories of modern physics has allegedly led to the physics science community's failure to support Plaintiff's TOU. Plaintiff filed this action against SA because a magazine it publishes called *Scientific America* refused to publish Plaintiff's TOU for peer review. The Plaintiff chose Scientific America to represent publishers of all science magazines which he alleges are corrupted.

Plaintiff filed this action against the United States Department of Education because the theories of modern physics are allegedly the only physical science theories taught in the public school system and allegedly brainwash students into believing that modern physics is the only correct theory. The United States Department of Education's alleged support of public school curriculum that only allegedly teaches the theories of modern physics has led to the dismissive response that Plaintiff's TOU has received from the physical science community. Finally, Plaintiff filed this action against the NSF and the APS for refusing to publish or fund his TOU. The Plaintiff claims that NSF and APS used unfair and invalid methods to evaluate his TOU which violated his [*5] right to have his TOU published and his TOU research program funded.

Plaintiff seeks $ 20 million dollars in punitive and compensatory damages from all defendants for: 1) the emotional distress he has suffered as a result of being rejected and treated unfairly by the defendants and 2) the financial losses he has incurred as a result of his TOU being neither published nor accepted by the scientific community at large. Plaintiff also requests that this court: 1) enjoin all defendants from engaging in corruptive practices; 2) order all defendants to treat his TOU as an important new theory; and 3) order the U.S. Department of Education and National Science Foundation to come

up with a plan to fund a scientific study evaluating Plaintiff's TOU versus the theories of modern physics.

## STANDARD OF REVIEW

In reviewing a motion to dismiss, we review all facts alleged in the complaint and inferences reasonably drawn therefrom in the light most favorable to the plaintiff. *See Caldwell v. City of Elwood, 959 F.2d 670, 671 (7th Cir. 1992).* Dismissal is warranted only if the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. [*6] *See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1975).* The standard of review for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depends upon the purpose of the motion. *See Freiburger v. Emery Air Charter, Inc., 795 F. Supp. 253, 256 (N.D. Ill. 1992).* If the motion challenges the sufficiency of the subject-matter jurisdiction allegations, the Court accepts as true all well-plead factual allegations and draws all reasonable inferences in the plaintiff's favor. *United Transp. Union v. Gateway, W. Ry. Co., 78 F.3d 1208, 1210 (7th Cir. 1996 (citing Rueth v. EPA, 13 F.3d 227, 229 (7th Cir. 1993)).*

A motion to dismiss under 12(b)(6) does not test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim for which relief may be granted. *Pickrel v. City of Springfield, Ill. 45 F.3d 1115, 1118 (7th Cir. 1995).* The court accepts as true all of plaintiff's well-pleaded factual allegations, and draws all reasonable inferences in the plaintiff's favor. *Id.* Thus, the court will dismiss a complaint under Rule [*7] 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ledford v. Sullivan, 105 F.3d 354, 357 (7th Cir. 1997)(quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984)).* Nevertheless, the court need "not strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." *Coates v. Illinois State Bd. of Ed., 559 F.2d 445, 447 (7th Cir. 1977).* Because Plaintiff is proceeding pro se, the Court has a special responsibility to construe his complaint liberally and to "take appropriate measures to permit the adjudication of pro se claims on the merits, rather than to order their dismissal on technical grounds." *Donald v. Cook County Sheriff's Dept., 95 F.3d 548, 555 (7th Cir. 1996).*

## DISCUSSION

### I. Plaintiff's Sherman Act Claim

Section 1 of the Sherman Act states in pertinent part: "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign

nations, is [*8] declared to be illegal ...." *15 U.S.C. § 1* (1977). Plaintiff cannot rely on a mere refusal to deal. In order to state a claim under § 1 of the Sherman Act, *15 U.S.C. § 1*(1977), Plaintiff must show "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *MCM Partners, Inc., v. Andrews-Bartlett & Assoc., 62 F.3d 967 at 972 n. 7* (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc., 8 F.3d 1217, 1220 (7th Cir. 1993)).*

Plaintiff's allegation that Defendants have paid no heed to his novel TOU is insufficient as a matter of law to set forth a claim for violation of the Sherman Act. Plaintiff's complaint fails to set forth any facts to support the elements of a Section one violation of the Sherman Act. Plaintiff has alleged the basis upon which he selected the Defendants to be as follows: the University of Chicago because it allegedly teaches the theory of modern physics as the only correct physical science theory and the Department of Education because theories of modern physics are the only physical science theories taught, [*9] fails to raise a reasonable inference that these Defendants, or the other Defendants for that matter, agreed to deal exclusively with each other and such agreement was motivated by their desire to restrain trade in the market. More importantly, the University of Chicago and the Department of Education have been sued as representatives of educational institutions only and there is nothing to be found in the complaint about what legal wrong they have committed. Furthermore, in the Court's view, Plaintiff's allegations entirely fail to suggest a meeting of the minds among the Defendants. Although having Plaintiff's ideas ignored is unfortunate for Plaintiff, it is not an antitrust violation for purposes of the Sherman Act. We do not equate the rejection of plaintiff's scientific theories with a restraint of trade or commerce among the states.

As to Plaintiff's allegations against Defendants NSF, APS and SA's for failing to publish or fund his theory, they too fail to state a claim under Section 1 of the Sherman Act. Instructive is *Lawline v. American Bar Association, et al. 956 F.2d 1378, 1382 (7th Cir. 1982),* in which the Court considered and rejected whether certain [*10] ethical opinions by the defendant bar associations were anticompetitive. The Court reiterated the Seventh Circuit's position "when a trade association provides information" (by giving its approval in that case, its disapproval in this case) "but does not constrain others to follow its recommendations, it does not violate the antitrust laws." *Schachar v. American Academy of Ophthalmology, Inc,. 870 F.2d 397, 399 (7th Cir. 1989)(citing Consolidated Metal Products, Inc. v. American Petroleum Institute, 846 F.2d 284 (5th Cir. 1988)).* This is so even where the organization at issue

has a towering reputation. *Id.* Thus, Plaintiff has failed to state a cognizable Sherman Act claim.

## II. Plaintiff's First Amendment Claim

As to Plaintiff's First Amendment claim it is undisputed that Plaintiff has already published a book about his TOU without any interference by any of the defendants. It can be purchased through the Internet from Joe T & Company and at Barnes & Noble. The fact that NSF, APS and SA refused to publish his particular work is insufficient as a matter of law to set forth a claim for violation of the First Amendment. As the Supreme [*11] Court stated in *Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 117, 93 S. Ct. 2080, 2094, 36 L. Ed. 2d 772 (1973)* "the power of a privately owned newspaper to advance its own political, social, and economic views is bounded by only two factors: first, the acceptance of a sufficient number of readers--and hence advertisers--to assure financial success; and, second, the journalistic integrity of its editors and publishers." Likewise, in *Avins v. Rutgers, the State University of New Jersey, 385 F.2d 151 (3rd Cir. 1967), cert. denied 390 U.S. 920, 88 S. Ct. 855, 19 L. Ed. 2d 982 (1968),* an action whose facts are very close to those at bar, the Court of Appeals upheld the right of the Rutgers University Law Review to refuse to publish an article critical of the Supreme Court's decision in a landmark case. Plaintiff's attempt to distinguish the above case law, arguing that it does not apply to scientific magazines, is insufficient as a matter of law.

Nor does Plaintiff offer any authority for his bald statement that "scientific magazines are still obligated to have an effective quality-control method [*12] to make sure that the public is protected from getting fake and defective scientific magazine products. The Supreme Court has recognized that in striking a balance between the desire for vigorous public debate and the fear of governmental intrusion into that debate, the First Amendment purposely leaves open the possibility that all viewpoints may not be heard:

> The balance struck by the First Amendment with respect to the press is that society must take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed. The press would be unlicenced because, in Jefferson's words, '(w)here the press is free, and every man able to read, all is safe.'[citation omitted]. Any other accommodation-any other system that would supplant private control of the

press with the heavy hand of government intrusion-would make the government the censor of what the people may read and know.

*Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 260, 94 S. Ct. 2831, 2841, 41 L. Ed. 2d 730 (1974).*

There is no question that Plaintiff has the right under the First Amendment to publish his theories free [*13] of governmental restraint. Furthermore, under well settled law, the government is not required to subsidize or help publish the ideas of a private party about physics or any other subject.    *Regan v. Taxation With Representation of Washington, 461 U.S. 540, 541-50, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983); Advocates for Arts v. Thomson, 532 F.2d 792, 795-97 (1st Cir. 1976)* and *Avins v. Rutgers, State University of N.J., 385 F.2d 151, 152-54 (3rd Cir. 1967).* As was explained by the court in *Regan*, although a private individual may not have as much money as he wants, and therefore may not be able to disseminate his ideas as much as he would like, a private individual has no right to compel the government to fund the development or publication of his ideas with taxpayer dollars. *Regan, 461 U.S. at 550.*

### III. Plaintiff's *Biven's* Claim

In Plaintiff's response to Defendants' motions to dismiss Plaintiff now claims that he has also set forth a *Bivens* claim against the federal defendants. Plaintiff's complaint fails to state a claim under *Bivens* because the Supreme Court has specifically declined to imply [*14] a *Bivens* action against federal agencies. *See FDIC v. Meyer, 510 U.S. 471, 484-86, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994).*

### IV. Plaintiff's Claim under the FTCA

Plaintiff's claim under the Federal Torts Claim Act, *28 U.S.C. § § 1346(b), 2671 et seq.* also fails to state a claim. Under the FTCA Plaintiffs are required to allege exhaustion of administrative remedies in accordance with *28 U.S.C. § 2675(a)* as a jurisdictional prerequisite. *See McNeil v. United States, 508 U.S. 106, 113, 113 S. Ct. 1980, 124 L. Ed. 2d 21 (1993)* and *Sullivan v. United States, 21 F.3d 198, 206 (7th Cir. 1994).* Furthermore, the federal defendants are not proper defendants for purposes of the FTCA. *See Hughes v. U.S., 701 F.2d 56, 58 (7th Cir. 1982)* and *McMasters v. U.S., 2000 U.S. Dist. LEXIS 5757, *15, 2000 WL 336549, *5 (N.D. Ill. 2000).*

### V. Plaintiff's Claim under the Civil Rights Act of 1964

Plaintiff's claim under the Civil Rights Act of 1964 also fails to state a claim. The Civil Rights Act of 1964 prohibits discrimination in employment because race, religion, sex or national [*15] origin. *42 U.S.C.A. § 2000e-2.* Plaintiff sets forth no facts to bring his claim under this statute.

### CONCLUSION

After a careful and liberal reading, the Court concludes that plaintiff's complaint lacks federal subject matter and fails to state a claim on which relief could be granted. For the foregoing reasons, defendants' motions to dismiss are granted (# # 5-1, 21-1, and 39-1). This case is terminated. This is a final and appealable order.

### SO ORDERED

**ENTERED: 9/28/00**

**HON. RONALD A. GUZMAN**

**United States Judge**

## CERTIFICATE OF SERVICE

I, Daniel V. Folt, do hereby certify that on October 16, 2006, I caused copies of the foregoing document to be served on the following parties in the manner indicated below:

Via Federal Express (signature required):

Christopher Langdon
1835 Edwin Blvd.
Winter Park, FL 32789

Via e-filing:

Kurt Michael Heyman, Esq.
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

/s/ Daniel V. Folt (Del. Bar No. 3143)